IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

**AUG 2 6** 2002

Michael N. Milby
Clerk of Court

JESUS LEDESMA AGUILAR, §
    Petitioner, §
        §
v. §   Civil Action No.  B-01-195
        §  **CAPITAL LITIGANT**
JANIE COCKRELL, Director, §
Texas Department of Criminal Justice, §
Institutional Division, §
    Respondent §

### RESPONDENT COCKRELL'S
### ANSWER AND MOTION FOR SUMMARY JUDGMENT
### WITH BRIEF IN SUPPORT

   Petitioner Jesus Ledesma Aguilar ("Aguilar") was properly convicted and sentenced

to die for murdering Leonardo Chavez, III during the same criminal transaction in which he

killed Leonardo's wife, Annette Esparza Chavez, in June 1995.  In his petition for writ of

habeas corpus, filed pursuant to 28 U.S.C. §§ 2241 and 2254, Aguilar  challenges the

constitutional soundness of his presumptively valid state capital murder conviction and death

sentence. However, Aguilar fails to overcome the procedural bars to reviewing his defaulted

claims in this Court; he fails to demonstrate that, where applicable, the state court's

adjudication of his exhausted claims was objectively unreasonable; and he fails to

demonstrate that his claims merit relief or that relief is not precluded under the non-

retroactivity doctrine announced in *Teague v. Lane*, 489 U.S. 288, 301 (1989). Therefore,

Respondent Janie Cockrell ("the Director") asks this Court to deny all habeas relief and grant

summary judgment in her favor.

## AGUILAR'S ALLEGATIONS

The Director understands Aguilar to raise the following twenty-five grounds for federal habeas relief:

1. that Aguilar was repeatedly displayed before the jury in shackles and handcuffs, despite his protests;

2. that the State made sidebar remarks during trial commenting on the failure of witnesses to appear as a result of threats allegedly made by Aguilar;

3. that the trial court failed to appoint a pathologist and a ballistics expert to assist the defense at trial;

4. that the trial court failed to grant a mistrial or inquire into jurors' knowledge and perception of an incident reported in the newspapers concerning a fight between Aguilar and a potential witness;

5. that there was no evidence supporting the finding that Aguilar was guilty as a party for the death of one of the victims, Leonardo ("Leo") Chavez;

6. that Aguilar's right to due process was violated when he was found guilty as a party;

7. that Aguilar's right to due process was violated because the trial court failed to include a lesser included charge of murder in the court's charge to the jury;

8. that the trial court erred in not granting a mistrial based on alleged jury tampering by a spectator of the trial;

9. that the trial court erred by failing to require one of the State's experts to reveal his sources after claiming that Aguilar was a member of the Texas Syndicate prison gang;

10.     that Aguilar's First Amendment rights were violated during the punishment phase by the introduction of evidence of Aguilar's membership in the Texas Syndicate because the evidence was not relevant to the murders for which he was on trial;

11.     that Aguilar's rights under Article I, Section 8 of the Texas Constitution were violated during the punishment phase by the introduction of evidence of Aguilar's membership in the Texas Syndicate which was not relevant to the murders for which he was on trial;

12.     that Aguilar's right not to incriminate himself under Article I, Section 10 of the Texas Constitution was violated;

13.     that Aguilar's right to due process was violated by Texas' alleged failure to enforce its own constitution;

14.     that the Texas capital murder scheme is unconstitutional, in that the legislature has not defined "reasonable expectation" and "probability" in the punishment phase special issues;

15.     that Aguilar's right to due process was denied by the trial court's failure to provide a definition for "deliberately" in the punishment phase special issues;

16.     that Aguilar was denied the right to effective assistance of counsel at trial by counsel's failure to limit the introduction of evidence of Aguilar's gang membership;

17.     that Aguilar was denied the right to effective assistance of counsel at trial by counsel's failure to request a limiting instruction regarding the jury's consideration of evidence of Aguilar's gang membership;

18.     that Aguilar was denied the right to effective assistance on appeal by appellate counsel's failure to raise certain constitutional issues on direct appeal;

19.     that Aguilar was denied effective assistance of counsel at trial by counsel's failure to request a jury charge on the "independent impulse" doctrine;

20. that Aguilar's right to due process was denied by the State knowingly using false testimony from the co-defendant at trial;

21. that Aguilar's right to due process was denied by the trial court's not allowing him to be present at the hearing on his motion for new trial;

22. that the identification line-up violated Aguilar's rights under *Simmons v. South Carolina,* 512 U.S. 154 (1994), because Aguilar was the only individual in a white jumpsuit;

23. that Aguilar's right to due process was denied when the State's witness Perez, in concert with the State, allegedly gave a deliberately false or misleading answer regarding the identification line-up;

24. that Aguilar was denied the right to meaningful appellate review when the Texas Court of Criminal Appeals allegedly did not read the record on direct appeal, but adopted the State's summary of the testimony of the witnesses in evaluating the legal sufficiency of the evidence; and

25. that Aguilar's right to due process was violated because his direct appeal was heard by the Texas Court of Criminal Appeals, an allegedly biased court.

*See* Aguilar's Post Conviction Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. Sec. 2254 ("Petition") at 9-17.

## EXHAUSTION OF STATE REMEDIES

Although Aguilar lists four claims as being unexhausted (claims 22-25 above), *see* Petition at 17-18, the record reflects that he raised the claims when he returned to state court and filed his successive state writ petition. *See* 2nd Writ at 30-38, 39-47, 14-18.[1] The

---

[1] Aguilar attached a copy of his successive state writ petition to his federal writ; however, it appears the page numbering of Aguilar's attached copy does not match the page numbering of the writ contained in the state court records, although the arguments do not appear to have any deletions or additions. When referring to Aguilar's successive writ, the Director will thus

-4-

Director thus believes that Aguilar has sufficiently exhausted his state remedies with regard to the claims raised in his original habeas petition filed in November 2001. However, as explained below, even though the claims are now exhausted, Aguilar fails to overcome the State court's application of an independent and adequate procedural bar. The Director does not believe Rivera has exhausted any of the allegations raised in his supplemental federal writ ("Supp. Petition") filed in March 2002. Supp. Petition at 1-4.[2] As detailed below, because Aguilar failed to present his allegations to the state courts, the claim is unexhausted and procedurally defaulted.

### STATEMENT OF THE CASE

Aguilar was convicted of capital murder in April 1996 for the deaths of Leonardo and Annette Chavez which occurred during the same criminal transaction in June 1996. I Tr 3; I-B Tr 848-53; 23 SR 976-78.[3] On May 2, 1996, a Cameron County jury returned affirmative answers to the two special issues regarding future dangerousness and party liability, and answered negatively the special issue regarding mitigation. I-B Tr 848-53; 26

---

reference the page numbering in the official petition in the state court records.

[2]    Although Aguilar states that he is supplementing "Grounds For Relief No. 8" and he provides new factual and legal arguments for ineffective assistance of appellate counsel, the eighth claim in his writ petition has nothing to do with ineffective assistance. Petition at 11-12. Instead, Aguilar's eighteenth claim concerns appellate counsel ineffectiveness. *Id.* at 13.

[3]    "Tr" refers to the transcript of pleadings and documents filed with the court during trial, preceded by volume and followed by page reference. "SR" refers to the state court record of the statement of facts of transcribed trial and punishment proceedings, preceded by volume and followed by page reference.

SR 351-53. In accordance with Texas law, on May 7, 1996, the trial court formally sentenced Aguilar to death. 27 SR 3-4. Aguilar moved for a new trial raising sixteen points of error and, after a hearing on July 26, 1996 which Aguilar attended, the trial court denied the request. I-B Tr 870-73; 28 SR 3-8.[4]

The Court of Criminal Appeals originally affirmed Aguilar's conviction and sentence on June 18, 1997; however, the court subsequently withdrew the opinion and issued an opinion in its place also affirming on October 29, 1997. *Aguilar v. State*, No. 72,470 (Tex. Crim. App. 1997) (Opinion on Court's Motion for Rehearing). The Texas court denied Aguilar's motion for rehearing on December 10, 1997, and the United States Supreme Court denied certiorari review on May 26, 1998. *Aguilar v. Texas*, 523 U.S. 1139 (1998).

On September 9, 1997, Aguilar filed an application for state writ of habeas corpus raising twenty-one grounds for relief supported by twenty-two exhibits. SHTr 1, 6-46, 49-179.[5] The state habeas court issued findings of fact and conclusions of law on December 3, 1997, and recommended denying all relief. Supp. SHTr 5, 1-5. Thereafter, the Court of Criminal Appeals reviewed the record, found the habeas court's findings supported by the record and, upon such basis, denied relief. *Ex parte Aguilar*, No. 36,142-01 at unpublished

---

[4]    In his twenty-first claim to this Court, Aguilar asserts that his right to due process was denied by the trial court's not allowing him to be present at the hearing on his motion for new trial. Petition at 14. The record of the new trial hearing clearly reflects otherwise. *See, e.g.*, 28 SR 5-8. (testimony from Aguilar).

[5]    "SHTr" refers to the original state habeas transcript, followed by page reference, whereas "Supp. SHTr" refers to the one volume of the supplemental writ transcript.

order of June 10, 1998.

Aguilar filed his original federal writ petition in this Court on May 28, 1999, and his first amended writ petition on June 9, 1999. *Aguilar v. Johnson*, Civil Action No. B-99-044 (S.D. Tex.) at Docket Entries ("DE") 11 & 9. The Director filed an answer and motion for summary judgment in October 1999. *See id.* at DE 15. On June 15, 2000, an evidentiary hearing was held at which time Aguilar asked the Court to dismiss his habeas petition so that he could return to State court to raise his unexhausted claims. *Id.* at DE 43. The Director agreed to the dismissal, and agreed not to assert a statute of limitations defense provided Aguilar would return to federal court within sixty days, assuming the Court of Criminal Appeals dismissed Aguilar's successive state habeas petition. *See id.* That same day a Joint Motion to Dismiss the Petition Without Prejudice was filed, which the Court granted on May 20, 2000, providing Aguilar sixty days from the date of dismissal to file his successive state writ and then return to federal court to re-file a federal habeas petition, if necessary. *Id.* at DE 42 & 46.

On August 24, 2000, Aguilar filed a successive state habeas application raising the first twenty-four claims he currently raises to this Court. 2nd Writ 50-51, 21, 30-38.[6] The Court of Criminal Appeals dismissed the application as an abuse of the writ pursuant to Tex. Code Crim. Proc. 11.071 5(a) (Vernon's Supp. 1995). *Id.* at cover; *Ex parte Aguilar*, No.

---

[6]     "2nd Writ" refers to the state habeas transcript from Aguilar's successive writ proceedings, followed by page reference.

36,142-02 at unpublished Order of November 21, 2001.

Thereafter, on November 26, 2001, Aguilar filed his federal habeas petition, which was followed by a supplemental petition on March 4, 2002.[7] This response follows.

## STATEMENT OF MATERIAL FACTS

### I.    Facts of the Crime

On direct appeal, the Court of Criminal Appeals accurately summarized the facts of Aguilar's commission of capital murder as follows:

> The record reveals that [Aguilar] and Rick Esparza had known each other since they were teenagers. After losing touch for a while, the two got reacquainted in the early nineties and Rick helped [Aguilar] get a job with him in the Mississippi cotton gins.[8] In November 1994, [Aguilar] approached Rick with the idea of transporting marijuana from their homes in the Texas valley to Mississippi. Apparently having no car of his own, [Aguilar] specifically needed Rick's help in providing transportation. Shortly after [Aguilar] and Rick began their "business," Rick was approached by another supplier to take marijuana to Mississippi, which mission Rick undertook without [Aguilar]. While Rick and his wife were in Mississippi on this new business, [Aguilar] appeared at Rick's motel room and accused Rick of using his ([Aguilar]'s) connection to sell drugs behind his back. Rick assured him that he had his own connection and the three of them subsequently returned to Texas together.

---

[7]    Undersigned counsel has a notation in her file indicating that on August 24, 2000, when the successive state writ was filed, only four days remained on the sixty-day period for Aguilar to re-file a federal writ petition. When Aguilar's state writ was dismissed on November 21, 2001, the four days ran and expired on November 25th. However, not counting the date the Court of Criminal Appeals actually ruled, Aguilar's current writ petition -- filed November 26th -- appears to be timely filed.

[8]    The cotton gin jobs were seasonal between September and December of each year. During the season, Rick and [Aguilar] would travel to Mississippi from their Texas homes and stay at a house near the gin.

In January 1995, Rick and [Aguilar] each took ten pounds of marijuana to Mississippi.[9] Because it took some time for them to sell off their respective stashes, Rick became nervous that the Mississippi police would become suspicious of them due to the Texas license plates on Rick's car. Thus, Rick took the remainder of his ten pound share to his connection and told him he would return later for the money. Rick talked a reluctant [Aguilar] into doing the same with his connection. [Aguilar] and Rick then drove to Dallas and dropped their wives off at Rick's sister-in-law's house and returned to Mississippi. Rick retrieved his money from his connection, but when [Aguilar] attempted to retrieve what was owed to him, his connection told him that it had been stolen.[10] [Aguilar] partly blamed Rick for his loss for making him leave his merchandise. When the foursome eventually returned to Harlingen, Rick decided he would not make any more trips to Mississippi with [Aguilar]. However, Rick did continue to make his own excursions.

Rick testified at trial that [Aguilar] would occasionally drop by Rick's trailer and accuse him of running drugs without him and told Rick that he owed him for getting him into the business.[11] In March 1995, [Aguilar] brought twenty pounds of marijuana over to Rick's home and told him to take him to Mississippi. Rick refused, but agreed to set up a transaction with his connection.[12] [Aguilar] then went to Mississippi with his cousin, Christopher Quiroz, sold the marijuana, and apparently bought a white Camaro with the proceeds. [Aguilar] visited Rick's home driving the Camaro and told Rick to come riding. While driving around, [Aguilar] again told Rick that he "owed" him. Rick testified that [Aguilar] also told him that "I can take you out of the picture." [Aguilar] apparently threatened Rick's life on a number of other occasions and Rick noted that he was afraid of [Aguilar] because he had seen "the way [Aguilar] hurts people."

---

[9]    Both [Aguilar] and Rick took their wives on this trip.

[10]    The record indicates that [Aguilar] had left some seven pounds of marijuana with his connection which would have been worth around $7,000.00.

[11]    Rick also told the jury that [Aguilar] had told him that he ([Aguilar]) would occasionally drop by Rick's trailer when Rick was not home. However, the reasons for these visits was not divulged.

[12]    [Aguilar] no longer trusted his own connection.

In spite of [Aguilar's] threats, Rick maintained his own drug courier business. During his out-of-town trips, he preferred that someone stay at his trailer home and often got his sister, Annette Chavez, and her family to do the job. On June 8, 1995, Rick and his wife took a load of drugs to Mississippi, leaving Annette, her husband Leo, and their two children, Leo Jr. (9 years old) and Lincoln (around 2 years old) at his home.

On June 9th, [Aguilar] spent much of his afternoon and evening drinking with friends and relatives. At one point around 9:00 p.m., he was at Albino Garcia's home with David Quiroz cooking and drinking beer. Eventually a neighbor and [Aguilar]'s nephew, Chris Quiroz, also showed up. As the evening wore on, Albino eventually went to bed and David Quiroz went home. As David was leaving, he saw [Aguilar] and Chris headed towards Chris's mother's red Buick. David went home to bed, but was awakened about an hour or two before sunrise by [Aguilar] and Chris wanting more to drink. David took a bottle of liquor across the alley to Chris's house and eventually fell asleep there.

Back at Rick's trailer, around 5:00 in the morning, Leo Jr. was awakened by what he thought was a gunshot. Leo Jr. got out of bed and went into the kitchen and stood by the sink. Because there was no wall between the rooms, Leo Jr. could see into the living room where a small lamp shone in the corner. Leo Jr. saw his parents on the floor with two men standing over them. Leo Jr. testified that he heard the "American" tell his father to "[g]et your fat ass up" and then saw the man shoot his father. The "Mexican" man then took the gun and shot his mother. After the men left the trailer, Leo Jr. went over to the window and saw the two drive off in what he thought was a purple Camaro.[13] Leo Jr. ran to the neighbors for help.

