28

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS,
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

JAN 2 7 2003

Michael N. Milby
Clerk of Court

Jesus Ledesma Aguilar v. Janie Cockrell


CAUSE #B-01-195

****************
BRIEF RE MOTION RE ATTORNEY'S FEES FOR SUBSEQUENT STATE WRIT
FILED AFTER DISMISSAL OF FIRST FEDERAL MOTION TO VACATE
WITHOUT PREJUDICE TO REFILE THE FEDERAL MOTION TO VACATE
****************


BY:

LARRY WARNER
COUNSEL FOR APPELLANT
777 EAST HARRISON
BROWNSVILLE, TEXAS   78520
PHONE (956)542-4784
FAX    (956)544-5234
STATE BAR# 20871500

Pursuant to FED.R.APP.P.26.1 and 5TH CIR.R.28.2.1, Appellant provides the following:

### Certificate of Interested Persons

The undersigned counsel of record certifies that the following listed persons have an interest in the outcome of this case. These representations are made in order that the Judges of this Court may evaluate possible disqualifications or recusal.

The Movant, Jesus Ledesma Aguilar filed a Motion to Vacate before the United States District Court for the Southern District of Texas, Brownsville Division.

Defendant is represented on the Motion  by Mr.Warner, of     ,Brownsville, Texas and by Mr. Sergi, of San Marcos, Texas. Counsel serve at the instance of the Court.

The Respondent, the State of Texas, represented by Katherine D. Hayes, Senior Assistant Attorney General, Capital Litigation Division, P.O.Box 12548, Austin, Tx. 78711

Respectfully submitted this January 27, 2003.

Larry Warner
Counsel for Jesus Ledesma Aguilar, Movant
777 East Harrison  2nd Floor
Brownsville, Texas  78520
Phone(956)542-4784 Fax (956)544-5234
State Bar# 20871500

Pursuant to FED.R.APP.P. 26(a), Appellant provides:

## TABLE OF CONTENTS

**CASES**                                                          **PAGE**

IDENTITY OF PARTIES....................................... 2

TABLE OF CONTENTS......................................... 3

TABLE OF AUTHORITIES...................................... 4

STATEMENT OF JURISDICTION................................. 5

ISSUES PRESENTED.......................................... 6

STATEMENT OF THE CASE..................................... 7-9

APPELLANT PRESENTS ARGUEMNT............................... 10-12

      Issue Number One.....................................10

      In the light of **In re Wischkaemper,** 123 S.Ct.687(2002),
      and **Barnes v. Johnson**, 31 Fed.Appx.832(5th Cir.2002)does
      the Court have jurisdiction to grant any attorney's
      fees for subsequent state writ filed after dismissal
      of first federal Motion to Vacate without  prejudice
      to refile the Federal Motion to Vacate?

   Issue Number Two . . . . . . . . . . . . . . . . . . . 11

      If  the  Court  has  discretion  to  grant  any  fees  for
      subsequent state writ filed after dismissal of first
      federal  Motion  to  Vacate  without   prejudice  to
      refile  the  Federal  Motion  to  Vacate,  should  it
      exercise that
      discretion in this case?

CONCLUSION STATING PRECISE RELIEF SOUGHT . . . . . . . . . 13

CERTIFICATE OF SERVICE  . . . . . . . . . . . . . . . . . 14

APPENDIX  . . . . . . . . . . . . . . . . . . . . . . . 15-41

Pursuant to FED.R.APP.P. 26(a)(1), Appellant provides·

## INDEX OF AUTHORITIES

**CASES**                                                              **PAGES**

**In re Wischkaemper,** 123 S.Ct.687(2002)  . . . . . . . 3,4,6,10,15

Barnes v. Johnson, 31 Fed.Appx.832(5th Cir.2002)  . . . . . . 15

**STATUTES**

28 U.S.C.848q . . . . . . . . . . . . . . . . . . . . . . . .5

Pursuant to Fed.R.App.P. 26(a)(2)

### STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION

(i) The basis for the subject matter jurisdiction in the District Court, with citation to applicable statutory provisions and with reference to the relevant statutes to establish such jurisdiction is as follows:

> The statute providing for appointment of counsel provides for compensation of counsel. 28 U.S.C.848q

Pursuant to FED.R.APP.P. 26(a)(3)

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

### Issue Number One

In the light of **In re Wischkaemper,** 123 S.Ct.687(2002), does the Court have jurisdiction to grant any attorney's fees for subsequent state writ filed after dismissal of first federal Motion to Vacate without  prejudice to refile the Federal Motion to Vacate?

### Issue Number Two

If the Court has discretion to grant any fees for subsequent state writ filed after dismissal of first federal Motion to Vacate without  prejudice to refile the Federal Motion to Vacate, should it exercise that discretion in this case?

Pursuant to FED.R.APP.P. 26(a)(4)

## STATEMENT OF THE CASE

Succinctly, Ledesma Aguilar was indicted, tried, and convicted in state court for capital murder and sentenced to death. The Court of Criminal Appeals affirmed the conviction and sentence of death. Aguilar filed an application for a state writ of habeas corpus. It was denied. The Court appointed Mr. Warner to file Motion to Vacate. He did. There was an evidentiary hearing. The Court permitted, without objection from the State of Texas, Aguilar to dismiss his Motion to Vacate without prejudice to refile. He pursued a subsequent state writ. It was denied. He reinstituted his federal Motion to Vacate.