Later that same afternoon, Daniel Pena was driving around with [Aguilar] and Chris Quiroz when [Aguilar] asked him to go to Rafael Flores, Jr.'s, residence. While there, [Aguilar] offered to sell a .22 revolver which Rafael bought for $18.00. Rafael then gave it to his brother who gave it to their father who placed it in the trunk of a car on his property. The police later received a tip that they could recover the murder weapon from the Flores'

---

[13]    The police later established that Leo Jr. could not distinguish between a Camaro and a Buick. They also established that a red car looked purple at night through the tinted glass on Rick's trailer.

residence and subsequently did so.  After they recovered the .22-caliber weapon, the police lab compared the bullets from it with the .22-caliber bullets recovered from the victims' bodies.  The expert testified that the bullets could have been fired from the gun recovered by the police.

Approximately two weeks after the crime, Leo Jr.'s grandmother was reading the newspaper when Leo Jr. saw a picture and told her that two of the guys in the picture were the ones that "hurt" his parents.  His grandfather then took Leo Jr. to the police station where Leo Jr. identified Chris Quiroz as the "American" who shot his father and [Aguilar] as the "Mexican" who shot his mother.

*Aguilar v. State*, slip op. at 1-5 (original footnotes).

## II.    Evidence Relating to Punishment

The punishment phase evidence revealed Aguilar's violent history.  Roger Dale Hearron, a sergeant with the Lubbock County police department, testified that he arrested Aguilar on August 14, 1983, for burglary of a building. 24 SR 54. The building at a used car lot had been broken into and ransacked.  Hearron apprehended Aguilar in an adjacent field, where Aguilar was in possession of some tools taken from the building and nineteen car keys.  24 SR 54-55.  Anthony Vaughn, a Lubbock County peace officer, testified that, on September 3, 1983, he attempted to apprehend Aguilar for an existing burglary warrant. Aguilar shot Vaughn in the leg and chest.  25 SR 216-18.  Vaughn stated that he spent twenty-three days in intensive care and eventually recovered from his physical injuries but continues to suffer emotionally from the shooting. 25 SR 220-221.

Several prison guards testified to violent assaults Aguilar committed on guards and inmates while in prison at the Ferguson Unit of the Texas Department of Corrections

-11-

("TDC"). Kevin Freed, a TDC guard, testified that, on July 5, 1985, he was escorting an inmate to the shower, when Aguilar struck Officer Mike Adams and tried to strike Freed with a piece of soap that he swung inside a sock. 24 SR 74. Freed explained that this was a very hard soap made at TDC and that he had seen a bar of that soap split a guard's head open on another occasion. 25 SR 75. Freed tried to pin Aguilar's hands down, but Aguilar grabbed a razor blade and tried to cut Freed. 25 SR 77-78.

Leon Hoight, a former TDC guard, testified that, on March 13, 1986, Aguilar and some other inmates jumped a fence that separated the recreation yards and attacked a group of inmates. Guard Jim Phillips had to wrestle Aguilar to the ground and restrain him. 25 SR 150. For his participation in the attack, Aguilar was charged with "fighting without a weapon." 25 SR 143.

John Martin Knapp, a correctional officer at the prison, explained that, on September 28, 1987, a guard was escorting a handcuffed inmate to the showers. Aguilar waited for the inmate to pass and kicked a metal and pipe fence so that it hit the inmate in the face and upper body. 25 SR 164.

Justice Wannamaker, with the Lubbock County Jail Division, testified that on October 23, 1989, Aguilar was on bench warrant in the Lubbock Jail and was using the phone. When trustee Gary Smith walked by, Aguilar asked him for a cup of coffee. Because Smith was not allowed to provide another inmate with coffee, Smith refused, and Aguilar attacked him with the telephone receiver. 25 SR 194-97.

-12-

Guard Jeffrey Oliver testified that, on December 5, 1986, Aguilar and four other inmates rushed him and guard Merle Tenant. 24 SR 91. As a result of the attack, Oliver received nine stitches on his head and six in his back. 24 SR 92. Merle Tenant stated that three of the inmates beat him in the stomach and head. 24 SR 101.

The State further introduced a judgment of conviction and eight-year sentence Aguilar received on January 23, 1984, for aggravated assault on a correctional officer. 26 SR 363 (State's Exhibit P1).

The State's evidence also revealed assaults Aguilar committed outside prison. For example, Rick Esparza testified that, in October of 1994, Aguilar punched Manual Fuentes. Fuentes fell to the ground unconscious, and Aguilar began kicking Fuentes in the face and ribs. Esparza and some other friends pleaded for Aguilar to stop, but Aguilar continued kicking Fuentes for another five minutes. 25 SR 170-72. Jose Rodriguez testified that, in June of 1995, Aguilar and Chris Quiroz jumped him when he was working on his car and started to hit him. 25 SR 274. Andrew Okafar, an emergency room doctor at Valley Baptist Hospital, testified that Norma Aguilar, Aguilar's wife, was treated for injuries that Aguilar had inflicted. Norma suffered a gash on the forehead; her eyes were swollen shut; her face, neck, and arm were black and blue; and her nose was broken. 24 SR 188.

The State further produced evidence that Aguilar is a confirmed member of the Texas Syndicate, a prison gang with then as many as five hundred confirmed and five thousand unconfirmed members, whose primary goal is to control all narcotics trafficking in the South

and Southwest. 25 SR 254, 283-84. R.C. Garcia, a narcotics officer with the Houston Police Department, explained that the Texas Syndicate is a "blood in and blood out" prison gang structured like a paramilitary organization. 25 SR 281. The gang has an organized justice system that requires a member to file a grievance against another member and to receive permission before that member can be killed. The penalty for violating a gang rule is death. 25 SR 284-85. When a gang member is released from prison, he is obligated to stay in contact with his gang brothers in prison and must report to the gang "chairman" of the county. 25 SR 282. The chairman will set up the paroled gang member with a job and involve that member in whatever illegal activity the gang is engaged in at that time. Garcia described the Texas Syndicate as "the most feared, fiercest, and deadliest of all the gangs." 25 SR 286-87. Aguilar was the Texas Syndicate chairman of his prison unit and chairman of his region when on parole. 25 SR 287.

The defense re-offered the evidence introduced at guilt/innocence and rested, and closed, its case in chief. 25 SR 318.

## STANDARD OF REVIEW

Summary judgment is proper if the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Martinez v. Johnson,* 255 F.3d 229, 237 (5th Cir. 2001) (citing *Turner v. Houma Mun. Fire & Police Civil Serv. Bd.,* 229 F.3d 478, 482 (5th Cir. 2000)), *cert. denied,* 122 S. Ct. 1175 (2002); FED. R. CIV. P. 56(c) (West 2002). "As a general principle, Rule 56 of the Federal

-14-

Rules of Civil Procedure, relating to summary judgment, applies with equal force in the context of habeas corpus cases." *Clark v. Johnson*, 202 F.3d 760, 764 (5th Cir.), *cert. denied*, 531 U.S. 831 (2000) (citing Rule 11, RULES GOVERNING § 2254 CASES; FED. R. CIV. P. 81(a)(2) (West 2000) (to the extent the Federal Rules are consistent with established habeas practice and procedure, then the rules may apply)). When ruling on a motion for summary judgment, the evidence is viewed through "the prism of the substantive evidentiary burden." *Anderson v. Liberty Lobby*, 477 U.S. 242, 254 (1986).

In a federal habeas case, summary judgment is appropriate if a claim is not cognizable on federal review. Aguilar, confined pursuant to a state court judgment, is entitled to relief "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a) (West 2002). In addition, because Aguilar filed his federal writ petition in November 2001 and, consequently, review is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"),[14] that prism differs depending on whether the issue is one of law, one of fact, or a combination of both. [15]

Under the AEDPA, a petition for a writ of habeas corpus shall not be granted with respect to any claim that was adjudicated on the merits in state court proceedings unless the

---

[14]     *See Lindh v. Murphy*, 521 U.S. 320, 326-27 (1997) (AEDPA standards intended to apply to petitions filed after its effective date); *Nobles v. Johnson*, 127 F.3d 409, 415 (5th Cir. 1997) (since petition was filed two months after the AEDPA's effective date, the AEDPA standards apply).

[15]     The same holds true even if based on Aguilar's original federal writ petition, which was filed in this Court on May 28, 1999.

prior adjudication:

> (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or

> (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d).

With regards to questions of law, the Supreme Court has explained that a decision is contrary[16] to clearly established Federal law if the state court "applies a rule that contradicts the governing law set forth in [the Court's] cases," or confronts facts that are "materially indistinguishable" from a relevant Supreme Court precedent, yet reaches an opposite result. 529 U.S. 362, 405-06 (2000) (*Williams I*); *Penry v. Johnson,* 532 U.S. 782, 792 (2001) (*Penry II*). Alternatively, when confronting a mixed question of law and fact, a state court "unreasonably" applies[17] clearly established Federal law "if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Penry II*, 532 U.S. at 792; *see Williams I*, 529 U.S. at 407-09.

In addition, the Supreme Court held that a federal habeas court's inquiry into

---

[16]    The Supreme Court defined "contrary" as "diametrically different," "opposite in character or nature," or "mutually opposed." *Williams v. Taylor*, 529 U.S. 362, 405 (2000) (*Williams I*) (citing WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 495 (1976)).

[17]    Justice O'Connor explained that the term "unreasonable" is "no doubt difficult to define"; however, she concluded that "it is a common term in the legal world and, accordingly, federal judges are familiar with its meaning." *Williams I*, 529 U.S. at 410.

reasonableness should be objective rather than subjective, and a court should not issue the writ simply because that court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. *Williams I,* 529 U.S. at 409-11. However, an unreasonable application of federal law is different from an incorrect application. *Penry II,* 532 U.S. at 793.[18] Thus, federal habeas relief is only appropriate where the state court decision is both incorrect *and* objectively unreasonable. *Id*; *Williams I,* 529 U.S. at 411; *Martin v. Cain,* 246 F.3d 471, 476 (5th Cir.) (citing *Williams I, supra*), *cert. denied,* 122 S. Ct. 194 (2001). In other words, habeas relief is *inappropriate* when a state court, at a minimum, reaches a "satisfactory conclusion." *Williams I, supra.* (citing *Wright v. West,* 505 U.S. 277, 287 (1992)). Further, the Fifth Circuit has also held that it is the state court's "ultimate decision" that is to be tested for reasonableness, "not every jot of its reasoning." *Santellan v. Cockrell,* 271 F.3d 190, 193 (5th Cir. 2001), *cert. denied,* 122 S. Ct. 1463 (2002); *DiLosa v. Cain,* 279 F.3d 259, 262 (5th Cir. 2002) (citing *Santellan, supra*); *see also Neal v. Puckett,* 286 F.3d 230, 246 (5th Cir. 2002) (*en banc*) (holding that a federal court's "focus on the 'unreasonable application' test under section 2254(d) should be on the ultimate legal conclusion that the state court reached and not on whether the state court considered and discussed every angle of the

---

[18]     As the Supreme Court explained: "Distinguishing between an unreasonable and an incorrect application of federal law, we clarified that even if the federal habeas court concludes that the state court decision applied clearly established federal law incorrectly, relief is appropriate only if that application is also objectively unreasonable." *Penry II,* 532 U.S. at 793 (citing *Williams I,* 529 U.S. at 410-11).

-17-

evidence"), *pet. for cert. filed* (June 13, 2002) (No. 01-10886).

Regarding questions of fact, section 2254(e)(1) requires federal courts to presume correct the factual findings of the state courts unless the petitioner "rebut[s] the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *Dowthitt v. Johnson*, 230 F.3d 733, 741 (5th Cir. 2000), *cert. denied,* 532 U.S. 915 (2001). Further, except for the narrow exceptions contained in section 2254(e)(2), the evidence upon which an applicant would challenge a state court fact finding must have been presented to the state court. Because a federal habeas court is prohibited from granting relief unless a decision was based on "an unreasonable determination of the facts in light of the evidence *presented in the state court proceeding,*" it follows that demonstrating the incorrectness of a state court fact finding based upon evidence not presented to the state court would be of no avail to a habeas petitioner. 28 U.S.C. § 2254(d)(2) (emphasis added).

Finally, where a habeas petitioner has failed to fully develop the factual bases of his claims in state court, he is precluded from further factual development in federal court unless (1) his claims rely on a new rule of constitutional law or a factual predicate previously undiscoverable through the exercise due diligence; *and* (2) he establishes by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found him guilty. 28 U.S.C. § 2254(e)(2). A failure to meet this standard of "diligence" will bar a federal evidentiary hearing in the absence of a convincing claim of actual innocence that can only be established by newly discovered evidence. (*Michael*) *Williams v. Taylor,*

529 U.S. 420, 436 (2000) (*Williams II*); *Beazley v. Johnson,* 242 F.3d 248, 272-73 (5th

Cir.), *cert. denied,* 122 S. Ct. 329 (2001).  For example, a petitioner's failure to present

controverted, previously unresolved factual issues to the state court is sufficient to constitute

"failure" under the plain meaning of section 2254(e)(2). *Williams II,* 529 U.S. at 433;

*Beazley,* 242 F.3d at 273.[19] Yet even if a petitioner can meet the foregoing standard, it is

within this Court's discretion to deny a hearing if sufficient facts exist to make an informed

decision on the merits of his claims.  *Clark v. Johnson,* 227 F.3d 273, 284-85 (5th Cir.

2000), *cert. denied,* 531 U.S. 1167 (2001).

### MOTION FOR SUMMARY JUDGMENT WITH BRIEF IN SUPPORT

Aguilar does not meet the foregoing standards for obtaining habeas relief. As

discussed below, he fails to overcome the State court's application of an independent and

adequate procedural bar;  he fails to demonstrate that, where applicable, the state court's

---

[19]    The record in Aguilar's case reveals that he did not diligently pursue a state writ hearing. Although the undersigned attorney has searched the records from the successive state habeas proceedings (2000), it appears Aguilar never even requested an evidentiary hearing. 2nd Writ at 1-58.  In his first state habeas petition (1997), his sole request for a hearing is found in his "Prayer for Relief," and asks simply for the court to "conduct a hearing to determine the facts...." SHTr 47. This one action fails to prove Aguilar exercised a reasonable attempt to develop the factual basis for his claims in state court. *Dowthitt v. Johnson,* 230 F.3d at 758 (holding that "[m]ere requests for evidentiary hearings will not suffice" to excuse a petitioner's failure to develop the state court record); *Williams II,* 529 U.S. at 435 (a "reasonable attempt" requires that a habeas applicant affirmatively seek an evidentiary hearing in state court in the manner prescribed by state law). Here, to obtain a writ hearing in Texas, the convicting court must determine "that controverted, previously unresolved factual issues material to the legality of the applicant's confinement exist." TEX. CODE CRIM. PROC. art. 11.071 § 9(a) (Vernon's Supp. 1995). Aguilar's 1997 request to "conduct a hearing" failed to apprize the state habeas court of what material factual issues were controverted and, consequently, it is no surprise that his request was not granted.  Thus, Aguilar's lack of diligence precludes this Court from granting a hearing absent any claim of actual innocence -- which, as evidenced by Aguilar's claims set out above, he fails to make.

-19-

adjudication of his exhausted claims was objectively unreasonable; and he fails to demonstrate that his claims merit relief or that relief is not *Teague*-barred. Relief should thus be denied on Aguilar's claims and summary judgment should be granted in the Director's favor.

**I.    Aguilar Fails To Demonstrate That His Right To Due Process Was Violated By Having Shackles And Handcuffs Placed On Him In The Courtroom. (Aguilar's claim 1)**

Aguilar first argues that he was repeatedly displayed before the jury in handcuffs and shackles, despite defense protests, and that this violated his due process rights. Petition at 9. However, Aguilar has not demonstrated error or prejudice, causing this claim to fail.

A criminal defendant is presumed innocent and, generally, should be presented to the jury in the trappings of innocence during trial. *See Wilkerson v. Whitley,* 16 F.3d 64, 67 (5th Cir. 1994); *United States v. Weeks,* 919 F.2d 248, 250 (5th Cir. 1990); *United States v. Nicholson,* 846 F.2d 277, 279 (5th Cir. 1988). Certain practices, such as shackling or gagging a defendant, or forcing the defendant to appear in prison garb, threaten the fairness of the fact-finding process because they serve as a "constant reminder of the accused's condition." *Estelle v. Williams,* 425 U.S. 501, 504 (1976). Such practices are therefore subject to close judicial scrutiny. *Holbrook v. Flynn,* 475 U.S. 560, 568 (1986); *Marquez v. Collins,* 11 F.3d 1241, 1243-44 (5th Cir. 1994).