Mr. Warner filed a Motion for payment. Part of the fees requested involve work done on the subsequent state writ. He noted that the state court had paid him $750 for the work on the subsequent state writ.

Pursuant to FED.R.APP.P. 26(a)(5)

## SUMMARY OF THE ARGUMENT

The Court may distinguish **Wischkaemper**. **Wischkaemper** represented the litigant on a Motion to Vacate, then in state clemency proceedings. The Supreme Court affirmed that the statute did not permit payment of counsel's fees for state clemency proceedings.

In **Aguilar**, everything done on the subsequent state writ was done with an eye toward filing the reinstituted federal Motion to Vacate. That is, everything done on the subsequent state writ was done preparing for the filing of the reinstituted federal Motion to Vacate. The most important point in the subsequent state writ was whether the Court of Criminal Appeals was effectively the patently biased judge of Fulminante v. Arizona, since the Court of Criminal Appeals affirmed the death sentence based on the testimony of Albino Garcia that Aguilar had the gun used by the other shooter the night before the murders, so Aguilar must have known that the other shooter was going to kill, and so is responsible for the first murder, committed by the other shooter, as well as the shooting of the second person, which Aguilar did. The case is capital because of Aguilar's responsibility for two murders. The problem is that Albino Garcia never testified. The Court of Criminal Appeals never read the record before affirming the

conviction and sentence.

This Court will have to determine whether the state process was fair in deciding whether to accept the result of the state court proceedings.

Pursuant to FED.R.APP.P. 26(a)(6)

## APPELLANT PRESENTS ARGUMENT

### Issue Number One

In the light of **In re Wischkaemper,** 123 S.Ct.687(2002), does the Court have jurisdiction to grant any attorney's fees for subsequent state writ filed after dismissal of first federal Motion to Vacate without prejudice to refile the Federal Motion to Vacate?

The Court should read **In re Wischkaemper,** 123 S.Ct.687(2002). A copy is included in the Appendix to this brief. **Wischkaemper** did not deal with any subsequent state writ preparing for the re-filing of a federal Motion to Vacate. It dealt with state clemency proceedings that were not related to the federal Motion to Vacate.

In **Aguilar,** everything done on the subsequent state writ was done with an eye toward filing the reinstituted federal Motion to Vacate. That is, everything done on the subsequent state writ was done preparing for the filing of the reinstituted federal Motion to Vacate. The most important point in the subsequent state writ was whether the Court of Criminal Appeals was effectively the patently biased judge of Fulminante v. Arizona, since the Court of Criminal Appeals affirmed the death sentence based on the testimony of Albino Garcia that Aguilar had the gun used by the other shooter the night before the murders, so Aguilar must have known that the other shooter was going to kill, and so is responsible for the

-10-

first murder, committed by the other shooter, as well as the shooting of the second person, which Aguilar did. The case is capital because of Aguilar's responsibility for two murders. The problem is that Albino Garcia never testified. The Court of Criminal Appeals never read the record before affirming the conviction and sentence.

This Court will have to determine whether the state process was fair in deciding whether to accept the result of the state court proceedings.

### Issue Number Two

If the Court has discretion to grant any fees for subsequent state writ filed after dismissal of first federal Motion to Vacate without prejudice to refile the Federal Motion to Vacate, should it exercise that discretion in this case?

The Court may review the summary of work done and expenses incurred. If it finds that it has jurisdiction to order any attorneys' fees for work done on the state writ, it may order compensation in accordance with 28 U.S.C. 848q.


Where attorney who had been appointed by district court to represent indigent defendant at trial could have been appointed by court of appeals prospectively at any time to represent the same defendant on appeal, court of appeals would enter appointment nunc

pro tunc as of date when appeal was taken in order to qualify the attorney for compensation for services after that date. U. S. v. Perry, C.A.D.C.1972, 471 F.2d 1069, 153 U.S.App.D.C. 101.

Where court of appeals granted leave to appeal in forma pauperis, counsel could, if he chose, request appointment and compensation under this section nunc pro tunc as of date of filing of notice of appeal from district court's order. Miranda v. U. S., C.A.2 (N.Y.) 1972, 458 F.2d 1179, certiorari denied 93 S.Ct. 207, 409 U.S. 874, 34 L.Ed.2d 126. **Hill v. Lockhart**, 992 F2d 801(8th Cir.1993) Counsel was not entitled to compensation for clemency petition in state.

Pursuant to FED.R.APP.P. 26(a)(7)

## CONCLUSION AND REQUEST FOR RELIEF

The Court should grant relief.


Respectfully submitted,


Larry Warner
Counsel for Appellant
777 East Harrison
Brownsville, Texas  78520
Phone (956)542-4784
Fax   (956)544-5234
State Bar# 20871500

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS,
BROWNSVILLE DIVISION


Jesus Ledesma Aguilar v. Janie Cockrell


CAUSE #B-01-195

# CERTIFICATE OF SERVICE

I, Larry Warner certify that I mailed a copy of **BRIEF RE MOTION RE ATTORNEY'S FEES FOR SUBSEQUENT STATE WRIT FILED AFTER DISMISSAL OF FIRST FEDERAL MOTION TO VACATE WITHOUT PREJUDICE TO REFILE THE FEDERAL MOTION TO VACATE**, the document to which this certificate is attached, to Ms. Hayes on January 27, 2003 at her address noted in the Cerificate of Interested Persons.