Nevertheless, courts must balance the interest in fairness against their own "obligation to protect the court and its processes, and to attend to the safety and security of

-20-

those in the courtroom." *Nicholson,* 846 F.2d at 279; *accord Weeks,* 919 F.2d at 250.  Trial

courts thus have discretion to use physical restraints when confronted with an "obstreperous

defendant" or with legitimate concerns about public safety. *Illinois v. Allen,* 397 U.S. 337,

343-44 (1970); *Wilkerson,* 16 F.3d at 67; *Weeks,* 919 F.2d at 250; *Nicholson,* 846 F.2d at

279; *see also Lemons v. Skidmore,* 985 F.2d 354, 357-58 (7th Cir. 1997) (finding that trial

judges have wide discretion in determining what is necessary to maintain courtroom

security).  As the Fifth Circuit has made clear, a trial judge has discretion to order that a

defendant be handcuffed or shackled during trial "where there is a danger of escape or injury

to the jury, counsel, or other trial participants." *Wilkerson,* 16 F.3d at 67; *see also Marquez,*

11 F.3d at 1244 (noting that trial judge has "considerable discretion" because he is "uniquely

situated to make this judgment call," and analogizing review of state trial judge's ruling to

that of a ruling under *Wainwright v. Witt,* 469 U.S. 412, 426-30 (1985)); *Weeks,* 919 F.2d

at 250-51 (concluding that trial court justified in shackling defendant based on information

that he had previously planned an escape and because court took steps to minimize potential

for prejudice from the shackles); *Hernandez v. Beto,* 443 F.2d 634, 636 (5th Cir. 1971)

(holding trial court justified in handcuffing defendant "to prevent his escape, to prevent him

from injuring bystanders and officers of the court, or to maintain a quiet and peaceable

trial.").

Federal courts throughout the nation have similarly recognized the constitutional

soundness of using physical restraints where a particular defendant posed a security risk,

-21-

even if jurors ultimately witnessed the restraints, provided that the trial court took steps to mitigate the influence on the jurors. *See, e.g., United States v. Pina,* 844 F.2d 1, 8 (1st Cir. 1988) (finding trial court did not abuse its discretion because it questioned three jurors who saw the defendant in shackles about what they witnessed); *United States v. Perez,* 144 F.3d 204, 211 (2d Cir. 1998) (finding trial court did not abuse its discretion because the trial court questioned jurors who saw defendant wearing leg shackles and gave curative instructions); *United States v. Jones,* 907 F.2d 456, 459 (4th Cir. 1990) (finding trial court did not abuse its discretion when it thoughtfully and carefully questioned jurors who saw defendant in handcuffs; *United States v. Fountain,* 211 F.3d 429, 436 (7th Cir. 2000) (finding trial court did not abuse its discretion in shackling defendant throughout trial because of the extensive need for courtroom security); *United States v. Collins,* 109 F.3d 1413, 1417-18 (9th Cir. 1997) (finding trial court did not abuse its discretion when defendant was shackled throughout trial because defendant had discussed escape plans and plans to kill court officers); *United States v. Olano,* 62 F.3d 1180, 1190 (9th Cir. 1995) (finding that even if some jurors saw defendant in handcuffs, "a jury's brief or inadvertent glimpse of a defendant in physical restraints is not inherently or presumptively prejudicial to a defendant."); *Holladay v. Haley,* 209 F.3d 1243, 1254-55 (11th Cir.) (finding no abuse of discretion in keeping defendant shackled throughout trial and placing state troopers inside courtroom where defendant was considered an escape risk and had received death threats), *cert. denied,* 531 U.S. 1017 (2000); *Spivey v. Head,* 207 F.3d 1263, 1272-73 (11th Cir.),

(finding no error in having several uniformed guards in courtroom where defendant had received death threats), *cert. denied,* 531 U.S. 1053 (2000); *but see, e.g., Rhoden v. Rowland,* 172 F.3d 633, 636-37 (9th Cir. 1999) (finding trial court abused its discretion in shackling defendant before the jury without making a proper determination of the security need for shackles).

The Supreme Court has stated that shackling during trial may only be justified by an "essential state interest specific to each case." *Holbrook v. Flynn,* 475 U.S. at 569; *see also Illinois v. Allen,* 397 U.S. at 344. However, it is the law of this circuit that a defendant is not necessarily prejudiced by a brief or incidental viewing by the jury of the defendant in handcuffs. *King v. Lynaugh,* 828 F.2d 257, 264-65 (5th Cir. 1987), *vacated on other grounds,* 850 F.2d 1055 (5th Cir. 1988); *United States v. Webster,* 750 F.2d 307, 331 (5th Cir. 1984); *United States v. Diecidue,* 603 F.2d 535, 549 (5th Cir. 1979); *Wright v. Texas,* 533 F.2d 185, 187 (5th Cir. 1976). In such a case, the defendant is required to make some showing of actual prejudice before a retrial is mandated. *Id.* In the present case, Aguilar has not alleged sufficient facts entitling him to relief, and the record does not support his claim. He only asserts that he was displayed before the jury "repeatedly" in shackles and handcuffs. *See* Petition at 9. There are no citations to the record. There is only a reference to "Exhibit 1" (presumably Aguilar's state writ exhibit) which consists of the affidavit of Aguilar's trial counsel Alfredo Padilla who states, in a cursory manner, that the defense requested that Aguilar not be handcuffed or restrained in the courtroom, and that Aguilar did

-23-

not disrupt the courtroom. SHTr 51. From Padilla's statement that "the Jury saw the Defendant in handcuffs in and out of the courtroom," it is impossible to tell whether Aguilar alleges that he was shackled continuously while inside the courtroom and outside of it, or whether he was handcuffed for transport into and out of the courtroom.

Although Aguilar claims that he objected to the alleged shackling, *see* Petition at 9, even attorney Padilla does not support that point, instead testifying that he made "requests" that Aguilar not be handcuffed or restrained. SHTr 51. Most damning, the state habeas court rejected this claim due to Aguilar's failure to have referenced a timely and specific objection in the trial record or in the referenced Exhibits. Supp. SHTr 1 (FF 5).[20] If Aguilar in fact failed to object, this claim is procedurally barred on federal habeas review as a consequence of his failure to comply with state procedural rules for preserving error. *See, e.g., Granviel v. State,* 552 S.W.2d 107, 121-22 (Tex. Crim. App. 1976) (preservation of error for review on appeal requires a defendant to object in a timely and specific manner); *Mercado v. State,* 718 S.W.2d 291, 296 (Tex. Crim. App. 1986) ("As a general rule, an appellant may not assert error pertaining to his sentence or punishment where he failed to object or otherwise raise such error in the trial court."). The Texas contemporaneous objection rule is strictly and regularly applied to similar claims, and is therefore an independent and adequate procedural bar. *Jackson v. Johnson,* 194 F.3d 641, 652 (5th Cir. 1999) ("The 'Texas contemporaneous objection rule constitutes an adequate and independent state ground that procedurally bars

---

[20]    "FF" refers to the state habeas court's findings of fact.

-24-

federal habeas review of a petitioner's claims.'") (internal citations omitted)); *Corwin v.*

*Johnson*, 150 F.3d 467, 473 (5th Cir. 1998) (quoting *Amos v. Scott*, 61 F.3d 333, 339 (5th

Cir.)); *Nichols v. Scott*, 69 F.3d 1255, 1280 (5th Cir. 1995). Because Aguilar has failed to

demonstrate any objection to the alleged shackling, or the required prejudice under *King v.*

*Lynaugh*, he has not established that the state court's rejection of the claim was clearly

erroneous or contrary to clearly established federal law. Thus, this claim must fail under the

AEDPA.

**II.    Aguilar Fails To Demonstrate That His Rights Were Violated By Remarks From
The State Regarding Threats Made To Some State's Witnesses. (Aguilar's claim
2)**

Next, Aguilar claims that, despite a pre-trial motion disallowing it, the State made

improper sidebar remarks concerning unproven threats by Aguilar to State's witnesses.

Petition at 9-10. However, Aguilar has not demonstrated that he objected to the alleged

remarks, that they were in fact improper, or that they were sufficiently prejudicial to warrant

relief.

Where improper prosecutorial argument is claimed, "it is not enough that the

prosecutors' remarks were undesirable or even universally condemned"; instead, "[t]he

relevant question is whether the prosecutors' comments so infected the trial with unfairness

as to make the resulting conviction a denial of due process." *Nichols v. Scott*, 69 F.3d 1255,

1278 (5th Cir. 1995) (quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)). To

constitute a denial of due process, "the acts complained of must be of such quality as

necessarily prevent a fair trial." *Nichols*, 69 F.3d at 1278 (quoting *Derden v. McNeel*, 978

F.2d 1453 (5th Cir. 1992)). The burden is on the petitioner to also show a reasonable

probability that, but for the remarks, the result would have been different. *Nichols*, 69 F.3d

at 1278. "A conviction should not be set aside if the prosecutor's conduct ... did not in fact

contribute to the guilty verdict and was, therefore legally harmless." *United States v.*

*Cardenas*, 778 F.2d 1127, 1129-30 (5th Cir. 1985). If misconduct is found, error is harmless

and does not justify reversal unless it casts serious doubt upon the correctness of the jury's

verdict. *United States v. Palmer*, 37 F.3d 1080, 1085 (5th Cir. 1994). Further, failing to

object to an argument -- wholly apart from issues of procedural default -- is an indication that

it was not perceived as having a substantial adverse effect. *Derden*, 978 F.2d at 1458.

    In this case, Aguilar points out that he brought a pre-trial motion asking that the State

not be allowed to mention that witnesses had been threatened unless the threats could be

linked to Aguilar. 6 SR 6. The trial court granted the motion. 6 SR 11. However, Aguilar

does not point to any allegedly harmful or improper statement, nor does he cite to where they

occurred in the record. *See* Petition at 9-10. Again, he only cites "Exhibit 1," which contains

trial counsel's bare assertion that the State made such remarks, and does not contain citations

either. SHTr 51. Therefore, Aguilar has failed to demonstrate that the alleged remarks were

improper, that he objected to the remarks in order to preserve any error, or that they were so

prejudicial as to create a reasonable probability that without them, the result would have been

different, under *Nichols*. The state habeas court rejected this claim on the basis that Aguilar

failed to reference a timely and specific objection to the allegedly improper remarks. Supp

SHTr 1 (FF 5). If Aguilar in fact failed to object, this claim is also procedurally barred on

federal habeas review as a consequence of his failure to comply with Texas'

contemporaneous objection rule. *See Jackson v. Johnson*, 194 F.3d at 652; *Corwin v.*

*Johnson*, 150 F.3d at 473 (quoting *Amos v. Scott*, 61 F.3d at 339); *Nichols v. Scott*, 69 F.3d

at 1280. For all of the above reasons, the state court's rejection of this claim was not clearly

erroneous or contrary to clearly established federal law, and the claim must fail under the

AEDPA.

### III.    Aguilar Fails To Prove He Was Denied Due Process By The Trial Court's Failure To Appoint A Pathologist And A Ballistics Expert To Assist The Defense At Trial. (Aguilar's claim 3)

Aguilar next argues that the trial court's failure to appoint an independent pathologist

and an independent ballistics expert violated his right to due process. Petition at 10.

However, he fails to make a showing of prejudice, which is required in order to be entitled

to relief.

The Supreme Court has held that an indigent defendant must have access to the

psychiatric examination and assistance necessary to prepare an effective defense based on

his mental condition, when his sanity at the time of the offense is seriously in question. *Ake*

*v. Oklahoma*, 470 U.S. 68, 83 (1985). It is evident that the Court's holding was focused on

the importance of psychiatric experts and their unique functioning at trial where mental

condition is at issue. *See id.* at 80. Fifth Circuit cases have extended this principle to apply

to the assistance of non-psychiatric experts where the evidence at issue is both critical to the

conviction and subject to varying expert opinion. *Scott v. Louisiana,* 934 F.2d 631, 633 (5th

Cir. 1991); *Yohey v. Collins*, 985 F.2d 222, 227 (5th Cir. 1993).

Aguilar points out in the record that, prior to trial, the trial court granted his request

for a psychologist if the State called one to testify, took the request for a pathologist under

consideration, and denied the request for a ballistics expert to assist the defense. Petition at

10 (citing 6 SR 11-16). Regarding the pathologist, at pre-trial hearings on Aguilar's motions,

the State asserted that the pathologist who had testified in Aguilar's co-defendant's trial was

an independent witness, that all of the pathologists they could use were independent doctors,

and that there appeared to be no controversy regarding the cause of death of the victims or

the murder weapon involved. 6 SR 14. In response, Aguilar failed to assert that he was

disputing the cause of death. *See id.* In light of this, Aguilar has not established that he was

entitled to the appointment of a pathologist under the standards of *Scott* and *Yohey.* In any

case, Aguilar does not allege that he ever sought to obtain a ruling from the court on his

motion for a defense pathologist, and any error would thus not be preserved.

Likewise, Aguilar has not demonstrated that he was entitled to the appointment of a

ballistics expert under *Scott* and *Yohey.* The facts of those cases are instructive because they

deal specifically with requests for ballistics experts. In *Scott*, the Fifth Circuit denied the

petitioner's claim because he had not demonstrated that the State "prevented inspection by

defense experts of tangible evidence that [was] both critical to the conviction and subject to

-28-

varying expert opinion." *Scott*, 934 F.2d at 633 (quoting *White v. Maggio*, 556 F.2d 1352, 1356 (5th Cir. 1977)). This conclusion was based on the fact that the nature of the bullet recovered could have no negative effect on the strength of eye-witness testimony that Scott fired his gun at three men, that Scott had failed to show how the expert assistance would help his case, and that Scott did not show that the ballistic evidence would have been open to varying expert interpretation. *Id.* Furthermore, in *Yohey*,

> Yohey's only evidence that the requested experts were needed was an affidavit from his first counsel, Robert Willmann, dated July 21, 1986. In the affidavit Willmann speculated that "more than one bullet may have penetrated more than one person", "[m]ore than one person may have fired a weapon," and that "test firing of the alleged weapons was not done by the State for powder type and distance determination concerning penetration of both clothing and the skin of the persons involved." Further, Yohey never introduced any evidence to the state trial court suggesting that any of the findings contained in the autopsy reports were either inaccurate or in any manner subject to disagreement between experts. Therefore, he has failed to establish a reasonable probability that the requested experts would have been of assistance to the defense and that denial of such expert assistance resulted in a fundamentally unfair trial.

*Yohey*, 985 F.2d at 227 (citing *Moore v. Kemp*, 809 F.2d 702, 712 (11th Cir.)). The same principles should apply here, as Aguilar has not demonstrated potential prejudice through an affidavit of another ballistics expert, or by any other method.

On state habeas review, the trial court rejected this claim due to Aguilar's "failure to have attached an affidavit from an expert or a portion of a learned treatise supporting the Ground's argument," his "failure to have attached an affidavit from trial counsel explaining what expert witness, including blood spatter, he anticipated calling, and how his defense was

-29-

actually prejudiced through his inability to present that expert," and his "failure to have referenced what 'blood spatter' evidence there was that the State relied on to connect him to the crime." Supp. SHTr 2 (FF 6). Because Aguilar has not included these or any other such items in the present petition -- nor should he because the evidence would be unexhausted -- this claim must fail under the AEDPA, as the state court's denial of relief was not contrary to clearly established federal law, nor unreasonable in light of the evidence.

**IV.    Aguilar Fails To Demonstrate That He Was Denied Due Process By The Trial Court's Failure To Inquire Into The Knowledge And Perception Of Previously Selected Jurors Regarding A Fight Between Aguilar And A Potential Witness Reported In Newspapers During Jury Selection. (Aguilar's claim 4)**

Aguilar next argues that his right to due process was violated because the trial court failed to inquire into how previously selected jurors may have been affected by reports of Aguilar's involvement in a fight with a potential witness during jury selection. Petition at 10. However, this claim must be denied because Aguilar has failed to allege, much less demonstrate, the prejudice required to be entitled to relief on this due process claim.

Every claim of potential jury prejudice due to publicity must turn upon its own facts. *United States v. Aragon*, 962 F.2d 439, 444 (5th Cir. 1992). The trial judge has broad discretion on the issue of prejudice due to midtrial publicity (as distinguished from massive pretrial publicity or a pervasive media presence during trial). *Id.* at 443, *United States v. Bermea*, 30 F.3d 1539, 1556 (5th Cir. 1994). The Fifth Circuit has articulated the test to apply to such cases:

-30-

voir dire is required if there are serious questions of possible prejudice, considering (1) whether the publicity is innately prejudicial, and if so (2) the probability that the publicity in fact reached the jury. In determining whether publicized material is innately prejudicial, we consider factors such as the content of the material, the timing of the publicity in relation to critical stages of the trial, and the possible effects of the material on legal defenses. The second prong is governed by commonsense considerations such as the prominence of the media coverage and the nature, number, and regularity of the district court's warnings against viewing the coverage. The test is necessarily highly fact-specific.