I mailed it on this January 27, 2003

LARRY WARNER
COUNSEL FOR APPELLANT
777 EAST HARRISON
BROWNSVILLE, TEXAS  78520
PHONE (956)542-4784
FAX    (956)544-5234
STATE BAR# 20871500

-14-

70 USLW 3698, 71 USLW 3395, 71 USLW 3398

Supreme Court of the United States

**In re Philip WISCHKAEMPER and Gary A. Taylor, petitioners.**

No. 01-1623.

Dec. 9, 2002.

Case below, **Barnes v. Johnson**, 31 Fed.Appx. 832 Petition for writ of certiorari to the United States Court of Appeals for the Fifth Circuit denied.

U.S.,2002 In re Wischkaemper 123 S.Ct. 687 (Mem), 70 USLW 3698, 71 USLW 3395, 71 USLW 3398 END OF DOCUMENT

Copr. (C) West 2003 No Claim to Orig. U.S. Govt. Works

State death row inmate filed petition for federal writ of habeas corpus. The United States District Court for the Southern District of Texas, Lee H. Rosenthal, J., denied petition. Inmate filed application for certificate of appealability (COA). The Court of Appeals, W. Eugene Davis, Circuit Judge, held that: (1) inmate's confession was voluntary despite alleged deceit of police; (2) state court's admission of inmate's videotaped confession, which was made after inmate made ambiguous invocation of his right to remain silent, was not contrary to "clearly established Federal law, as determined by the Supreme Court"; and (3) record supported

state court's determination that actions of police did not render inmate's statements involuntary.

Application denied.

### West Headnotes

KeyCite Notes110 Criminal Law110XX Trial, 110XX(F) Province of Court and Jury in General 110k733 Questions of Law or of Fact 110k734 k. In General. Most Cited Cases 10 Criminal Law 110XX Trial 110XX(F) Province of Court and Jury in General 110k733 Questions of Law or of Fact 110k736 Preliminary or Introductory Questions of Fact 110k736(2) k. Confessions, Admissions, and Declarations. Most Cited Cases

The voluntariness of a confession is ultimately a legal determination; however, the determination may also involve subsidiary factual determinations and mixed issues of law and fact. KeyCite Notes\

110 Criminal Law

110XVII Evidence

110XVII(T) Confessions

110k519 Voluntary Character in General 110k519(9) k. Questioning and Soliciting in General. Most Cited Cases Suspect's confession was voluntary even though he was not told that he was capital murder suspect, he was brought before judge on charge that technically did not exist, and he was not informed that he could

receive death penalty for victim's murder, where suspect understood from beginning that police were investigating victim's murder and that he was suspected of committing the murder, and police merely added superfluous phrase in identifying suspect's charge as "burglary of a habitation with intent to commit murder." V.T.C.A., Penal Code §§ 30.02(a)(1).

[3] KeyCite Notes

110 Criminal Law

110XVII Evidence

110XVII(M) Declarations

110k411 Declarations by Accused

110k412.2 Right to Counsel; Caution

110k412.2(5) k. Failure to Request Counsel; Waiver. Most Cited Cases

A suspect's waiver of *Miranda rights is not invalid merely because police interrogators did not advise him of the subject matter of the upcoming interrogation.*

[4] *KeyCite Notes110 Criminal Law*

*110XVII Evidence*

*110XVII(M) Declarations*

*110k411 Declarations by Accused*

*110k412.2 Right to Counsel; Caution*

*110k412.2(5) k. Failure to Request Counsel; Waiver. Most Cited Cases*

*A suspect's waiver of Miranda rights is not invalid simply because*

*the suspect did not have a full and complete appreciation of all the consequences flowing from the nature and quality of the evidence in the case.*

*[5] KeyCite Notes*

*110 Criminal Law*

*110XVII Evidence*

*110XVII(M) Declarations*

*110k411 Declarations by Accused*

*110k412.2 Right to Counsel; Caution*

*110k412.2(3) k. Informing Accused as to His Rights. Most Cited Cases*

*110 Criminal Law*

*110XVII Evidence*

*110XVII(T) Confessions*

*110k518 Caution*

*110k518(3) k. Sufficiency. Most Cited Cases A suspect need not be told that a statement or confession may expose him to the death penalty, in order for that statement or confession to be considered voluntary.*

*[6] KeyCite Notes197 Habeas Corpus*

*197II Grounds for Relief; Illegality of Restraint 197II(B) Particular Defects and Authority for Detention in General 197k489 Evidence 197k490 Admissibility 197k490(3) k. Confessions, Declarations, and Admissions. Most Cited Cases State court's admission of inmate's videotaped confession during inmate's capital*

*murder trial was not contrary to "clearly established Federal law, as determined by the Supreme Court," and therefore Court of Appeals was required under Antiterrorism and Effective Death Penalty Act (AEDPA) to respect such ruling in inmate's subsequent federal habeas corpus proceedings, though inmate claimed that he invoked his right to remain silent before making statement, where inmate's invocation of right was ambiguous, and officer asked noncoercive clarifying questions. U.S.C.A. Const.Amend. 5; 28 U.S.C.A. §§ 2254(d)(1).*