*Bermea*, 30 F.3d at 1557 (citations omitted).

Turning to the facts of this case, publicity revealing to jurors a defendant's prior criminal record is inherently prejudicial, and such was not the case here. *Id.* Secondly, Aguilar's evidence consists of two articles (which are essentially identical) which explain in the third paragraph that the witness was not attacked by Aguilar, but by a third man who was *allegedly* talked into it by Aguilar. *See* Brief at 10 (referencing state habeas "Exhibit 19" at SHTr 156-60). Third, the jury selection stage, during which the articles appeared, would not be a stage of trial as critical as the guilt-innocence phase. Further, the material in the articles is not directly germane to any legal defenses. *See id.* These factors militate against finding that the articles were inherently prejudicial.

In relation to the second prong of the test, Aguilar conceded in arguing his motion for a mistrial that the court instructed jurors not to read anything about the case. 13 SR 707. Just as courts are to presume jurors follow the instructions they are given, *see Zafiro v. United States,* 506 U.S. 534, 540 (1993); *Harris v. Rivera,* 454 U.S. 339, 465 (1981); *Vuong*

*v. Scott,* 62 F.3d 673, 685 (5th Cir. 1995); *Brooks v. Texas,* 768 S.W.2d 481, 482 (Tex.App.--Houston [1st Dist.] 1986)), so too must it be presumed that these jurors followed the judge's instructions to avoid the media. Thus, the three previously selected jurors would likely have had to ignore the court's instructions in order to understand the meaning of the articles.

At any rate, it is doubtful that the trial judge could have erred in this case. Regarding the publicity, Aguilar moved only for a mistrial. 13 SR 702-09. He did not specifically request that the court conduct voir dire questioning of the previously selected jurors. *See id.* However, after the motion for mistrial was denied, the following exchange took place:

> MR. PADILLA:   Judge, how do we cover the issue, Judge, about the jurors that have already been selected, Judge?
>
> THE COURT:   Well, when they come in, you can take them aside and ask them about it.

13 SR 709. Presumably, then, Aguilar himself, through trial counsel, had a full opportunity to question the selected jurors about their knowledge and perception of the news articles. There is no mention in Aguilar's petition of this fact, or of whether he ever actually did take advantage of the trial court's allowance of this voir dire.

On state habeas review, the trial court rejected this claim due to Aguilar's failure to substantiate a claim of prejudice. Supp. SHTr 2 (FF 7). Because the rejection of this claim was neither contrary to clearly established federal law, nor unreasonable in light of the evidence, the claim must be denied under the AEDPA.

**V.   Evidence Is Sufficient To Support The Finding That Aguilar Was Guilty As A Party For The Death Of One Of The Victims, Leo Chavez, And Thus There Was No Due Process Violation By The Jury's Verdict At Guilt/Innocence. (Aguilar's claims 5 & 6)**

In his fifth claim for relief, Aguilar asserts that the guilty verdict based on the law of parties was a violation of his rights because, although the evidence at trial showed that Aguilar was directly responsible for the death of Annette Chavez, it was his co-defendant Chris Quorez who was responsible for the death of Leo Chavez. Petition at 10-11. Aguilar then states that there was "no evidence that [Aguilar] had any prior design, desire, knowledge, or intent to kill the Chavezes." *Id.* at 11. In his sixth claim for relief, he contends that his rights to due process were violated by the jury's verdict based on the above arguments. *Id.* These claims are meritless.

As an initial matter, the Director presumes that when Aguilar argues that due process was violated, he intends to refer to his Fourteenth Amendment right to due process because federal habeas corpus relief only lies for violations of federal constitutional law or treaty. *See* 28 U.S.C. § 2254(a); *Estelle v. McGuire*, 502 U.S. 62, 68 (1991) (this reviewing court must limit its opinion to whether the facts in this case present a federal constitutional violation).

However, Supreme Court jurisprudence has analyzed this issue under the Eighth rather than the Fourteenth Amendment. The Court held in *Enmund v. Florida*, 458 U.S. 782, 801 (1982), that the Eighth Amendment prohibits the assessment of the death penalty against

-33-

any defendant who did not kill, attempt to kill, or intend or contemplate that life would be taken.[21] This standard was lowered in *Tison v. Arizona*, 481 U.S. 137, 158 (1986), when the Court held that the Constitution's proportionality concerns require only "major participation in the felony committed, combined with reckless indifference to human life." In this case, the evidence does indeed support the determination that Aguilar murdered Annette Chavez, and that he was responsible as a party for the murder of Leonardo Chavez. Indeed, Aguilar concedes that the evidence shows that he was directly responsible for the death of Annette Chavez. Petition at 10. Moreover, the record reflects that the jury was charged on the law of parties as follows:

> All persons are parties to an offense who are guilty of acting together in the commission of an offense. A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both.

> A person is criminally responsible for an offense committed by the conduct of another if, acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense. Mere presence alone will not constitute one a party to an offense.

---

[21]    To the extent Aguilar wants this Court to consider his claim under the Fourteenth Amendment, then his request would be barred under *Teague*. *Teague* bars federal habeas relief that is based on a rule of constitutional law that was not dictated by precedent at the time the petitioner's conviction became final. *Teague*, 489 U.S. at 301; *Goecke v. Branch*, 514 U.S. 115, 118 (1995). Although a federal court may choose to raise *Teague sua sponte* if the government does not assert it, a court *must* apply *Teague* where the government *does* assert it. *Caspari v. Bohlen*, 510 U.S. 383, 389 (1994). *Teague* contains two exceptions: first, for rules "forbidding criminal punishment of certain primary conduct [and] rules prohibiting a certain category of punishment for a class of defendants because of their status or offense," *Penry v. Lynaugh*, 492 U.S. 302, 330 (1989) (*Penry I*); and second, for "watershed rules of criminal procedure" implicating the fundamental fairness and accuracy of the proceeding. *Teague*, 489 U.S. at 311-12.

Now if you find from the evidence beyond a reasonable doubt that on or about the 10th day of June, 1995, in Cameron County, Texas, as alleged in the indictment, the defendant, Jesus Ledesma Aguilar, acting alone or as a party with Christopher Aguilar Quiroz, as that term has been defined above, did then and there intentionally or knowingly cause the deaths of Leonardo Chavez, III and Annette Esparza Chavez, by shooting them with a firearm during the same criminal transaction, then you will find the defendant, Jesus Ledesma Aguilar guilty of capital murder as charged in the indictment.

1-B Tr 823.

In rejecting the claims on direct appeal[22], the Court of Criminal Appeals summarized

the relevant evidence:

In the instant case, [Aguilar] was charged with killing two persons during the same criminal transaction. Leo Jr., positively identified [Aguilar] as the person directly responsible for the death of his mother. The evidence shows that [Aguilar], and not Quiroz, was the person with a motive to kill the people in the trailer home. Furthermore, [Aguilar] later sold a .22 caliber revolver, which was recovered by police and identified as consistent with the murder weapon. A rational jury could have concluded from these facts that [Aguilar] decided to kill the couple and provided the means for doing so, enlisting Quiroz's help for transportation and possible help in restraining the two victims. Thus, [Aguilar] would be responsible as a party for any actions undertaken by Quiroz, including the shooting of Leo Jr.'s father, thereby making [Aguilar] guilty of capital murder for murdering two people during the same criminal transaction.[23]

---

[22]     On direct appeal, Aguilar argued that the trial court erred in denying his motion for instructed verdict because evidence was legally and factually insufficient to support the jury's verdict. *See* Aguilar's Brief of Appellant at points of error 2 & 3. Although the claims were couched in terms of the denial of Aguilar's motion, all the arguments concerning Aguilar not being responsible for Leo Chavez's death where made therein. *See id.* On state habeas, Aguilar raised the instant sufficiency and due process claims, which the state court rejected based on the Court of Criminal Appeals' rejection of the issues on direct appeal. *See* Supp. SHTr 2 (FF 8).

[23]     A parties charge was included in the charge.

*Aguilar v. State*, slip op. at 6-7 (original footnote).

It is clear from the statement of facts from the Court of Criminal Appeals' opinion[24], which Aguilar does not dispute, that he was involved in transporting marijuana with Rick Esparza, and that he knew where Esparza's trailer home was located. He had threatened Esparza on numerous occasions. Aguilar also told Esparza that he had visited the trailer when Esparza was not home. Additionally, the record shows that Aguilar told Esparza that he had questioned Annette Chavez about where Esparza had gone and when he was returning. 19 SR 590. The Chavezes went with Esparza once to pick up money from a marijuana sale. *Id.* When the Chavezes were house-sitting for Esparza, Esparza had left twenty pounds of marijuana in the trailer with the Chavezes' knowledge. 19 SR 592. When he first found out his sister and brother-in-law had been killed, Esparza believed Aguilar had done it because of the threats Aguilar had made against him, and how Aguilar had noticed things such as Esparza's new furniture that was purchased with drug money. 19 SR 603-05. Further, referring again to the statement of facts, the gun Aguilar subsequently sold was consistent with the sort of weapon that was used to shoot both victims. In contrast, there is no evidence that Chris Quiroz was involved in the marijuana "business." These facts are more than sufficient to satisfy *Tison;* that is, Aguilar directly participated in one murder, and exhibited reckless indifference to the life of the second victim.

---

[24]    Provided in Part I of the STATEMENT OF MATERIAL FACTS section above.

For these reasons, the state court's rejection of these related claims was reasonable in light of the evidence and not contrary to clearly established federal law. As a result, Aguilar's claims must fail under the AEDPA.

**VI.    Aguilar's Rights Were Not Violated By The Trial Court's Failure To Give A Lesser Included Instruction On Murder In The Jury Charge At Guilt/Innocence. (Aguilar's claim 7)**

Aguilar next argues that there was evidence that would have permitted a jury to rationally find him guilty of murder rather than capital murder and, therefore, the failure to give the lesser included offense of murder in the jury charge violated his due process rights. Petition at 11. This claim is also without merit, because the evidence does not support an instruction on murder.

This claim must likewise be analyzed under federal, rather than state law. In *Beck v. Alabama*, 447 U.S. 625, 627 (1980), the Supreme Court held that the death penalty could not be imposed "after a jury verdict of guilt of capital murder offense, when the jury was not permitted to consider a verdict of a lesser included non-capital offense, and when the evidence would have supported such a verdict." *Accord Hopper v. Evans*, 456 U.S. 605, 609 (1982). The Court specifically invalidated Alabama's blanket statutory prohibition against giving lesser included offense instructions in capital cases. That state's death penalty scheme provided juries in capital cases with only two options -- to find the defendant guilty

-37-

of capital murder and sentence him to death, or to acquit him.[25]

The Court's holding stemmed from its recognition that the all-or-nothing choice between death and total acquittal would lead juries to act unlawfully, either by convicting and sentencing to death because the defendant was guilty of a serious, violent crime, even though there was reasonable doubt as to his guilt of the capital offense, or by acquitting even though the defendant was plainly guilty due to a belief that he did not deserve to die. *Beck*, 447 U.S. at 642-43; *Hopper*, 456 U.S. at 609. The flaw with the Alabama statute, therefore, was that it made "the guilt determination depend, at least in part, on the jury's feelings as to whether or not the defendant deserves the death penalty, without giving the jury any standards to guide its decision on this issue." *Beck*, 447 U.S. at 640. Thus, the *Beck* Court "was concerned with insuring that sentencing discretion in capital cases is channeled so that arbitrary and capricious results are avoided," under the Alabama statutory scheme. *Hopper*, 456 U.S. at 611.

The Fifth Circuit has interpreted the holding of *Beck* to apply in capital cases whenever the evidence supports a lesser included offense instruction and the trial court refuses to give one. *Cordova v. Lynaugh*, 838 F.2d 764, 767 (5th Cir. 1988); *Creel v.*

---

[25]     Under the Alabama sentencing scheme at issue in *Beck*, the judge had the ultimate sentencing power. After a jury found a defendant guilty and fixed punishment at death as required by law, it was incumbent upon the trial judge to conduct a hearing on punishment. However, the *Beck* Court found that the state's statistics showed that the jury's verdict would ordinarily be followed by the trial judge and, thus, was "not persuaded that sentencing by the judge compensate[d] for the risk that the jury would return an improper verdict because of the unavailability of a 'third option.'" *Beck,* 447 U.S. at 645.

*Johnson*, 162 F.3d 385 (5th Cir. 1998). However, the Supreme Court has emphasized in *Hopper* that even in capital cases, "due process requires that a lesser included offense instruction be given only when the evidence warrants such an instruction." *Hopper*, 456 U.S. at 611. Moreover, the Court noted that in a case in which the evidence does not warrant an instruction on a lesser offense, giving one would actually be impermissible:

> In *Roberts v. Louisiana* [428 U.S. 325 (1976)], the Court considered a Louisiana statute which was the obverse of the Alabama preclusion clause. In Louisiana, prior to *Roberts*, every jury in a capital murder case was permitted to return a verdict of guilty of the noncapital crimes of second-degree murder and manslaughter, "even if there [was] not a scintilla of evidence to support the lesser verdicts." *Id.* 428 U.S. at 334 ... (plurality opinion). Such a practice was impermissible, a plurality of the Court concluded, because it invited the jurors to disregard their oaths and convict a defendant of a lesser offense when the evidence warranted a conviction of first-degree murder, inevitably leading to arbitrary results. *Id.* at 335 ... The analysis in *Roberts* thus suggests that an instruction on a lesser offense in this case would have been impermissible absent evidence supporting a conviction of a lesser offense.

*Hopper*, 456 U.S. at 611.

Contrary to Aguilar's assertion, there is no evidence in this case to support an acquittal on the capital murder charge and a conviction on a lesser included offense of murder. This is due to the fact that Aguilar was charged with murdering more than one person in the same criminal transaction, 1 Tr 3, and there is no evidence that co-defendant Chris Quiroz acted on his own in shooting the second victim. As explained in relation to the preceding claim, Aguilar was the one involved in the drug trade with Rick Esparza (the owner of the trailer), Aguilar had on previous occasions visited the trailer when Esparza was

-39-

not home, and had sold a weapon after the crime consistent with the murder weapon used on both victims. The record further reveals, as cited above, that Aguilar had questioned Annette Chavez about Esparza's whereabouts, had made serious threats to Esparza, had noticed things in the trailer bought with drug money, and was the first and only individual to come to mind to Esparza as the murderer of both victims. In contrast, Aguilar points to no evidence that Quiroz had any dealings with Esparza or the victims staying in Esparza's home. Therefore, the evidence does not warrant an instruction on murder.

For all of these reasons the Court of Criminal Appeals' rejection of this claim was not contrary to clearly established federal law, nor was it unreasonable in light of the evidence. Thus, this claim must be denied under the AEDPA.

## VII.    Aguilar's Rights Were Not Violated When The Trial Court Failed To Grant A Mistrial After Alleged Jury Tampering By A Spectator Of The Trial. (Aguilar's claim 8)

Aguilar next claims that it was error for the trial court not to order a mistrial after a spectator asked a juror about the case, and the juror subsequently told the court that she was asked what she thought about the case and whether Aguilar was guilty. Petition at 11-12. However, this claim is without merit because the contact was not shown to reach the level of jury tampering, and Aguilar has not shown any possible prejudice from the contact.

In *Remmer v. United States*, the petitioner learned for the first time after the jury rendered its verdict that during the trial someone had communicated with a juror who afterwards became the foreman, and remarked that he could profit by bringing a verdict

-40-

favorable to the petitioner. 347 U.S. 227, 228 (1954). The Supreme Court held that in a criminal case, any private communication, contact, or tampering with a juror during a trial about the matter pending before the jury is deemed presumptively prejudicial. *Id.* at 229. The Court went on to say that "[t]he presumption is not conclusive, but the burden rests heavily upon the Government to establish ... that such contact with the juror was harmless to the defendant." *Id.*

However, current jurisprudence no longer recognizes an automatic presumption of prejudice in such cases; instead, the presumption is to be imposed at the discretion of the trial court. The Fifth Circuit pointed out that after *Smith v. Phillips*, 455 U.S. 209 (1982), and *United States v. Olano*, 507 U.S. 725 (1993), the *Remmer* presumption of prejudice cannot survive. *United States v. Sylvester*, 143 F.3d 923, 934 (5th Cir. 1998). The court then clarified:

> Accordingly, the trial court must first assess the severity of the suspected intrusion; only when the court determines that prejudice is likely should the government be required to prove its absence. This rule comports with our longstanding recognition of the trial court's considerable discretion in investigating and resolving charges of jury tampering. As stated in *Olano*, 507 U.S. at 739 ..., regardless of whether the presumption arises, the court's "ultimate inquiry" must be whether the intrusion will affect the jury's deliberations and verdict.