*[7] KeyCite Notes 197 Habeas Corpus*

*197III Jurisdiction, Proceedings, and Relief*

*197III(C) Proceedings*

*197III(C)4 Conclusiveness of Prior Determinations*

*197k765 State Determinations in Federal Court*

*197k775 Admissibility of Evidence; Arrest and Search*

*197k775(1)  k.  In General. Most Cited Cases State court record supported determination that actions of police in subjecting suspect to lengthy interrogation, depriving suspect of footwear and preventing suspect from sleeping for more than three hours at a time did not render suspect's statements involuntary. *219 Tom Alan Cunningham, Cunningham, Darlow, Zook & Chapoton, Houston, TX, Raoul Dieter Schonemann, University of Texas School of Law, Austin, TX, for Petitioner-Appellant. Delane T. Hendrix, Austin, TX, for Respondent-Appellee. Appeal from the United States District Court*

for the Southern District of Texas. W. EUGENE DAVIS, Circuit
Judge:Willis Jay Barnes, a Texas death row inmate, seeks a
certificate of appealability ("COA") to challenge the district
court's denial of his petition for writ of habeas corpus. For the
reasons that follow, we deny Barnes's application for a COA.

## I. Facts & Procedural History

The district court below provided an in-depth and complete
description of the facts. We recount the facts only as necessary
for our analysis.

### A. Facts

The body of eighty-four-year-old Helen Greb was found in her
home in Houston, Texas on February 14, 1988. Her nude body was
badly bruised and she had been sexually assaulted, probably with a
bottle. Her ribs and back were broken and she had been manually
strangled. The cause of death was "asphyxia due to manual
strangulation and compression of the chest."

A kitchen window in Ms. Greb's house had been pried open and
the telephone wire outside the house had been cut. A second window
at the back of the house had been opened and the screen pried
loose. There was a footprint from a tennis shoe in the kitchen sink
below the kitchen window. Police determined that a television set
and two firearms were missing from the house.

*The Houston Police located these missing items in the possession of Robert Glenn "Pokey" Davis, a known dealer in stolen property and a police informant. Davis told the police that he had received the stolen items from Willis Jay Barnes. On February 17, 1998, an arrest warrant for Barnes was issued charging him with theft by receiving, a misdemeanor offense. Barnes was arrested the same day by Sergeant David E. Calhoun of the City of Houston Police Department, the primary investigator of Ms. Greb's murder. Calhoun and his partner, Sergeant Robert Parish, handcuffed Barnes and read him his Miranda rights.* Barnes indicated that he understood his rights and had no questions. Barnes was told only that he was under arrest for possession of stolen property, not that he was a capital murder suspect.

At approximately 6 pm, Calhoun brought Barnes into a police interview room, where he was again read his *Miranda* rights. At the pretrial suppression hearing, Barnes testified that Calhoun initially told him that a woman was dead and Calhoun asked whether Barnes knew anything about her. Barnes also testified that Calhoun stated that police had recovered skin fragments from the dead woman's fingernails and had taken a shoe print from the home that would match Barnes's shoes. Calhoun, however, did not directly tell Barnes that he was a murder suspect.

At approximately 8 pm, after two hours of interrogation,

Barnes agreed to give a written statement (the "first statement") stating that he had entered Ms. Greb's house through an open door, had found the house already ransacked, and had stolen the television and the two firearms. The statement was made on a "statement of a person in custody" form, which includes *Miranda* warnings on the top of every page. Calhoun reviewed these warnings with Barnes, and Barnes placed his initials next to each of the warnings. Barnes waived his *Miranda* *220 rights and initialed this waiver on the statement form.

After the first statement was signed, around 10 pm, Sergeant J.W. Belk, who had witnessed the signing, remained alone with Barnes in the interview room. Belk had participated in a 1984 investigation of Barnes for burglary involving the aggravated sexual assault of an elderly woman. That investigation had resulted in Barnes pleading guilty to the burglary of four homes. Barnes served approximately three years of his thirty-year sentence and was released from prison in October 1987.

At approximately 10:30 pm, Sergeant Parish entered the interview room to get permission to search Barnes's car. Barnes gave this permission. In addition, upon request, Barnes removed his shirt. He had scratches on his chest, on both arms, and under his left eye. The police took Barnes's clothes and provided him with a trusty uniform. They also took Barnes's shoes as evidence. Barnes was not

given socks or shoes because the police were unable to find any.
Calhoun testified that the next morning he brought in a pair of his
own shoes and a pair of socks for Barnes.

Around midnight, Calhoun showed Barnes one of the stolen firearms
and a picture of the television set. He asked Barnes if he would
give a written statement identifying the items. Barnes agreed to
give such a statement. Calhoun again reviewed the *Miranda* warnings
with Barnes, who stated that he understood them. Calhoun began to
type the statement (the "second statement") at approximately half
past midnight. At approximately 1 am, Barnes read the statement,
made and initialed some changes, and signed the statement in the
presence of Belk and Parish. In this statement, Barnes admitted
entering the house and stealing the firearms and television.
However, he denied killing Greb.