*Id.*

In this case, when the contact was discovered, the trial court brought in the spectator and then the juror for questioning. 18 SR 241-52. Although the spectator may have been

untruthful to some extent, the juror's account of the contact shows it to be insignificant in terms of its possible effect upon the jurors. The questioning of the juror went as follows:

| | |
|---|---|
| THE COURT: | Ma'am, it's come to my attention that somebody approached you? |
| JUROR: | Well, there was three of us going into the coffee area, and this one person with – she was standing on the side with a Black man and she asked us, "What do you think? Is he guilty or not guilty?" |
| THE COURT: | And she was asking who? |
| JUROR: | Basically the three of us, "What do you all think?" There was three of us there, but they didn't hear it. I did. |
| THE COURT: | The other jurors didn't hear it? |
| JUROR: | Well, they heard something, but they weren't sure what it was. |
| THE COURT: | Okay. And what happened after that? |
| JUROR: | We just ignored her and went inside to the coffee room and picked up a Coke and came back out again. |

18 SR 250. The following subsequently took place:

| | |
|---|---|
| THE COURT: | All right. Bring her back in. I'm sorry, ma'am. I forgot to ask you a question. |
| JUROR: | Yes, sir. |
| THE COURT: | Have you formed an opinion because of what happened? |
| JUROR: | No. |
| THE COURT: | Okay. Has it influenced you in any way? |
| JUROR: | No. |
| THE COURT: | All right. I just want to make sure of that. |
| JUROR: | No. Oh, no. Uh-uh. |

18 SR 251-52. These exchanges are sufficient to rebut a claim that prejudice should have been presumed, as well as to establish that the minimal contact would not have affected the jury's verdict or deliberations on punishment, under *Sylvester*.

-42-

The state habeas court rejected this claim on the grounds that Aguilar failed to show that this contact with the spectator influenced deliberations, or even that it was perceived as an attempt to influence deliberations. SHTr 2-3 (FF 9). Because this determination was neither contrary to clearly established federal law, nor an unreasonable application of the law to the facts, this claim must be denied under the AEDPA.

**VIII. Aguilar's Rights Were Not Violated By The Trial Court's Failure To Require An Expert For The State To Reveal His Sources For The Assertion That Aguilar Was A Member Of The Texas Syndicate. (Aguilar's claim 9)**

Next, Aguilar argues that the trial court's failure to direct an expert for the State to reveal sources for his assertion at the punishment phase that Aguilar was a member of the Texas Syndicate prison gang violated his rights. Petition at 12. This claim is without merit.

Although Aguilar does not mention what specific rights were violated, *see* Petition at 12, presumably he intended to refer to the Sixth Amendment, which guarantees the right of an accused in a criminal prosecution "to be confronted with the witnesses against him." *Davis v. Alaska*, 415 U.S. 308, 315 (1974). However, the Supreme Court has noted that

> the Confrontation Clause of the Sixth Amendment [does not] prevent[] a trial judge from imposing any limits on defense counsel's inquiry into the potential bias of a prosecution witness. On the contrary, trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.

*Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986). The bottom line is that the Sixth Amendment requires that a defendant be permitted to expose a witness' motivation for

-43-

testifying where the witness has a vulnerable relationship with the state. *Davis*, 415 U.S. at 317-18.

In this case, Aguilar asked for the names of those who gave information to the State's expert regarding Aguilar's membership in the Texas Syndicate. 25 SR 291-92. The court denied the request because the State testified that they were confidential informants whose lives would be in jeopardy if their identities were exposed. *Id.* Aguilar did not object to the ruling and did not request an *in camera* hearing for purposes of determining the credibility of the sources. As a result, he cannot substantiate error, because he made no record. Moreover, this claim is procedurally barred on federal habeas review as a consequence of his failure to comply with state procedural rules for preserving error. *See, e.g., Granviel v. State*, 552 S.W.2d at 121-22 (preservation of error for review on appeal requires a defendant to object in a timely and specific manner); *Mercado v. State*, 718 S.W.2d at 296 ("As a general rule, an appellant may not assert error pertaining to his sentence or punishment where he failed to object or otherwise raise such error in the trial court."). The Texas contemporaneous objection rule is strictly and regularly applied to similar claims, and is therefore an independent and adequate procedural bar. *Jackson v. Johnson*, 194 F.3d at 652; *Corwin v. Johnson*, 150 F.3d at 473 (quoting *Amos v. Scott*, 61 F.3d at 339); *Nichols v. Scott*, 69 F.3d at 1280. Because Aguilar has failed to demonstrate any objection to being denied the expert witnesses's contacts, he has not established that the state court's rejection of the claim was clearly erroneous or contrary to clearly established federal law.

-44-

Finally, even if error could be shown, Aguilar would still be required to demonstrate that the error was not harmless. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). Even trial error of constitutional magnitude provides a basis for federal habeas relief only if it "had substantial and injurious effect or influence in determining the jury's verdict." *Id.* (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)); *see also O'Neal v. McAninch*, 513 U.S. 432 (1995). To assess whether a violation of the right to effective cross-examination is harmless, a three-prong test is employed.[26] *See Van Arsdall*, 475 U.S. at 684. First, it is assumed that the damaging potential of the cross-examination was fully realized. *Id.* Second, bearing that assumption in mind, the error is reviewed in light of a host of factors, including: (a) the importance of the witness's testimony in the prosecution's case; (b) whether the testimony was cumulative; (c) the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points; (d) the extent of cross-examination otherwise permitted; and (e) the overall strength of the prosecution's case. *Id.* Third, considering the previous prongs, the reviewing court determines if the error was harmless beyond a reasonable doubt. *Id.*

Here, the State's expert was not the only witness to testify to Aguilar's involvement in the Texas Syndicate. Further, there was other evidence, including the photographic evidence of Texas Syndicate tattoos, which corroborates the evidence on material points.

---

[26] Though this test was formulated by the Court in the context of the less stringent *Chapman v. California*, 386 U.S. 18 (1967), harmless-error standard utilized on direct appeal (whether the error "was harmless beyond a reasonable doubt"), the *Van Arsdall* analysis is useful for evaluating harm under the *Brecht* standard as well.

-45-

*See* 26 SR 380-84 (State's Exhibits P2 to P6). Aguilar was allowed full cross-examination on these other points. Finally, the prosecution had a large amount of solid evidence against Aguilar, as is apparent in the statement of facts above.

On state habeas review, the trial court recommended rejection of this claim, stating that Aguilar failed to substantiate a claim of prejudice, and did not show that he sought an *in camera* hearing after his request that the witness divulge the identities of the sources was denied. Supp. SHTr 3 (FF 10). This determination is neither contrary to clearly established federal law, nor unreasonable in light of the evidence and, therefore, relief must be denied under the AEDPA.

### IX.    Aguilar's First Amendment Rights Were Not Violated By The Admission Of Evidence Of Gang Membership At The Punishment Phase Of Trial. (Aguilar's claim 10)

Aguilar next claims that his First Amendment right to association was violated by the trial court's allowing the State to bring evidence of his membership in the Texas Syndicate prison gang at the punishment phase of trial. Petition at 12. However, there was no objection made on this ground to the evidence, causing the claim to be defaulted, and, at any rate, relief on this claim is foreclosed by Fifth Circuit precedent.

Aguilar's claim is procedurally defaulted on federal habeas review as a consequence of his failure to comply with state procedural rules for preserving error. *See Granviel*, 552 S.W.2d at 121-22 (appellant needs to object or error is waived); *Mercado v. State*, 718 S.W.2d at 296. The Texas contemporaneous objection rule is strictly and regularly applied

-46-

to similar claims, and is therefore an independent and adequate procedural bar. *Jackson v. Johnson*, 194 F.3d at 652; *Corwin v. Johnson*, 150 F.3d at 473 (quoting *Amos v. Scott*, 61 F.3d at 339); *Nichols v. Scott*, 69 F.3d at 1280. Aguilar did not object to any of the gang membership evidence on First Amendment grounds.[27] The trial court on state habeas review rejected this claim based on the determination that Aguilar did not show that he objected to the evidence on the same theory now advanced. Supp. SHTr 3 (FF 11). As a result, this claim is barred on federal habeas review.

At any rate, the claim is also without merit. In *Dawson v. Delaware*, the Supreme Court held that although the First Amendment protects an individual's right to join groups and associate with others, the Constitution does not erect a *per se* barrier to the admission of evidence concerning beliefs and associations at sentencing. 503 U.S. 159, 161 (1992). The Court then ruled in that case that the admission of evidence of the defendant's membership in the Aryan Brotherhood prison gang violated the First Amendment because the prosecution offered no evidence of the gang's violent tendencies relevant to sentencing. *Id.* at 166. The Court then clarified the issue further:

> Because the prosecution did not prove that the Aryan Brotherhood had committed any unlawful or violent acts, or had even endorsed such acts, the Aryan Brotherhood evidence was also not relevant to help prove any

---

[27]     Aguilar objected to the evidence from the expert witness on the basis that the witness had not been qualified as an expert, and objected to the gang membership evidence in general on relevancy grounds, 25 SR 232, 255, 280, and responded to the State's motion to have his tattoos photographed by arguing that it violated his Fifth Amendment right not to incriminate himself. 5 SR 18.

-47-

> aggravating circumstance. In many cases, for example, associational evidence
> might serve a legitimate purpose in showing that a defendant represents a
> future danger to society.

*Id.* The Fifth Circuit followed this reasoning in affirming a capital murder conviction in

*Fuller v. Johnson*, 114 F.3d 491 (5th Cir. 1997). There, the court approved the introduction

of Fuller's membership in the Aryan Brotherhood because the State had also introduced

evidence that the gang had committed unlawful acts including homicides, drug dealing, and

aggravated assaults. *Id.* at 498. The court stated, "[a] reasonable juror could conclude that

membership in such a gang is relevant to future dangerousness ... [t]he fact that Fuller was

within his rights in joining the gang does not bar the use of relevant evidence at trial." *Id.*

In Aguilar's case, the State introduced evidence from their witnesses that members

of the Texas Syndicate participate in various illegal activities, including assaults and

murders. 25 SR 267, 283-84, 287, 305-06. Clearly, this evidence is relevant to Aguilar's

future dangerousness and, thus, is properly admitted at the punishment phase under *Dawson*

and *Fuller, supra.* Because this claim is procedurally defaulted, and because, regardless, it

is without merit, relief must be denied.

**X.    Aguilar's Two Claims Which Allege Violations Of His Texas Constitutional
        Rights Are Inadequately Briefed And, Alternatively, Fail To Raise Issues Upon
        Which Federal Relief Can Be Granted. (Aguilar's claims 11 & 12)**

In his eleventh claim for relief, Aguilar argues that his rights under Article I, Section

8 of the Texas Constitution were violated by the admission of evidence of his membership

in the Texas Syndicate prison gang. Petition at 12. In his twelfth ground for relief, Aguilar

-48-

claims that the trial court violated his right not to provide evidence against himself, under

Article I, Section 10 of the Texas Constitution. *Id.* Neither issue merits relief.

Aguilar fails to provide any facts or legal authority in support of either of his claims.

*See* Petition at 12. Such briefing is wholly inadequate because, as the Supreme Court

explained, claims which are "unsupported by specifics are subject to summary dismissal."

*Blackledge v. Allison*, 431 U.S. 63, 74 (1977). Bald assertions without evidentiary support

such as the instant claims are insufficient to warrant collateral relief and do not compel

federal courts to hold evidentiary hearings. *Ross v. Estelle*, 694 F.2d 1008, 1011 (5th Cir.

1983). Instead, a habeas petitioner must allege facts that, if true, would entitle him to relief.

*Theriot v. Whitley*, 18 F.3d 311, 315 (5th Cir. 1994). In the instant case, Aguilar's claims

consist only of the title of the claim, which no facts or legal support whatsoever. *See* Petition

at 12. Neither does Aguilar reference any other pleading which actually contains his

arguments[28] and which he seeks to incorporate by reference, although the Fifth Circuit

repeatedly finds such attempts at incorporation to be improper.[29] Given Aguilar's complete

---

[28]    Indeed, Aguilar's two state writ petition claims are briefed just as inadequately. *See* 2nd Writ at 33.

[29]    Circuit precedent is clear that attempts to raise issues through incorporation by reference fail to preserve error for appeal. *Yohey v. Collins*, 985 F.2d 222, 224-25 (5th Cir.1993) (holding that arguments were "abandoned" where petitioner failed to argue them in the body of his brief and instead requested the adoption of previously filed legal and factual arguments); *United States v. Hall*, 152 F.2d 381, 398 n. 9 (5th Cir. 1998) (declining to address issues which it found inadequately briefed where petitioner incorporated by reference the pleadings filed at the district court level) (citing *Yohey, supra*); *Perillo v. Johnson*, 79 F.3d 441, 443 n. 1 (5th Cir. 1996) (finding attempts to incorporate by reference "insufficient to preserve error," and that the issues were "waived on appeal.") (citing *Yohey, supra*).

failure to provide any facts or legal support, his claims must be rejected.

However, even if the claims were adequately briefed, neither raises an issue upon which federal relief could be granted. In order for a federal writ to issue, there must be a violation of "the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. at 68;  28 U.S.C. § 2254(a) (petition must allege that the inmate "is in custody in violation of the Constitution or laws or treaties of the United States.")  Federal reviewing courts must limit their opinions to whether the facts in this case present a federal constitutional violation. *Id.*;  *Coleman v. Thompson*, 501 U.S. 722, 730 (1991). Hence, a federal writ will not be granted to correct errors of state constitutional, statutory, or procedural law, unless a federal issue is also presented. *See Estelle v. McGuire*, 502 U.S. at 67-68;  *Pulley v. Harris*, 465 U.S. 37, 41 (1984);  *Pemberton v. Collins*, 991 F.2d 1218, 1223 (5th Cir. 1993);  *Lavernia v. Lynaugh*, 845 F.2d 493, 496 (5th Cir.1988).

Here, however, Aguilar's claims are premised solely upon alleged violations of Texas constitutional law, *see* Petition at 12;  consequently, neither issues is cognizable on federal habeas review.

## XI. Aguilar's Claim That Due Process Was Violated By The Alleged Failure Of The State To Not Enforce Its Own Constitution Is Inadequately Briefed. (Aguilar's claim 13)

Aguilar next argues "Due Process violation for the State not to enforce its own constitution." Petition at 12.  Since this is the entirely of his argument, he fails to prove any facts or legal authority for his claim and, thus, for the reasons explained in Part X. *supra*, the

claim is inadequately briefed.

Assuming arguendo Aguilar intended to assert that his due process rights were violated because the State did not enforce the right not to incriminate oneself under Article I, Section 10 of its own Constitution when it had Aguilar photographed and fingerprinted, then this claim is defaulted. In any case, no right under the Texas Constitution was abridged, rendering Aguilar's federal due process claim moot.

The "presumed" claim is procedurally barred because Aguilar did not make an objection to the photographs being admitted or the fingerprints being taken on the grounds he now advances. *See* 25 SR 247-48; 22 SR 868. The failure to comply with the state's contemporaneous objection rule is an independent and adequate procedural bar on federal habeas review, as explained above. *See Granviel*, 552 S.W.2d at 121-22 (must object or error is waived); *Mercado v. State*, 718 S.W.2d at 296; *Jackson v. Johnson*, 194 F.3d at 652 (Texas' contemporaneous objection rule is strictly and regularly enforced); *Corwin v. Johnson*, 150 F.3d at 473 (quoting *Amos v. Scott*, 61 F.3d at 339); *Nichols v. Scott*, 69 F.3d at 1280. The trial court on state habeas review rejected the claim on this basis. Supp. SHTr 3 (FF 12).

At any rate, the trial court's allowing the State to photograph and fingerprint Aguilar did not violate Aguilar's right not to provide evidence against himself under Article I, Section 10 of the Texas Constitution. In *Thomas v. State*, 723 S.W.2d 696 (Tex. Crim. App. 1986) (*en banc*), the Court of Criminal Appeals adopted the narrow formulation of the

privilege as articulated in *Olson v. State*, 484 S.W.2d 762 (Tex. Crim. App. 1969). The court stated,

> After examining the history of Article I, § 10, *supra*, we concluded:
>
>> . . . [W]e have found no historical evidence for [defendant's] position that the framers of our state constitution meant, by choice of language, for Article I, § 10, to be more encompassing than, "witness against himself," as used in the federal constitution or other formulations of the privilege then in existence in other states.
>
> [*Olson*]., at 762. After also reviewing the policy and precedents surrounding Article I, § 10, we "adopt[ed] the view that the Texas constitutional self-incrimination privilege extends its protection to testimonial compulsion." *Id.,* at 772. This holding overruled the prior view that Article I, § 10, *supra*, prevented police from forcefully collecting physical evidence from a defendant [footnote omitted]. Therefore, we reject appellant's claim that Article I, § 10, *supra*, provides broader protection than the Fifth Amendment because of differences in language.