After signing the second statement, Barnes was taken to the
city jail. He was placed in a holding cell and then talked to a
bailbondsman. Barnes slept from approximately 2:30 am to 4:30 am,
when he was awakened for breakfast. After breakfast, he slept from
approximately 5:10 am to 8:00 am. Barnes testified that he slept
for a total of approximately five hours.

At approximately 8:30 am, February 18, 1988, Sergeant R.L.
Doyle and Sergeant Sharon Durham brought Barnes to court. Barnes
was dressed in a jail uniform and was still barefoot. Barnes was

brought before Judge Michael McSpadden. Barnes was informed that he was charged with the offense of "burglary of a habitation with intent to commit murder," a first-degree felony charge. Judge McSpadden also informed Barnes of his *Miranda* rights. As he stated each right, Judge McSpadden asked Barnes if he understood the right, and Barnes stated "Yes."

Judge McSpadden also questioned Barnes about his education. Barnes stated that he had received his G.E.D. and had twenty-nine hours of college credit. He also stated that he had failed high school English, but had taken college English and had received a D. Judge McSpadden noted Barnes's answers and observed that Barnes appeared to understand everything stated to him. After the hearing before Judge McSpadden, Barnes was returned to the city jail, where he was given shoes and socks. During both the journey to court and the return trip, Barnes was briefly outside barefoot in rainy and chilly weather.

Beginning at approximately 9:45 am, Calhoun interrogated Barnes further. Before commencing interrogation, he read Barnes his Miranda rights. Barnes stated that he had already been given his rights by Judge McSpadden and that he understood them. During this interrogation, Barnes again told Calhoun that he had stolen the television and firearms, but continued to deny seeing anyone in the house. At approximately 11:45 am, Calhoun ceased the interrogation

and left the interview room.

A few minutes later, Sergeant Belk stopped by the interview room and asked Barnes if he needed anything. Belk then accompanied Barnes to the restroom. While returning from the restroom, Barnes indicated that he wanted to talk to Belk. Back inside the interview room, Barnes brought out a copy of the written *Miranda* warnings *221 from Judge McSpadden and read out loud the charge that was listed there, "burglary of a habitation with intent to commit murder." Barnes then told Belk, "I didn't intend to commit a murder. It was an accident."

Barnes explained that he had entered the house through the kitchen window, intending to take property and money. Greb had confronted him with mace and a rifle. She sprayed mace at him and they struggled. Barnes overcame Greb and left her lying on the floor. Barnes stated that after he had grabbed some cash, the television, and the firearms, he realized that Greb was not breathing and he attempted "mouth to mouth resperation." When this was unsuccessful, he covered her body and fled the scene.

Belk requested that Barnes repeat the events that took place so that Belk could type another statement. Belk again repeated Barnes's *Miranda* rights. Barnes again stated that he waived them. Belk began typing this statement (the "third statement") just after noon. When he finished, Barnes made and initialed two minor changes

and then signed the statement. At the pretrial suppression hearing, Barnes testified that his interrogators did not promise anything in exchange for his statement and did not force, coerce, or compel Barnes to make the statement. After Barnes made his third written statement, Calhoun obtained a warrant for capital murder.

Around 2 pm, Belk asked Barnes whether he would be willing to repeat his third statement on videotape. Barnes stated that he would. Barnes, Belk, and the camera operator were present in the videotape interview room when Barnes gave his videotaped statement (the "fourth statement"). Belk began by reading Barnes questions from a video statement checklist form. These questions included Barnes's *Miranda* rights and whether he understood and waived each right. With one exception that is discussed in-depth in Section II.B, Barnes stated that he understood and waived each right. Barnes then gave a statement on videotape that was consistent with his third written statement.

On June 22, 1988, Barnes was indicted for capital murder. Barnes's trial counsel moved that all of Barnes's statements be suppressed because they were not voluntary and were obtained in violation of Barnes's right to counsel. The trial court conducted a four-day evidentiary hearing on the motion to suppress, during which Barnes, Belk, Calhoun, Doyle, and Judge McSpadden all testified. Following this four-day hearing, the trial court entered extensive

findings of fact and conclusions of law, holding that Barnes's statements were voluntary. The court found that Barnes had the mental capacity and education needed to understand the warnings and that there was no evidence of police misconduct during the interrogation. The court found that "all waivers of constitutional rights involved in each and every statement" were voluntarily and intelligently made. Thus, the trial court admitted all the written statements and the fourth, videotaped statement.

### B. Procedural History

A jury convicted Willis Jay Barnes of capital murder on March 16, 1989. A week later, he was sentenced to death. His conviction and sentence were upheld on direct appeal by the Texas Court of Criminal Appeals in September 1993. *Barnes v. State,* No. 70,858, slip op. (Tex.Crim.App. Sept. 22, 1993). The same court denied Barnes's motion for a rehearing in November of 1993. In April 1994, the United States Supreme Court denied Barnes's petition for a writ of certiorari. *Barnes v. Texas,* 511 U.S. 1063, 114 S.Ct. 1635, 128 L.Ed.2d 357 (1994).