*Thomas v. State,* 723 S.W.2d at 702-03.

The Fifth Amendment privilege against self-incrimination protects a defendant from being compelled to provide information against himself, or otherwise provide the State with evidence, of a testimonial or communicative nature. *Pennsylvania v. Muniz*, 496 U.S. 582 (1990). It does not protect him from being compelled to produce real or physical evidence, such as giving a blood sample. *Schmerber v. California*, 384 U.S. 757, 765 (1966). A voice exemplar does not violate one's Fifth Amendment privilege because the exemplar is merely a source of physical evidence. *United States v. Wade*, 388 U.S. 218 (1967); *United States v. Dionisio*, 410 U.S. 1 (1973). Further, the Fifth Circuit has explicitly held that the privilege

does not apply to "real or physical evidence, such as compulsion to submit to a photograph." *Edwards v. Butler*, 882 F.2d 160, 164 (5th Cir. 1989). Neither did a court's judicial notice of a defendant's "identifying tattoos and scar" impinge on his Fifth Amendment privilege. *Tasco v. Butler*, 835 F.2d 1120, 1124 (5th Cir. 1988).

It is clear that since the extraction and admission of photographic and fingerprinting evidence, being "physical evidence," did not violate Aguilar's Fifth Amendment rights, neither did it violate Article I, § 10 of the Texas Constitution. Therefore, there is no basis for Aguilar's due process claim, causing this claim to fail even if the merits are reached.

**XII.**  **Aguilar's Rights Were Not Violated Because His Jury Did Not Receive Definitions Of The Terms "Reasonable Expectation," "Probability," And "Deliberately" At Punishment And, At Any Rate, Relief Is Barred Under *Teague v. Lane*. (Aguilar's claims 14 & 15)**

In his fourteenth ground for relief, Aguilar asserts that Article 37.071 of the Code of Criminal Procedure which describes the operation of the Texas capital murder statute at trial is unconstitutional because it does not contain definitions of the terms "reasonable expectation" and "probability," as used in the punishment phase special issues. Petition at 12. He further claims that the failure of the trial court to give definitions of these terms to the jury also violated his constitutional rights. *Id.* In his fifteenth claim for relief, Aguilar asserts that the failure to define "deliberately" violates due process. *Id.* at 12-13. Relief is not warranted on these claims.

To rule that a non-weighing state such as Texas must define terms used in the special

issues would require the announcement and retroactive application of a new rule of

constitutional law, in violation of *Teague.* 489 U.S. at 301. The Supreme Court in *Jurek v.*

*Texas,* 428 U.S. 262 (1976), upheld the Texas capital scheme as constitutional. Furthermore,

the Fifth Circuit reiterated its prior holdings that the terms used in the Texas special issues

need not be defined:

> *Jurek* expressly rejects the contention that the second punishment issue is
> impermissibly vague. *Id.* at 275-76 ... We have likewise frequently rejected
> challenges to the lack of definition of diverse terms in the first two punishment
> special issues. *See Milton v. Procunier,* 744 F.2d 1091, 1095-96 (5th
> Cir.1984) ("deliberately," "probability," and "criminal acts of violence" "have
> a plain meaning of sufficient content that the discretion left to the jury" is "no
> more than that inherent in the jury system itself"), *cert. denied,* 471 U.S. 1030
> ...(1985); *Thompson v. Lynaugh,* 821 F.2d 1054, 1060    (5th Cir.)
> ("deliberately" and "reasonable doubt" need not be defined as their "common
> meaning is sufficiently clear to allow the jury to decide the special issues on
> punishment"), *cert. denied,* 483 U.S. 1035 ... (1987); *James [v. Collins,* 987
> F.2d 1116, 1120 (5th Cir.), *cert. denied,* 509 U.S. 947 (1993)] (not necessary
> to define "deliberately," "probability," "criminal acts of violence," or
> "continuing threat to society"); *Nethery v. Collins,* 993 F.2d 1154, 1162 (5th
> Cir.1993) (not necessary to define "deliberately," "probability," or "society").
> *See also Pulley v. Harris,* 465 U.S. 37, 50 n. 10 ... (1984) (Texas punishment
> issues are not impermissibly vague as they have "a common sense core of
> meaning").

*Woods v. Johnson,* 75 F.3d 1017, 1033-34 (5th Cir. 1996).

On state habeas review, the trial court found that Aguilar failed to show how the

Texas capital murder statute was unconstitutional, as applied to his case, and that he failed

to show that he was denied certain definitions of terms at trial after making a timely and

-54-

specific request. SHTr 4 (FF 13-14). Indeed, Aguilar has not pointed to any place in the trial

record where he objected to a lack of definitions nor did he propose what definitions should

be offered. *See* Petition at 12-13. Again, Aguilar's failure to comply with the state's

contemporaneous objection rule is an independent and adequate procedural bar on federal

habeas review, as explained above. *See Granviel*, 552 S.W.2d at 121-22 (must object or error

is waived); *Mercado v. State*, 718 S.W.2d at 296; *Jackson v. Johnson*, 194 F.3d at 652

(Texas' contemporaneous objection rule is strictly and regularly enforced); *Corwin v.*

*Johnson*, 150 F.3d at 473 (quoting *Amos v. Scott*, 61 F.3d at 339); *Nichols v. Scott*, 69 F.3d

at 1280. Here, Aguilar has not shown these findings to be clearly erroneous, or contrary to

clearly established federal law and, thus, relief on these claims must be denied under the

AEDPA.

## XIII. Aguilar's Trial Counsel Did Not Render Ineffective Assistance By Failing To Limit The Introduction Of Evidence Of Aguilar's Membership In The Texas Syndicate At The Punishment Phase, Or To Request A Limiting Instruction Regarding The Evidence. (Aguilar's claims 16 & 17)

In two related claims, Aguilar argues that his Sixth Amendment right to effective

assistance of counsel was violated due to his trial attorney's (1) failure to limit the scope or

purpose of evidence at the punishment phase regarding Aguilar's membership in the Texas

Syndicate prison gang, and (2) failure to request a limiting instruction from the trial court.

Petition at 13. However, these claims are meritless because all of the evidence regarding

Aguilar's gang membership was relevant and properly admitted.

A claim of ineffective assistance of counsel is reviewed under the standard of *Strickland v. Washington*, 466 U.S. 668 (1984), which requires a petitioner to demonstrate both that counsel's performance was deficient and that the deficient performance prejudiced the defense. *Id.* at 687. When reviewing such claims, "judicial scrutiny of counsel's performance must be highly deferential," and every effort must be made to "eliminate the distorting effect of hindsight." *Id.* at 689. Courts must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," *id.*, and a conscious and informed decision on trial tactics and strategy cannot be the basis for a constitutionally ineffective assistance claim unless it is so ill chosen that it permeates the entire trial with obvious unfairness. *Moreno v. Estelle*, 717 F.2d 171, 176-77 (5th Cir. 1983).

It is not sufficient that the habeas petitioner merely allege a deficiency on the part of counsel; he must affirmatively plead prejudice as well. *Hill v. Lockhart*, 474 U.S. 52, 60 (1985); *Manning v. Blackburn*, 786 F.2d 710, 712 (5th Cir. 1986). The defendant must show that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. *Strickland*, 466 U.S. at 687. Thus, the issue is not necessarily whether the result would have been different if counsel had taken different action, but whether the result of the proceeding was fundamentally unfair or unreliable. *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993).

The burden of proving claims of ineffective assistance of counsel is on the petitioner. *Alexander v. McCotter*, 775 F.2d 595, 602 (5th Cir. 1985). Claims may be disposed of due

to either reasonable performance of counsel or lack of prejudice so that, if one prong is found

to be dispositive, it is not necessary that the court address the other. *Strickland,* 466 U.S. at

697. Moreover, a petitioner's mere conclusory and speculative allegations will not suffice

in this regard. *Kinnamon v. Scott,* 40 F.3d 731, 734-35 (5th Cir.) (finding "speculation" of

ineffective assistance to be no basis for habeas relief); *Barnard v. Collins,* 958 F.2d 634, 643

n.11 (5th Cir. 1992) (holding that "conclusory allegations" of ineffective assistance are

without merit "[i]n the absence of a specific showing of how these alleged errors and

omissions were constitutionally deficient, and how they prejudiced his right to a fair trial").

   Clearly, Aguilar must overcome a heavy burden in order to prevail on a claim of

ineffective assistance of counsel. In light of the trial record, he has failed to satisfy this

burden. As discussed in Claim IX note 26 *supra,* Aguilar's trial counsel objected to the gang

membership evidence from the expert witness on the basis that the witness had not been

qualified as an expert, and objected to the evidence in general on relevancy grounds. 25 SR

232, 255, 280. Trial counsel responded to the State's motion to have Aguilar's tattoos

photographed by arguing that it violated his Fifth Amendment right not to incriminate

himself. 5 SR 18. Aguilar has not demonstrated how counsel's performance in this regard

fell outside the broad realm of reasonable professional assistance, under *Strickland.*

   Regardless of whether counsel's performance was deficient, however, Aguilar cannot

establish prejudice under *Strickland,* because all of the evidence of Aguilar's membership

in the Texas Syndicate was properly admitted. As discussed in relation to Claim IX, the

admission of the evidence does not offend the First Amendment because, under *Dawson v. Delaware* and *Fuller v. Johnson*, associational evidence is not barred if it is demonstrated to be relevant to future dangerousness. In this case, the State introduced evidence from their witnesses that Aguilar was a high-ranking member of the Texas Syndicate, and that members of the group participate in various illegal activities, including assaults and murders. 25 SR 267, 283-84, 287, 305-06. Because the evidence was relevant to future dangerousness, and only came in at the punishment phase, Aguilar cannot demonstrate that the failure to request a limiting instruction rendered his sentence fundamentally unfair or unreliable. *See Lockhart v. Fretwell, supra.*

Furthermore, the admission of this evidence did not violate the Fifth Amendment privilege against self-incrimination. As set forth in the Director's response to Claim XI, the physical evidence of Aguilar's tattoos showing his Texas Syndicate involvement does not amount to testimonial evidence and, thus, simply does not implicate his Fifth Amendment rights. *See Schmerber v. California; Edwards v. Butler; Tasco v. Butler, supra.* Therefore, because trial counsel's ultimate failure to exclude the evidence of Aguilar's gang membership or to request a limiting instruction did not result in the violation of his constitutional rights, Aguilar cannot show that the result of his trial was fundamentally unfair or unreliable. Because he cannot establish that counsel's performance was deficient for failing to limit this evidence, or demonstrate the required prejudice under the second prong of the *Strickland* test, his ineffective assistance of counsel claim fails. Thus, the state habeas

-58-

court's rejection of these claims was proper, and relief should be denied.  *See* SHTr 4 (FF 16).

## XIV. Aguilar's Direct Appeal Counsel Did Not Render Ineffective Assistance For Failing To Raise Certain Issues On Appeal. (Aguilar's claim 18)

Aguilar next argues that his appellate counsel was ineffective, in violation of his Sixth Amendment rights, because counsel failed to raise certain constitutional issues on appeal. Petition at 13. More specifically, Aguilar contends counsel should have raised claims (1) that using a questioning scheme violates the Eighth and Fourteenth Amendments, (2) that the questioning scheme violates the Sixth and Fourteenth Amendments, and (3) that the failure to define terms in the special issues violates the Eighth and Fourteenth Amendments. *Id.* However, because none of these claims have merit, counsel could not have rendered ineffective assistance for failing to raise them on appeal. In his supplemental writ petition, Aguilar asserts that counsel was ineffective for failing to brief the legal and factual sufficiency claims separately on direct appeal, and that such action prejudiced him because the Court of Criminal Appeals treated the issues together as a legal sufficiency claim. Supp. Petition at 1-4; *Crawford v. State*, slip op. at 5-7. Although in his original state writ, Aguilar listed fifteen claims which he asserted counsel was ineffective for failing to raise, the instant sufficiency issue was never raised in state court, SHTr 39-40, and, thus, the allegation is unexhausted and federal relief is procedurally barred.

-59-

## A.    Aguilar's three exhausted allegations are meritless.

A convicted defendant pursuing a first appeal as of right is entitled to those safeguards necessary to make the appeal adequate and effective, including the effective assistance of counsel. *Evitts v. Lucey,* 469 U.S. 387, 393-94 (1985).   The effectiveness of appellate counsel is measured by the same standard as that of trial counsel:   whether his performance was deficient when judged by an objective standard and whether the appeal was prejudiced thereby. *Sharp v. Puckett,* 930 F.2d 450, 452 (5th Cir. 1991).   Counsel is not ineffective merely because he fails to raise issues requested by the defendant.  *Id.   See also, Ellis v. Lynaugh,* 873 F.2d 830, 840 (5th Cir. 1989). Further, counsel is not ineffective for failing to raise every possible point on appeal, nor for failing to raise every *nonfrivolous* issue requested by defendant. *Engle v. Isaac* , 456 U.S. 107, 134 (1982) ("[T]he constitution guarantees criminal defendants only a fair trial and a competent attorney.  It does not insure that defense counsel will recognize and raise every conceivable constitutional claim."); *Wicker v. McCotter,* 783 F.2d 487 (5th Cir. 1986); *Jones v. Barnes*, 463 U.S. 745, 750 (1983). Appellate counsel is only obligated to raise and brief those issues which are believed to have the best chance of success. *Jones v. Barnes,* 463 U.S. at 751-53 (noting that counsel must winnow out the weaker claims and focus on those claims that stand the greatest probability of success and that "[a] brief that raises every colorable issue runs the risk of burying good arguments. . . ."). Further, the test for prejudice is not merely whether there is a reasonable probability that, but for counsel's omitting a particular ground of error, the

-60-

case would have been reversed; the presence or absence of prejudice hinges on whether the result of the proceeding was fundamentally unfair or unreliable. *Goodwin v. Johnson,* 132 F.3d 162, 174 (5th Cir. 1998) (citing *Lockhart v. Fretwell,* 506 U.S. at 369).

Regarding Aguilar's two claims about Texas' "questioning scheme," Aguilar relies on the dissent in *Johnson v. Texas,* 509 U.S. 350 (1993), for his apparent premise that appellate counsel should have raised these claims on direct appeal due to their potential merit. *See* Petition at 13. The case does not support his position, however. *Johnson*'s primary issue was whether the Texas special issues allow adequate consideration of potentially mitigating evidence, specifically that of the petitioner's youth. *See id.* at 367. The Court held the Texas sentencing scheme to be constitutional, as it allows mitigating evidence to be considered while also guiding the discretion of the sentencer. *Id.* at 373. The dissent opined that the jury in Johnson's case could not give full mitigating effect to his youth due to the structure of the special issues. *Id.* at 388. Contrary to Aguilar's suggestion, the dissenting justices would *not* have invalidated the "questioning scheme" as a whole. *See id.* Moreover, Aguilar does not point to anything in his case regarding the operation of Texas' sentencing scheme which would form a basis for relief, even under the logic of *Johnson*'s dissent. He does not point to evidence of youth or any other "double-edged" mitigating factor presented at his trial which could potentially cause *Johnson*'s dissent to become relevant. For this reason, appellate counsel could not have been ineffective for failing to bring claims challenging the capital scheme.

As to Aguilar's one claim that counsel should have challenged the court's failure to define terms in the special issues, Petition at 13, the claim would not have been successful for the reasons discussed in Part XII, above.

Appellate counsel's performance could not have been deficient for failing to bring unmeritorious claims such as Aguilar suggests. *Evitts v. Lucey,* 469 U.S. at 394 (appellate counsel does not render deficient performance for failing to raise a meritless issue); *Jones v. Barnes,* 463 U.S. at 754 (same); *Sharp v. Puckett,* 930 F.2d 450, 452 (5th Cir. 1991) (same). Because Aguilar could not have been prejudiced by this failure, under *Sharp* and *Goodwin, supra,* his claim fails. Therefore, rejection by the state habeas court was proper. *See* SHTr 4 (FF 17).