In July 1995, Barnes filed an application for a post-conviction writ of habeas corpus in state court. The district court conducted a limited evidentiary hearing on Barnes's allegation of ineffective assistance of counsel. The court entered findings of

fact and conclusions of law and transmitted the post-conviction record to the Texas Court of Criminal Appeals. In February 1996, the Texas Court of Criminal Appeals entered an order stating that the trial court's findings of fact and conclusions of law were "supported by the record and upon such basis the relief sought by the petitioner is denied." *Ex Parte Barnes*, Application No. 30,357-01 (Tex.Crim.App. Feb. 14, 1996).

In April 1997, Barnes timely filed a petition for writ of habeas corpus in federal district court. Respondent answered and filed a motion for summary judgment. The district court granted Respondent's motion for summary judgment and entered a Final Judgment denying Barnes's petition for a writ of habeas corpus and denying a COA. *Barnes v. Johnson,* No. H-97-400 (S.D.Tex. Apr. 30, 1998) (order denying writ of habeas corpus). Barnes now challenges the district court's denial of a COA. He requests that this Court grant a COA and direct the issuance of a writ of habeas corpus.

## C. AEDPA

The standards by which we determine whether to grant a COA are provided by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C.A. §§§§ 2241-55 (Supp.1998). Under the regime set forth by the AEDPA, Barnes is required to obtain a COA from either the district court or this Court in order to proceed

with an appeal. 28 U.S.C.A. §§ 2253(c)(1). To obtain a COA, a petitioner must make a substantial showing of the denial of a constitutional right. 28 U.S.C.A. §§ 2253(c)(2).

Barnes claims that the third written statement and the fourth videotaped statement were not voluntary. He argues that their admission at his trial violated his constitutional rights to counsel and to remain silent under the Fifth, Sixth, and Fourteenth Amendments.

[1] The voluntariness of a confession is ultimately a legal determination. *See Miller v. Fenton*, 474 U.S. 104, 112, 106 S.Ct. 445, 450-51, 88 L.Ed.2d 405 (1985); *Muniz v. Johnson*, 132 F.3d 214, 219 (5th Cir.), *cert. denied*, 523 U.S. 1113, 118 S.Ct. 1793, 140 L.Ed.2d 933 (1998). However, the determination may also involve subsidiary factual determinations and mixed issues of law and fact. *Muniz*, 132 F.3d at 219. Under the standards set forth by the AEDPA, for the issues that are purely legal or mixed law and facts, this Court must respect a state court's determination of voluntariness so long as it was not "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C.A. §§ 2254(d)(1); *Drinkard v. Johnson*, 97 F.3d 751, 767-68 (5th Cir.1996), *cert. denied*, 520 U.S. 1107, 117 S.Ct. 1114, 137 L.Ed.2d 315 (1997); *see also Mata v. Johnson*, 99 F.3d 1261, 1267 (5th Cir.1996) (equating

this form of review with the "clearly erroneous"-standard). Purely factual subsidiary determinations are presumed to be correct and are overturned only if they were "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C.A. §§ 2254(d)(2). When challenging a state court's factual determinations, a petitioner must rebut this presumption of correctness by "clear and convincing evidence." 28 U.S.C.A. §§ 2254(e)(1).

## II. Applicant's Claims

Barnes argues that his confession--through his third written statement and fourth videotaped statement--was not voluntary and that he was coerced into waiving his constitutional rights. He argues that the trial court thus erred in admitting the third and fourth statements at his trial. He provides six specific allegations of police "physical and mental coercion, fraud and deceit" to support his argument. Barnes alleges that: (1) the police deliberately and fraudulently misled him as to the charges that they intended to press; (2) the police did not cease interrogation after Barnes invoked his right to remain silent; (3) the police coerced him by interrogating him for ten hours and holding him in custody for over nineteen hours; (4) the police left Barnes without footwear for an extended period of time, during

which he was outside at points; (5) the police prevented Barnes
from sleeping for more than two or three hours at a time; and (6)
the police's treatment of Barnes, when viewed in its entirety, was
fundamentally unfair. We review these arguments to determine
whether the trial court's decision to admit the third and fourth
statements was "contrary to, or involved an unreasonable
application of, clearly established Federal law, as determined *223
by the Supreme Court...." 28 U.S.C.A. §§ 2254(d)(1).

### A. The Intentionally Fraudulent Charge

[2] It is undisputed that for most, if not all, of Barnes's
interrogation, he was not specifically told that he was a suspect
for capital murder. [FN1] In addition, when he was brought before
Judge McSpadden, Barnes was told that he was being charged with
"burglary of a habitation with intent to commit murder," a charge
that apparently does not technically exist. Barnes alleges that
these two aspects of his interrogation--he was not told that he was
a capital murder suspect and he was brought before Judge McSpadden
on a "made up" charge--render his confession involuntary. We do not
agree.

FN1. We assume for our purposes that this was an affirmative
police decision made in an attempt to get Barnes to implicate
himself in the murder.

While Barnes was not directly informed that he was a capital murder suspect, from the beginning of his interrogation Barnes was aware that a woman had died in the house he was alleged to have burglarized. Sergeant Calhoun mentioned Ms. Greb's murder shortly after Barnes was arrested. Moreover, Barnes himself stated that he had seen on the television news that the woman living in the house he had burglarized had been killed. In Barnes's first statement, he mentioned the death and attempted to divert attention from himself by mentioning someone that he had seen next door, stating "I think that this man had something to do with the old womans death." Thus, it is clear that Barnes understood from the start that the police were investigating Ms. Greb's murder, not just theft of property. He was also well aware that he was suspected of committing the murder.