## B.   Aguilar's one unexhausted allegation is procedurally defaulted.

In his fourth claim of ineffective assistance, Aguilar asserts counsel was ineffective for failing to separately brief the legal and factual sufficiency claims on direct appeal instead of combining them as one claim. Supp. Petition at 1-4. On state habeas, Aguilar listed fifteen claims which he asserted counsel should have raised; however, he has never before raised the instant claim involving sufficiency of the evidence. *Compare id.* with SHTr 39-40. Since Aguilar's argument was not presented to the state courts, this Court cannot grant habeas relief.

Before filing his federal writ petition, Aguilar was required to present the same legal claims and factual allegations to the Texas courts, and thereby exhaust available state court

remedies. 28 U.S.C. § 2254(b)(2)(A).[30] A petitioner must first provide the highest state court

a fair opportunity to apply the controlling federal constitutional principles to those same legal

claims and factual allegations and, if necessary, correct alleged deprivations of federal

constitutional rights before a federal court will entertain the alleged errors. *Duncan v. Henry,*

513 U.S. 364, 365 (1995); *Castille v. Peoples,* 489 U.S. 346, 348 (1989); *Anderson v.

Harless,* 459 U.S. 4, 6 (1982); *Picard v. Collins,* 404 U.S. 270, 275-76 (1971).

"To exhaust, a petitioner 'must have fairly presented the substance of his claim to the

state courts.'" *Wilder v. Cockrell,* 274 F.3d 255, 259 (5th Cir. 2001) (quoting *Nobles v.

Johnson,* 127 F.3d at 420 (citing *Picard,* 404 U.S. at 275-76)). "It is not enough that all the

facts necessary to support the federal claim were before the state courts or that a somewhat

similar state-law claim was made." *Wilder, supra* (quoting *Anderson v. Harless, supra*

(internal citation omitted)). "Indeed, 'where petitioner advances an argument based on a

legal theory distinct from that relied upon in the state court, he fails to satisfy the exhaustion

requirement.'" *Wilder, supra* (quoting *Vela v. Estelle,* 708 F.2d 954, 958 n. 5 (5th Cir.

1983)). A review of Aguilar's state writ evidences that he failed to exhaust his claim in state

court. However, because the claim is unexhausted, relief is procedurally barred.

The exhaustion requirement "is satisfied 'if it is clear that [the habeas petitioner's]

claims are now procedurally barred under [state] law.'" *Gray v. Netherland,* 518 U.S. 152,

_____

[30]    A petition for federal writ of habeas corpus will not be granted unless an applicant
has exhausted state court remedies or there is either (i) an absence of state court remedies or (ii)
those remedies are insufficient to protect the applicant's rights. 28 U.S.C. §2254 (b)(1)(A) & (B).

161 (1996) (quoting *Castille v. Peoples*, 489 U.S. at 351). As the Supreme Court held in *Coleman v. Thompson*, though normally a state court must explicitly apply a procedural bar in order for review to be barred, that rule

> [d]oes not apply if the petitioner failed to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred. In such a case there is a procedural default for purposes of federal habeas regardless of the decision of the last state court to which the petitioner actually presented his claims.

501 U.S. at 735; *see also Keeney v. Tamayo-Reyes,* 504 U.S. 1, 9-10 (1992) (holding that an unexhausted claim is procedurally defaulted for the purposes of federal habeas review if the claim would now be found procedurally barred by the state court); *Teague v. Lane*, 489 U.S. at 298-99 (finding an unexhausted claim procedurally barred). The Fifth Circuit has consistently found unexhausted claims, which would be barred by the Texas abuse-of-the-writ doctrine if raised in a successive state habeas petition, procedurally barred. *See, e.g., Ogan v. Cockrell*, 297 F.3d 349, 356-57 n. 6 (5th Cir. 2002) (citing *Horsley v. Johnson*, 197 F.3d 134, 137 (5th Cir. 1999) (claims are procedurally barred on federal habeas review if the petitioner would be precluded from exhausting the same claims in state court by the abuse-of-the-writ doctrine of Article 11.071 of the Texas Code of Criminal Procedure)); *Martinez v. Johnson,* 255 F.3d at 239; *Fuller v. Johnson*, 158 F.3d 903, 906 (5th Cir. 1998) (Texas' abuse of the writ doctrine is regularly and strictly applied) (citing *Emery v. Johnson*, 139 F.3d 191, 201 (5th Cir. 1997)); *Nobles v. Johnson,* 127 F.3d at 423; *see also Little v.*

*Johnson*, 162 F.3d 855, 859 (5th Cir. 1998) ("When the ground upon which the petitioner relies for habeas relief was not exhausted in state court and state procedural rules would bar subsequent presentation of the argument, this court may not consider the claim absent 'cause' and 'prejudice'....") (citing *Muniz v. Johnson*, 132 F.3d 214, 221 (5th Cir. 1998)); *Fearance v. Scott*, 56 F.3d 633, 642 (5th Cir. 1995) (*per curiam*) (dismissal is independent and adequate state bar).

Here, it is clear that Aguilar's unexhausted claim is procedurally barred. If he now tried to return to state court to raise the allegations in a third writ petition, the Court of Criminal Appeals would refuse to review the merits based on the existence of an independent and adequate state procedural bar. *See* TEX. CODE CRIM. PROC. ANN. art. 11.071 § 5(a) (barring successive state habeas applications absent a showing of cause or actual innocence); *see Martinez, supra*; *Fuller, supra*. As a result, Aguilar would thus be barred from returning to the state court to file yet another state habeas petition.

Where a claim is procedurally barred or where a state court has explicitly relied on a procedural bar to deny relief, a state prisoner may not obtain federal habeas relief unless he can demonstrate cause for the default and actual prejudice attributable to the default, or that the federal court's failure to consider the claim will result in a fundamental miscarriage of justice. *Coleman v. Thompson*, 501 U.S. at 750; *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977); *Martinez v. Johnson*, 255 F.3d at 239; *Deters v. Collins*, 985 F.2d 789, 795 (5th Cir. 1993) (citing *Coleman, supra*).

To demonstrate a miscarriage of justice in this context, the petitioner must show he is actually innocent of the crime of which he was convicted. *Sawyer v. Whitley,* 505 U.S. at 339-40; *Smith v. Dixon,* 14 F.3d 956, 974 (5th Cir. 1994). This exception applies "if petitioner has shown by *clear and convincing evidence* that but for constitutional error, *no reasonable juror would find him eligible for the death penalty." Sawyer,* 505 U.S. at 348 (emphasis added). However, where the petitioner admits in his habeas petition that he committed the crime, he cannot avail himself of the "manifest miscarriage of justice" exception. *See Glover v. Hargett,* 56 F.3d 682, 684 (5th Cir. 1995) (cannot assert "fundamental miscarriage of justice" exception unless first claim actual innocence). Here, Aguilar has never asserted that he is actually innocent of capital murder and, thus, he cannot claim the "manifest miscarriage of justice" exception. As a result, he must demonstrate prove cause and actual prejudice attributable to the default.

To demonstrate the existence of cause, a petitioner must ordinarily show that some objective factor external to the defense impeded efforts to comply with the state's procedural rule. *Murray v. Carrier,* 477 U.S. 478, 488 (1986). This external impediment was explained by the Supreme Court as follows:

> [W]e think that the existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule. Without attempting an exhaustive catalog of such objective impediments to compliance with as procedural rule, we note that a showing that the factual or legal basis for a claim was not reasonably available to counsel, or that some interference by officials made compliance impracticable, would constitute

-66-

cause under this standard.

*Id.* If a petitioner fails to show that cause existed for the procedural default of his claims

during state habeas proceedings, the federal reviewing court need not address the prejudice

prong of the test. *See Engle v. Isaac*, 456 U.S. at 134 n. 43.

Here, Aguilar does not even mention that this claim is a new or unexhausted issue, *see*

Supp. Petition at 1-4, much less attempt to prove that he meets the standards as would allow

those Court to excuse his default. Habeas relief thus remains barred on this defaulted

claim.[31]

## XV. Aguilar's Attorney Did Not Render Ineffective Assistance For Failing To Request A Jury Instruction On The "Independent Impulse" Doctrine. (Aguilar's claim 19)

Aguilar claims that he was denied the Sixth Amendment right to effective assistance

of counsel at trial due to the failure of counsel to request a charge on the Texas doctrine of

"independent impulse." Petition at 14. This doctrine states that when the conspiracy theory

---

[31]     Because Aguilar's claim is unexhausted and relief is foreclosed, the Director does not address the issue on the merits. However, one portion of Aguilar's claim does deserve mention -- his assertion that counsel's failure to separately brief the sufficiency issues resulted in the constructive denial of counsel, and that prejudice is presumed. Supp. Petition at 3-4 (citing *United States v. Cronic,* 466 U.S. 648, 658-61 (1984)). In *Cronic,* the Supreme Court discussed in *dicta* a narrow category of situations in which prejudice may be presumed. 466 U.S. at 658-61. *Cronic's* presumed prejudice was certainly never intended to cover situations where, as here, Aguilar has the assistance of direct appeal counsel but counsel failed to raise one point on appeal. Indeed, the Supreme Court recently emphasized, "[w]hen we spoke in *Cronic* of the possibility of presuming prejudice based on an attorney's failure to test the prosecutor's case, we indicated that the attorney's failure must be *complete.*" *Bell v. Cone,* 122 S. Ct. 1843, 1851 (2002) (emphasis added). "We said 'if counsel *entirely* fails to subject the prosecution's case to meaningful adversarial testing.'" *Id.* (internal citation omitted, emphasis in original).

of vicarious criminal responsibility is involved, and when the evidence raises a question of whether the offense actually committed was perpetrated in furtherance of the object felony, or was one which the accused should have anticipated, "a timely requested affirmative instruction on the theory of independent impulse" should be submitted to the jury. *Mayfield v. State*, 716 S.W.2d 509, 515 (Tex. Crim. App. 1986). However, there was no evidence presented supporting such an instruction. Thus, counsel was not ineffective under *Strickland*, 466 U.S. at 6878, for failing to request one.

The evidence supporting the verdict that Aguilar was responsible for both the murder of Annette Chavez and the murder of Leo Chavez is provided in Part I of the STATEMENT OF MATERIAL FACTS section as well as in Parts V and VI of the Director's motion for summary judgment. Quiroz's lack of involvement with Rick Esparza or the Chavezes, and the sequence of events during the murders do not support any inference that Aguilar might not or should not have anticipated the shooting of Leo Chavez. Because an independent impulse instruction was not supported by the evidence, counsel's failure to have requested one could not have constituted deficient performance, under *Strickland*. *See Clark v. Collins*, 19 F.3d 959, 966 (5th Cir. 1994) ("Failure to raise meritless objections is not ineffective lawyering; it is the very opposite."); *Koch v. Puckett*, 907 F.2d 524, 526 (5th Cir. 1990) ("This Court has made clear that counsel is not required to make futile motions or objections.").

Furthermore, even if counsel should have requested the instruction, Aguilar cannot establish prejudice under *Strickland*. At the conclusion of the guilt-innocence phase, the trial court instructed the jury as follows:

> All persons are parties to an offense who are guilty of acting together in the commission of an offense. A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is responsible, or by both.

> A person is criminally responsible for an offense committed by the conduct of another if, acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense. Mere presence alone will not constitute one a party to an offense.

> Now, if you find from the evidence beyond a reasonable doubt that on or about the 10th day of June, 1995, in Cameron County, Texas, as alleged in the indictment, the Defendant, Jesus Ledesma Aguilar, acting alone or as a party with Christopher Aguilar Quiroz, as that term has been defined herein above, did then and there intentionally and knowingly cause the deaths of Leonardo Chavez, III and Annette Esparza Chavez by shooting them with a firearm during the same criminal transaction, then you will find the Defendant, Jesus Ledesma Aguilar, guilty of capital murder as charged in the indictment.

> Unless you so find beyond a reasonable doubt, or if you have a reasonable doubt thereof, you will acquit the Defendant of capital murder.

> The mere presence of an accused at or near the scene of the commission of the offense does not make him a party to the offense. Likewise, mere knowledge that an offense is about to be committed by others will not make him a party to the offense, nor will his knowledge that the offense if [sic] being committed by others, or has been committed by others, nor will his failure to give alarm, his silence or inaction make him a party to the offense.

22 SR 870-71. In *Mayfield*, the Court of Criminal Appeals noted its ruling that an instruction requiring the jury to find that the defendant not only acted with intent to promote or assist

the commission of the offense of murder by encouraging, directing, aiding, or attempting to aid in its commission, but also that she knew of the intent of her companion to kill, before it could convict, was substantially the same as an affirmative instruction on the independent impulse doctrine. *Mayfield*, 716 S.W.2d at 516 (citing *LeDuc v. State*, 593 S.W.2d 678, 685 (Tex. Crim. App. 1980)). The additional instructions on criminal responsibility and the law of parties given in Aguilar's case also serve the same function. Therefore, because Aguilar cannot show that counsel's failure to request an independent impulse charge rendered the result of the proceeding fundamentally unfair or unreliable, his ineffective assistance claim must fail. *See Strickland*, 466 U.S. at 687; *Lockhart v. Fretwell*, 506 U.S. at 369.

On state habeas review, the trial court rejected the claim on the grounds that, given the incriminating evidence against Aguilar from Leo Chavez, Jr., a request for the instruction would not have been favored, and neither would the claim have been successful had it been raised on direct appeal. Supp. SHTr 4-5 (FF 18). Because these findings are neither contrary to clearly established federal law, nor unreasonable in light of the evidence, Aguilar is not entitled to relief under the AEDPA.

**XVI. Aguilar's Claim That He Was Denied Due Process By The State's Introduction Of Allegedly False Statements Made By Co-defendant Chris Quiroz Is Procedurally Barred And, Alternatively, Without Merit. (Aguilar's claim 20)**

Aguilar next claims that the State introduced statements at trial made by Quiroz regarding Quiroz's involvement in the offense which the State knew or believed to be false, in violation of his right to due process. Petition at 14. Although Aguilar fails to specify

-70-

which statements are allegedly false and, thus, his petition fails to allege facts which if true might entitle him to relief, *Theriot v. Whitley*, 18 F.3d at 315, in his original state writ he argued that since Quiroz had already been convicted of capital murder, the State had to have believed that Quiroz's statement that he waited outside while others entered the Chavez residence was untrue. SHTr 45. However, Aguilar failed to object to the statements on this basis, causing the claim to be procedurally barred on federal habeas review. Even if the claim is reached on the merits, however, he fails to make a claim warranting relief.

At a hearing on the introduction of the statements outside the presence of the jury, Aguilar objected on the ground that admission would violate the rule invoked to have witnesses excluded from the trial until their time to testify arrived, on the ground that the statement did not fall under a hearsay exception, and on the ground that the defense had not had the opportunity to determine whether the statement was voluntary or involuntary. *See* 25 SR 112-15. There was no suggestion that the statement should be excluded due to its alleged falsity. Thus, Aguilar's failure to comply with the State's contemporaneous objection rule renders this claim procedurally barred on federal habeas review. *See Granviel v. State*, 552 S.W.2d at 122; *Corwin v. Johnson*, 150 F.3d at 473 (citing *Amos v. Scott*, 61 F.3d at 339). The trial court on state habeas review rejected the claim on this basis. Supp. SHTr 5 (FF 19).

At any rate, the claim is without merit. The State violates a defendant's due process rights by knowingly presenting false evidence at trial or by allowing false testimony to go

-71-

uncorrected. *Giglio v. United States*, 405 U.S. 150, 153 (1972); *Napue v. Illinois*, 360 U.S. 264, 269 (1959); *Faulder v. Johnson*, 81 F.3d 515, 519 (5th Cir. 1996). To prevail on such a claim, Aguilar must demonstrate that the evidence in question was actually false, that it was material, and that the prosecution offered the testimony knowing it to be false. *Faulder*, 81 F.3d at 519; *East v. Scott*, 55 F.3d 996, 1005 (5th Cir. 1995). Due process is not implicated unless the prosecution actually knows or believes the testimony to be false or perjured. *United States v. Sutherland*, 656 F.2d 1181, 1203 (5th Cir. 1981) (citation omitted). It is not enough that a witness's testimony is challenged by another witness, *United States v. Brown*, 634 F.2d 819, 827 (5th Cir. 1981), or that contradictory evidence has appeared after trial. *See United States v. Washington*, 44 F.3d 1271, 1282 (5th Cir. 1995). Finally, evidence is material only if it was "a highly significant factor reasonably likely to have affected the jury's verdict." *Blackmon v. Scott*, 22 F.3d 560, 565 (5th Cir. 1994).