[3]

A suspect's waiver of *Miranda* rights is not invalid merely because police interrogators did not advise him of the subject matter of the upcoming interrogation. Colorado v. Spring, 479 U.S. 564, 574, 107 S.Ct. 851, 857, 93 L.Ed.2d 954 (1987). Similarly, the waiver is not invalid simply because the suspect did not have "a full and complete appreciation of all the consequences flowing from the nature and quality of the evidence in the case." *Oregon v. Elstad,* 470 U.S. 298, 317, 105 S.Ct. 1285, 1297, 84 L.Ed.2d 222

(1985). In light of Barnes's clear understanding that the police were investigating a murder, the police's decision not to inform Barnes specifically that he was a capital murder suspect does not render his third and fourth statements involuntary.

Barnes's further argument that he was coerced and deceived by the abnormal charge of "burglary of a habitation with the intent to commit murder" is equally without merit. Section 30.02 of the Texas Penal Code defines burglary of a habitation as follows: "(A) A person commits an offense if, without the effective consent of the owner, he: (1) enters a habitation ... with intent to commit a felony or theft." Tex.Penal Code Ann. §§ 30.02(a)(1) (Vernon 1997). Thus, in identifying Barnes's charge, the police added a superfluous phrase--"with the intent to commit murder"--to the crime of burglary of a habitation. All this phrase served to do, however, was to identify the particular felony that the police intended to use for the requisite "commit a felony or theft" element. The addition of this phrase cannot be said to have worked a deception upon Barnes. Indeed, the inclusion of this phrase goes directly against Barnes's claim that he was deceived and coerced into confessing the murder because he was not informed that he was a capital murder suspect.

[5] Finally, Barnes alleges that he was deceived and coerced by not being informed that he could receive the death penalty for the

Greb's murder. There is no Supreme Court law requiring that a suspect be informed that he is suspected of an offense that could result in the death penalty. Indeed, the Supreme Court's decisions in Colorado v. Spring, 479 U.S. at 574, 107 S.Ct. at 857, and Oregon v. Elstad, 470 U.S. at 317, 105 S.Ct. at 1297, indicate just the opposite--a suspect need not be told that a statement or confession may expose him to the death penalty.

   *224 In sum, Barnes's claims of deceit and an "intentionally fraudulent charge" provide no support to his claim that the state court's determination of voluntariness was either contrary to, or an unreasonable application of, clearly established federal law, or, alternatively, an unreasonable determination of the facts.

B The Fourth Amendment and Assertion of Rights

   [6]Barnes argues that prior to the videotaping of his fourth statement, he invoked his right to remain silent. Therefore, any statements made after this point could not have been admitted at trial without violating his constitutional rights. The transcript of Sergeant Belk's exchange with Barnes, however, makes it clear that at no point did Barnes unambiguously invoke his right to remain silent. Therefore, Belk did not violate Barnes's Fifth Amendment rights by continuing the videotaped statement and the trial court did not err in admitting it.

   The alleged invocation was recorded on videotape. The

-34-

transcript of that incident is as follows:

Q: I'm Sergeant J.W. Belk.

A: I'm Willis Jay Barnes.

Q: Okay, Willis. That's B-A-R-N-E-S.

A: B-A-R-N-E-S.

Q: Okay. I'm going to read you your warnings, and if at any point
you don't understand, stop me and we will go through it. A: Okay.

Q: You have the right to remain silent and not make any statement
at all and that statement you make may be used against you and
probably will be used against you at trial. Do you understand that
right?

A: I understand it.

Q: Do you waive this right?

A: No.

Q: Okay, do you understand what "waive" means?

A: It mean, uh, do I waive rights for you to do it, right?

Q: Well, it's explained.... you have the right to remain silent....

A: Right.

Q: And you can remain silent and not say anything at all, or you
can waive that right....

A: Right, that's what I'm saying. I waive what I'm saying, it's
okay, what I'm saying is I'm giving you the right to put me that
... to ask me these questions. All right?

Q: Okay, and so you're waiving your right to remain silent and you are talking.

A: I am talking.

Q: Okay, so you understand that right ...

A: I understand that right. Q: And you are waiving that right?

A: Right.

Q: Okay.

After this exchange, Belk continued videotaping and Barnes gave his fourth statement, which was consistent with his third written statement.

The question raised by this dialogue is whether Belk should have immediately ceased interrogation after Barnes replied "No." Barnes argues that by continuing beyond this apparent invocation, Belk denied Barnes his Fifth Amendment right to remain silent. The Supreme Court has held that if a suspect "indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." *Miranda v. Arizona*, 384 U.S. 436, 474-75, 86 S.Ct. 1602, 1627, 16 L.Ed.2d 694 (1966). In this case, it was not clear that the suspect wished to remain silent. Indeed, considering Barnes's previous statements and the fact that Barnes himself had initiated this particular discussion, Belk had every reason to believe that Barnes wished to talk.