If this claim is reached on the merits, it must fail because even if Aguilar could show that the State knowingly introduced false testimony -- which has not been established -- Aguilar cannot demonstrate that the statement was constitutionally material. The testimony given at trial by investigator Abel Perez Jr. regarding Quiroz's statement, in relevant portion, was as follows:

> PROSECUTOR:  Okay.  Sir, I'm going to ask you to recall your investigation of this case and I'll ask you if you had an opportunity during your investigation to, in fact, talk with the individual Chris – Christopher Quiroz?
> PEREZ:  Yes, sir.

PROSECUTOR:     And when is it that you had that opportunity, sir?
PEREZ:          On or about the – I believe it was the 26th of June, 1995.
PROSECUTOR:     Okay.  And where is it that you, in fact, talked to this individual?
PEREZ:          At the Harlingen Sheriff's Office.
PROSECUTOR:     Okay.  And for what purpose did you talk to this individual?
PEREZ:          For questioning.
PROSECUTOR:     For questioning?
PEREZ:          Yes, sir.
PROSECUTOR:     Regarding what, sir?
PEREZ:          The double murder.

*     *     *     *     *

PROSECUTOR:     And you testified you talked to him for the purposes of questioning him.  And specifically, what did you want to question him about?
PEREZ:          His whereabouts on that early morning of June the 10th.
PROSECUTOR:     Okay.  So, you were concerned about what his whereabouts were at the time of when?
PEREZ:          On June the 10th.
PROSECUTOR:     Did he, in fact, give you a statement concerning his whereabouts on June the 10th?
PEREZ:          Yes, sir.
PROSECUTOR:     Okay.  And remember, Officer Perez, I want you to tell me what he specifically told you about his whereabouts on June the 10th of 1995.
PEREZ:          Yes, sir.  That he had driven himself and others in his mother's vehicle, a 1982 Buick, four door, red in color, that he had driven the vehicle to the crime scene which is 82 Palm Vista, that –
PROSECUTOR:     And what did he do once he was there?  Did he tell you?
PEREZ:          Yes, sir.
PROSECUTOR:     And what was it that he told you?
PEREZ:          That he waited in the car for about 15 minutes while the others went inside the trailer house.
PROSECUTOR:     And after those 15 minutes transpired, what did he do next?

PEREZ:            He drove himself and the others away from the crime scene.
25 SR 224-25, 226-27.

In the instant case, Quiroz's statement was introduced *after* the jury had found Aguilar

guilty of capital murder. The Court of Criminal Appeals, while passing on the issue of

whether the statement's admission violated the hearsay prohibition or the Confrontation

Clause, noted that Quiroz had already been identified as one of the shooters. *Aguilar v. State*,

slip op. at 19. Therefore, the only relevant import of Quiroz's statement, that he drove

"others" to the crime scene, was to establish Aguilar's moral culpability under the second

special issue regarding party liability. The evidence adduced at the guilt/innocence phase

supporting Aguilar's guilt, however, also established overwhelmingly that Aguilar "actually

caused the death of ... Annette Esparza Chavez" or "anticipated that a human life would be

taken."[32]

The record of the guilt/innocence phase of trial establishes that Leo Jr., the 10-year-

old son of the victims, was an eye-witness to his parents' murders. Leo testified that the

"Mexican" man kicked his mom in the ribs, the "American" man shot his father, and then

"[t]he American gave the gun to the Mexican and he shot my mom." 18 SR 155. Leo Jr.

identified Aguilar in court as the "Mexican" man who shot his mother. 18 SR 156, 207. Leo

---

[32]    The jury was instructed: "In determining your answer to the questions, or special
issues, submitted to you, you shall consider all the evidence submitted to you in this whole trial,
which includes the phase of the trial wherein you were called upon to determine the guilt or
innocence of the defendant, and this punishment phase of trial wherein you are now called upon to
determine the answers to Special Issues submitted to you by the court." 1-B Tr 836.

Jr. further indicated that on June 22, 1995, he was at his grandmother's house and saw a picture of three men in the newspaper.[33] 18 SR 171; 23 SR 985 (State's Exhibit 6, newspaper clipping). He told his grandmother that two of the men were the ones that "hurt his parents." 18 SR 173. Leo Jr. pointed to the man in the white suit and the man on the right as the two men he saw in the trailer. 19 SR 174. Officer Perez testified during the guilt/innocence phase that Leo Jr. came to the police station with his grandfather and brought the newspaper picture. 19 SR 396. Leo Jr. told Perez that "the guy in the white shirt, he's the guy who shot my mommy." 19 SR 400. Perez identified the man in the photograph with the white shirt as Aguilar and the man on the right as Chris Quiroz. 19 SR 398.

In the afternoon of the same day Annette and Leo were killed, Aguilar sold a .22 caliber revolver to Rafael Flores for $18.00. 19 SR 524. Ten days after the murder, Officer Perez retrieved the revolver from the trunk of a car on Rafael's father's property. 19 SR 376-78. Ronald Richardson, a firearms examiner with the Texas Department of Public Safety, testified that the .22 caliber bullets recovered from the victims shared the same rifling characteristics, the number and relative width of the lands and grooves, as the gun the police seized. 20 SR 688-89, 710.

Lawrence John Dahm, a pathologist at Valley Baptist Medical Center, testified that the "[c]ause of death for Annette Chavez was a single gunshot wound to the neck which

---

[33]     Officer Perez testified that, including the people in the background, about thirteen people altogether appear in the photograph. 19 SR 401.

crossed the spinal cord." 20 SR 726. According to Dahm, soot and smoke deposited on the back of Annette's neck indicated that the fatal shot was "a very close range wound." 20 SR 732-33. He estimated that the end of the gun barrel was placed between one half of one inch to four inches away from her neck when it was fired. 20 SR 733. Dahm further testified that Leo Chavez received a single gunshot wound to the back of the head that killed him instantly, "lights out, just like that." 20 SR 737. Leo had also suffered injuries to his face and blows to his head inflicted around the time of his death. 20 SR 740, 751. Dahm described Annette's and Leo's deaths as "execution style killings." 20 SR 743.

Based on the foregoing evidence, the jury found Aguilar guilty of killing more than one person in the same criminal transaction. 1-B Tr 829. Because there was no indication during the guilt/innocence phase of trial that anyone other than Aguilar shot Annette Chavez, the guilty verdict necessarily reflected the jury's belief that Aguilar intentionally caused Annette's death. Accordingly, Quiroz's statement that "others went into the trailer house" was inconsequential. Moreover, Quiroz's statement did not directly implicate Aguilar in the crime. *Cf. Gray v. Maryland*, 523 U.S. 185, 194-95 (1998) (using "me and a few other guys" as an example of a properly redacted co-defendant's statement under *Bruton v. United States,* 391 U.S. 123 (1968)). Further, evidence at the guilt/innocence phase established that Quiroz was the "American" who shot Leo Chavez in the head and handed the gun to Aguilar. 19 SR 398, 400. The jury, therefore, would have discounted any inference, in Quiroz's statement, that Aguilar was the sole shooter. Thus, given the overwhelming evidence that Aguilar

assassinated Annette Chavez by shooting a bullet through her spinal cord, there is no reasonable possibility that Quiroz's out-of-court statement contributed to the jury's affirmative finding that Aguilar actually caused Annette's death or "anticipated that a human life would be taken." *See Schneble v. Florida*, 405 U.S. 427, 432 (1972) (holding that "the 'minds of an average jury' would not have found the State's case significantly less persuasive" had the co-defendant's testimony implicating the defendant been excluded).

The trial court on state habeas review also found that, in addition to the claim being procedurally barred, Aguilar's allegation of wrongdoing by the State is unsupported by the record. Supp. SHTr 5 (FF 19). Because the state court's rejection of this claim is reasonable in light of the evidence, relief must be denied under the AEDPA.

## XVII. Aguilar Fails To Demonstrate That He Requested And Was Denied The Right To Attend The Hearing On His Motion For New Trial, In Violation Of His Due Process Rights. (Aguilar's claim 21)

Aguilar argues that he was not present at the hearing on his motion for new trial, even though he wished to be, and that this violated his right to due process under the Fourteenth Amendment. Petition at 14. However, Aguilar presents no evidence in support of the contention that he desired to be present, or that he was not present. There was no request in his motion for new trial that he be allowed to attend, and no mention of Aguilar's presence or absence was made in the order setting the hearing for July 26, 1996. *See* I-B Tr 870-73,

874.[34]  However, prior to the hearing the State applied for a Writ of Habeas Corpus Ad

Prosequendum, which required the United States Marshall to bring Aguilar to the hearing,

and the court granted the writ. I-B Tr 877, 878, 880. The court heard the motion for new

trial and denied it on July 26, 1996. I-B Tr 884. Most damning, the record of the hearing

reflects that Aguilar was, in fact, actually present. *See* 28 SR 308.

The trial court on state habeas review found that Aguilar failed to have included

Exhibit 18 in his petition and that, regardless, Aguilar was present at the hearing. Supp.

SHTr 5 (FF 20); *see* 28 SR 3-8 (hearing transcript). Obviously, the trial court was in the

best position to determine whether Aguilar attended the hearing before it. Given the fact that

the record clearly evidences Aguilar's presence at the hearing, his claim fails to allege facts

which if true might entitle him to relief. *Theriot v. Whitley*, 18 F.3d at 315. Accordingly,

Aguilar fails to demonstrate that the trial court's factual findings on this claim are clearly

erroneous and, as a result, this claim fails under the AEDPA.

## XVIII. Aguilar's Final Four Claims Are Procedurally Defaulted Because The Texas Court Dismissed The Claims As An Abuse Of The Writ. (Aguilar's claims 22 to 25)

In his twenty-second claim, Aguilar asserts that his identification lineup violated

*Simmons*, presumably referring to *Simmons v. United States*, 390 U.S. 377 (1968), because

he was the only one appearing in a white jumpsuit,  and a white man was placed next to him,

---

[34]     Aguilar does not cite to the record in support of the claim and, after due diligence, the Director has been unable to locate "Exhibit 18" which Aguilar references in his petition. Petition at 14.

suggesting the man to have been Aguilar's "American" co-actor. Petition at 14. As his

twenty-third ground for relief, Aguilar asserts that State's witness Abel Perez gave false

testimony when Perez stated, after conferring with the prosecutor, that he could not

remember whether there was a white man in the line up. *Id.* In two related claims, Aguilar

argues that he was denied a meaningful appellate review because the Court of Criminal

Appeals allegedly did not read the record in his case (claim 24), and because his appeal was

heard by a biased court (claim 25). *Id.* at 14-17.[35] Aguilar exhausted these claim in state

court by filing them in a successive writ petition. *See* 2nd Writ at 39-47. However, the Court

of Criminal Appeals dismissed Aguilar's successor petition as an abuse of the writ pursuant

to TEX. CODE CRIM. PROC. ANN. art. 11.071 § 5(a) (Vernon's 1997). *Id.* at cover; *Ex parte*

*Aguilar*, No. 36,142-02 at unpublished order of November 21, 2001.[36] When Aguilar's

allegations were dismissed on the basis of an independent and adequate state procedural bar,

the dismissal imposed a procedural bar to federal review of the merits as well.

---

[35]     Aguilar's final two claims appear to have been combined in his successive state writ petition. Compare Petition at 14-17 *with* 2nd Writ 36-38. To the extent Aguilar would argue that the Court of Criminal Appeals denial of his "Motion to Recuse the Entire Court of Criminal Appeals of Texas and Alternatively All Those Judges Who Sat on His Direct Appeal" (*see* 2nd Writ at 14-18) somehow forms an independent basis for claim 25, then he failed to seek reconsideration from the Texas court of the denial of its own motion and, thus, that aspect would remain unexhausted.

[36]     Under Section 5(a), unless Crawford presents a factual or legal basis for a claim that was previously unavailable or shows by a preponderance of the evidence that, but for a violation of the United States Constitution, no rational juror would have found for the State, Crawford is procedurally barred from returning to the Texas courts to exhaust his claims. TEX. CODE CRIM. PROC. ANN. art. 11.071 § 5(a) (Vernon's 1997).

It is well settled that federal review of a claim is procedurally barred if the last state court to consider the claim expressly and unambiguously based its denial of relief on an independent and adequate state rule. *Coleman v. Thompson*, 501 U.S. at 729; *Harris v. Reed*, 489 U.S. 255, 263 (1989); *Amos v. Scott*, 61 F.3d 333, 338 (5th Cir. 1995). A procedural bar will be found constitutionally valid if it is "adequate," which means "that it is strictly or regularly followed by the cognizant state court." *Amos*, 61 F.3d at 339; *Hawthorn v. Lovorn*, 457 U.S. 255, 262 (1982) (citing *Barr v. City of Columbia*, 378 U.S. 146, 149 (1964)). The Fifth Circuit has long held that dismissal of a state habeas petition pursuant to TEX. CODE CRIM. PROC. ANN. art. 11.071 § 5(a) constitutes a procedural bar which the Texas courts strictly and regularly enforce. *See, e.g., Horsley v. Johnson*, 197 F.3d at 137; *Nobles v. Johnson*, 127 F.3d at 423; *Emery v. Johnson*, 139 F.3d at 196; *Fearance v. Scott*, 56 F.3d at 642. Even more importantly, no evidence suggests that the Texas statutory provision was applied selectively or irregularly in Aguilar's case. Consequently when Aguilar's second writ petition was dismissed, that action was consistent with the established practice of the Court of Criminal Appeals and sufficient to create a procedural bar under the *Coleman* standard. *See Coleman*, 501 U.S. at 729; *Fearance*, 56 F.3d at 642.

As discussed more thoroughly in Part XIV above and incorporated herein, where a state court has explicitly relied on a procedural bar to deny relief, a state prisoner may not obtain federal habeas relief unless he can demonstrate cause for the default and actual prejudice attributable to the default, or that the federal court's failure to consider the claim

will result in a fundamental miscarriage of justice. *Coleman v. Thompson*, 501 U.S. at 750;

*Wainwright v. Sykes*, 433 U.S. 72, 87 (1977); *Deters v. Collins*, 985 F.2d 789, 795 (5th Cir.

1993) (citing *Coleman, supra*). Here, Aguilar does not even mention that the Texas court

dismissed his successor petition, much less attempt to establish cause and prejudice as might

allow this Court to excuse his default. *See* Petition at 1-19. Consequently, Aguilar's last

four claims are procedurally defaulted from federal habeas review.

## CONCLUSION

For the foregoing reasons, the Director respectfully asks that her motion for summary

judgment be granted, and that Aguilar's writ of habeas corpus petition be denied.

Respectfully submitted,

JOHN CORNYN
Attorney General of Texas

HOWARD G. BALDWIN, JR.
First Assistant Attorney General

MICHAEL T. McCAUL
Deputy Attorney General
for Criminal Justice

GENA BUNN
Assistant Attorney General
Chief, Capital Litigation Division

KATHERINE D. HAYES*
Senior Assistant Attorney General
*Attorney-in-charge
State Bar No. 00796729
Southern District Admission No. 22698

Office of the Attorney General
Capital Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas  78711-2548
Telephone:  (512) 936-1600
Telecopier:  (512) 320-8132

ATTORNEYS FOR RESPONDENT

## CERTIFICATE OF SERVICE

I, Katherine D. Hayes, Senior Assistant Attorney General of Texas, do hereby certify

that a true and correct copy of the above and foregoing motion has been served by placing

same in overnight mail delivery, postage prepaid, on this the 23rd day of August, 2002,

addressed to:

Mr. Larry Warner
LAW OFFICE OF LARRY WARNER
777 East Harrison, Suite 2
Brownsville, Texas 78520
contact # (956) 542-4784

and

Mr. David K. Sergi
SERGI & ASSOCIATES, P.L.L.C.
109 East Hopkins, Suite 200
San Marcos, Texas 78666
contact # (512) 392-5010

KATHERINE D. HAYES
Senior Assistant Attorney General

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| JESUS LEDESMA AGUILAR, | § | |
|      Petitioner, | § | |
| | § | |
| v. | § | Civil Action No.  B-01-195 |
| | § | **CAPITAL LITIGANT** |
| JANIE COCKRELL, Director, | § | |
| Texas Department of Criminal Justice, | § | |
| Institutional Division, | § | |
|      Respondent | § | |

## ORDER GRANTING SUMMARY JUDGMENT

On the motion of Respondent, summary judgment is hereby GRANTED and the

petition for writ of habeas corpus is DENIED WITH PREJUDICE.

It is so ORDERED.

SIGNED on this the _____ day of _____, 200__.


_____

UNITED STATES DISTRICT JUDGE