The Supreme Court's most recent exposition on ambiguous invocations was in the context of whether a suspect invoked his Sixth Amendment right to counsel. In Davis v. United States, 512 U.S. 452, 459, 114 S.Ct. 2350, 2355, 129 L.Ed.2d 362 (1994), the Court held that the determination of whether a suspect invoked his right to counsel is an objective one. The question is whether the suspect "articulate[d] his desire to have counsel *225 present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." Id  Other circuits have held that this "objective inquiry" into ambiguity is applicable to invocations of the right to remain silent. [FN2]

FN2. See e.g. Medina v. Singletary, 59 F.3d 1095, 1100 (11th Cir.1995), *cert. denied*, 517 U.S. 1247, 116 S.Ct. 2505, 135 L.Ed.2d 195 (1996) (applying Davis's objective inquiry to determine whether suspect's invocation of the right to remain silent was ambiguous or equivocal); United States v. Banks, 78 F.3d 1190, 1197 (7th Cir.) (same), vacated on other grounds, 519 U.S. 990,117 S.Ct. 478, 136 L.Ed.2d 373 (1996); c.f. United States v. Ramirez, 79 F.3d 298, 305 (2d Cir.), *cert. denied,* 519 U.S. 850, 117 S.Ct. 140, 136 L.Ed.2d 87 (1996) (assuming, arguendo, that *Davis* applies to invocations of the right to remain silent, but not holding that it definitely does); *see also United States v. Johnson,* 56 F.3d 947, 955 (8th

Cir.1995) (citing Davis while determining whether right to remain silent had been invoked). The Texas Court of Criminal Appeals has also applied the Davis analysis to invocations of the right to remain silent. Dowthitt v. Texas, 931 S.W.2d 244, 257 (Tex.Crim.App.1996) (citing

Davis and holding that statement, "I can't say more than that. I need to rest," was not an unambiguous invocation of the right to remain silent).

This circuit has not yet determined whether the Davis analysis is applicable to invocations of the right to remain silent. However, because Section 2254 is specifically focused on federal law *as determined by the Supreme Court*, we need not decide that issue here. 28 U.S.C.A. §§ 2254(d)(1). We only need to decide whether the state court's decision to admit the fourth statement was contrary to clear Supreme Court law. In light of the language and logic of the Supreme Court's decision in Davis, we cannot say that it was.

The majority opinion in Davis held that when faced with an ambiguous invocation of a right, an interrogator was not required to ask clarifying questions. Davis, 512 U.S. at 461, 114 S.Ct. at 2356. Nevertheless, the Court noted that it will "often be good police practice for the interviewing officers" to ask clarifying

questions. Id. Thus, in the present case, Belk went beyond what the Supreme Court required and followed what the Court described as "good police practice." He was presented with an ambiguous and surprising apparent invocation. He asked a few explanatory, noncoercive questions that revealed that Barnes did not wish to invoke his right to remain silent.

In light of Davis and this clear record--in which an ambiguous statement was made and noncoercive clarifying questions revealed no intent to invoke the right to remain silent--the trial court's admission of the fourth, videotaped statement is not contrary to "clearly established Federal law, as determined by the Supreme Court...." 28 U.S.C.A. §§ 2254(d)(1). [FN3]

FN3. Furthermore, as noted by the district court, even had there been error in admitting the fourth, videotaped statement, such error would probably have been harmless. See Arizona v. Fulminante, 499 U.S. 279, 310-11, 111 S.Ct. 1246, 1265-66, 113 L.Ed.2d 302 (1991) (holding that the admission of an involuntary confession is subject to harmless error analysis). The fourth, videotaped statement is cumulative of the third statement. Therefore, had it been error to admit the fourth statement-- which it was not--such error would probably have been harmless under the particular circumstances of this case. See United States v. Ramirez, 963 F.2d 693, 698 (5th Cir.), cert. denied, 506 U.S. 944, 113 S.Ct. 388, 121

L.Ed.2d 296 (1992); Boles v. Foltz, 816 F.2d 1132, 1135-36 (6th Cir.), *cert. denied*, 484 U.S. 857, 108 S.Ct. 167, 98 L.Ed.2d 121 (1987).

### C. Barnes's Other Arguments

[7]Barnes's additional arguments are heavily factual in nature. Barnes argues that his statements were not voluntary because he was coerced by the police. He points to the length of his interrogation, his lack of footwear, and the fact that he was prevented from sleeping for more than three hours at a time. The state court made factual determinations that these police actions were not coercive and therefore did not render the statements involuntary. These state court factual determinations are entitled to a presumption of correctness. 28 U.S.C.A. §§ 2254(d)-(e). As the district court noted in its meticulous analysis of the state court proceedings, the state court record does not support Barnes's claims that these police actions rendered his statements involuntary.

*226 D. Totality of the Circumstances and Fundamental Unfairness

In light of our rulings on the previous issues, it is clear that under the totality of the circumstances, the admission of Barnes's third and fourth statements was not fundamentally unfair and did not violate Barnes's constitutional rights.

-40-

### III. Conclusion

Because Willis Jay Barnes has failed to make a substantial showing
of the denial of a constitutional right, his application for a COA
is DENIED.

C.A.5 (Tex.),1998.

Barnes v. Johnson

160 F.3d 218