33

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**BROWNSVILLE DIVISION**

United States District Court
Southern District of Texas
ENTERED

MAR 0 3 2003

Michael N. Milby, Clerk of Court
By Deputy Clerk

| | | |
|---|---|---|
| JESUS LEDESMA AGUILAR, | § | |
| Petitioner | § | |
| | § | |
| v. | § | CIVIL ACTION NO. B-01-195 |
| | § | |
| JANIE COCKRELL, DIRECTOR, | § | |
| TEXAS DEPARTMENT OF CRIMINAL | § | |
| JUSTICE - INSTITUTIONAL DIVISION, | § | |
| Respondent. | § | |

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Jesus Ledesma Aguilar has petitioned for a writ of habeas corpus, and Janie Cockrell has

moved for summary judgment. This motion was referred to me for Report and Recommendation

pursuant to 28 U.S.C. § 636(b)(1)(B).

## BACKGROUND

Petitioner Jesus Ledesma Aguilar, currently in the custody of the Texas Department of

Criminal Justice, filed this federal habeas corpus application. Because this is Aguilar's first

application for federal relief, a brief history of the case is included.[1]

Aguilar and Rick Esparza knew each other since they were teenagers. After losing touch, the

two became reacquainted in the early 1990s and Rick helped Aguilar get a job with him in the

Mississippi cotton gins between September and December of each year. In November 1994, Aguilar

approached Rick with the idea of transporting marijuana from their homes in Texas to Mississippi.

---

[1] For convenience, the facts are adapted largely from the opinion of the Texas Court of
Criminal Appeals affirming Aguilar's conviction and sentence. See Aguilar v. State, No. 72,470
(Tex.Crim.App. October 29, 1997), cert. denied, 523 U.S. 1139 (1998). Citations to the trial record will
appear where this opinion elaborates on the Court of Criminal Appeals' recitation of the relevant facts.

1

Apparently having no car of his own, Aguilar needed Rick's help in transporting the marijuana. Shortly thereafter, another supplier asked Rick to transport marijuana to Mississippi. Rick did this without Aguilar. While Rick and his wife were in Mississippi on this run, Aguilar appeared at Rick's motel room and accused Rick of using Aguilar's connections to sell drugs behind his back. Rick assured him that he had his own connections, and Rick, his wife, and Aguilar returned to Texas together.

In January 1995, Rick and Aguilar each took 10 pounds of marijuana to Mississippi. It took some time for them to sell their inventories, and Rick became nervous that his Texas license plates would make the Mississippi police suspicious. Rick therefore took the remainder of his inventory to his connection and told him he would return later for the money. He talked Aguilar into doing the same. Rick later retrieved his money from his connection, but Aguilar's connection told him that his money was stolen. Aguilar blamed Rick for this loss because Rick convinced him to leave his merchandise. After returning to Harlingen, Texas, Rick decided he would not make any more trips to Mississippi with Aguilar. Rick continued to travel to Mississippi on his own.

Aguilar occasionally dropped by Rick's trailer and accused Rick of running drugs without him. Aguilar told Rick he owed him for getting him into the business. In March 1995, Aguilar brought 20 pounds of marijuana to Rick's home and told Rick to take him to Mississippi. Rick refused, but agreed to set up a transaction with his connection. Aguilar then went to Mississippi with his cousin, Christopher Quiroz, sold the marijuana, and apparently bought a white Camaro with the proceeds. Aguilar visited Rick's home driving the Camaro and told Rick to come riding. While driving around, Aguilar again told Rick that Rick "owed" him. Rick testified that Aguilar also told him that "I can take you out of the picture." Aguilar apparently threatened Rick's life on a number

2

of other occasions. Rick noted that he was afraid of Aguilar because he had seen "the way [Aguilar] hurts people."

In spite of Aguilar's threats, Rick maintained his own drug courier business. Rick often asked his sister, Annette Chavez, and her family to stay at his home during his out-of-town trips. On June 8, 1995, Rick and his wife took a load of drugs to Mississippi. Annette, her husband Leo, and their two children, Leo, Jr. (nine years old) and Lincoln (about two years old), stayed at Rick's home.

Aguilar spent much of the afternoon and evening of June 9 drinking with friends. At approximately 9:00 p.m., he was at a friends' house with, among others, David and Chris Quiroz. Their host eventually went to bed. As David Quiroz was leaving, he saw Aguilar and Chris Quiroz walk toward Chris' mother's red Buick. David went home to bed but was awakened an hour or two before sunrise by Aguilar and Chris, who wanted more to drink. David took a bottle of liquor across the alley to Chris' house and eventually fell asleep there.

At approximately 5:00 a.m., Leo, Jr. was awakened from his bed in Rick's trailer by the sound of a gunshot. Leo, Jr. got out of bed and entered the kitchen. Because there was no wall between the rooms, Leo, Jr. could see into the living room, which was illuminated by a small lamp. Leo, Jr. saw his parents on the floor with two men standing over them. Leo, Jr. testified that the "American" man told his father to "[g]et your fat ass up," and then saw the man shoot his father. The "Mexican" man then took the gun and shot his mother. After the men left the trailer, Leo, Jr. went over to the window and saw them drive off in what he thought was a purple Camaro.[2] Leo, Jr. ran

---

[2]     The police established that Leo, Jr. could not distinguish between a Camaro and a Buick, and that a red car looked purple at night through the tinted glass on Rick's trailer.

to the neighbors for help.

That afternoon, Daniel Pena was driving around with Aguilar and Chris Quiroz when Aguilar asked him to go to Rafael Flores, Jr.'s residence. While there, Aguilar offered to sell a .22 caliber revolver. Rafael bought the revolver and gave it to his brother, who gave it to their father. Their father placed the gun in the trunk of a car on his property. The police later received a tip that they could recover the murder weapon from the Flores' residence, which they did. After recovering the weapon, the police lab compared bullets from the gun with the bullets recovered from the Chavez' bodies. An expert testified that the bullets that killed the Chavezes could have been fired from the gun, but could not testify that they were, in fact, fired from that gun. 20 Tr. at 686-89, 709.[3]

Approximately two weeks after the murders, Leo, Jr.'s grandmother was reading the newspaper when Leo, Jr. saw a picture and told her that two of the men in the picture were the men who "hurt" his parents. His grandfather took Leo, Jr. to the police station where Leo, Jr. identified Chris Quiroz as the "American" who shot his father, and Aguilar as the "Mexican" who shot his mother. Leo was unable to identify Aguilar in a police lineup, but an investigator for the Cameron County Sheriff's office testified that Leo, Jr. became visibly upset when Aguilar entered the lineup room. 18 Tr. at 286; 19 Tr. at 348.

Aguilar was convicted of capital murder for intentionally and knowingly causing the death of more than one person during the same criminal transaction. SHTr. at 196;[4] Tex. Penal Code Ann. § 19.03(a)(7)(A). During the punishment phase of his trial, the state presented evidence of numerous

---

[3]    "Tr." refers to the trial transcript. The number preceding "Tr." identifies the volume of the transcript, and the numbers following "Tr." identify the specific pages in that volume. For example, "20 Tr. at 686-89" refers to volume 20 of the trial transcript, pages 686-689.

[4]    "SHTr." refers to the transcript of the State habeas corpus proceeding.

4

other offenses committed by Aguilar, including drug and property crimes, numerous assaults, violations of prison disciplinary rules, driving while intoxicated, and fleeing a police officer. Among the assault victims was Aguilar's wife. She received medical treatment for a broken nose inflicted by Aguilar. She also had lacerations, bruises, and swelling from the same assault. 25 Tr. at 188-89. Aguilar also shot a peace officer who was attempting to arrest him. *Id.* at 216-17. The State also established Aguilar's high-ranking membership in a violent prison gang called the Texas Syndicate, 24 Tr. at 15-106; 25 Tr. at 116-318, and presented victim impact testimony.

The Texas Court of Criminal Appeals originally affirmed Aguilar's conviction and sentence on June 18, 1997. That court subsequently withdrew its opinion and issued a new opinion affirming the conviction and sentence on October 29, 1997. *Aguilar v. State*, No. 72,470 (Tex.Crim.App. Oct. 29, 1997). On May 26, 1998, the United States Supreme Court denied certiorari. *Aguilar v. Texas*, 523 U.S. 1139 (1998). Aguilar then filed a state application for post conviction relief. It was denied by the Texas Court of Criminal Appeals on June 10, 1998. *Ex Parte Aguilar*, No. 36,142-01 (Tex.Crim.App. June 10, 1998). Aguilar filed his original federal habeas corpus petition on May 28, 1999, and amended it on June 9, 1999. At an evidentiary hearing on June 15, 2000, Aguilar asked this Court to dismiss his petition without prejudice so that he could return to State court and raise unexhausted claims. That request was granted. Aguilar's subsequent State habeas corpus petition was dismissed by the Texas Court of Criminal Appeals as an abuse of the writ on November 21, 2001. Five days later, Aguilar again filed a federal habeas corpus petition, which he amended on March 4, 2002. This petition is timely.

## DISCUSSION

A.    The Anti-Terrorism and Effective Death Penalty Act

5

This federal petition for habeas relief is governed by the Anti-Terrorism and Effective Death Penalty Act (AEDPA), which became effective April 24, 1996. *See Lindh v. Murphy*, 521 U.S. 320, 335-36 (1997). Under the AEDPA, federal habeas relief based upon claims that were adjudicated on the merits by the state courts cannot be granted unless the state court's decision (1) "was contrary to, or involved an unreasonable application of, clearly established federal law," or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d).

The "unreasonable application" standard permits federal habeas relief only if a state court decision identifies the correct rule from Supreme Court case law but unreasonably applies the rule to the facts before it or "if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Terry Williams v. Taylor*, 529 U.S. 362, 406 (2000).[5] In applying this standard, this court must determine (1) what was the decision of the state courts and (2) whether there is any established federal law with which the state court decision conflicts. *Hoover v. Johnson*, 193 F.3d 366, 368 (5th Cir. 1999). The state court's factual determinations are presumed correct unless rebutted by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

B.    <u>Procedural Default</u>

---

[5]    On April 18, 2000, the Supreme Court issued two separate opinions, both originating in Virginia, involving the AEDPA, and in which the petitioners had the same surname. <u>Terry Williams v. Taylor</u>, 529 U.S. 362 (2000), involves § 2254(d)(1), and <u>Michael Williams v. Taylor</u>, 529 U.S. 420 (2000), involves § 2254(e)(2). To avoid confusion, this court will include the full name of the petitioner when citing these two cases.

6

When a state court declines to hear a prisoner's federal claims because the prisoner failed to fulfill a state procedural requirement, federal relief is generally barred on that claim. *Sayre v. Anderson*, 238 F.3d 631, 634 (5th Cir. 2001).

> In all cases in which a state prisoner had defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

C.    The Standard for Summary Judgment in Habeas Corpus Cases

"As a general principle, Rule 56 of the Federal Rules of Civil Procedure, relating to summary judgment, applies with equal force in the context of habeas corpus cases." *Clark v. Johnson*, 202 F.3d 760, 764 (5th Cir. 2000), *cert. denied*, 531 U.S. 831 (2000). Insofar as they are consistent with established habeas practice and procedure, the Federal Rules of Civil Procedure apply to habeas cases. *See* Rule 11 of the Rules Governing Section 2254 Cases. In ordinary civil cases, a district court considering a motion for summary judgment is required to construe the facts in the case in the light most favorable to the non-moving party. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986) ("The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor"). Where a state prisoner's factual allegations have been adversely resolved by express or implicit findings of the state courts and where the prisoner's evidence fails to demonstrate clearly and convincingly that the statutory presumption of correctness has been rebutted, the facts of a case may not be resolved in the petitioner's favor. *See Marshall v. Lonberger*, 459 U.S. 422, 432 (1983); *Sumner v. Mata*, 449

7

U.S. 539, 547 (1981); *May v. Collins*, 955 F.2d 299, 310 (5th Cir. 1991), *cert. denied*, 504 U.S.

901 (1992); *Emery v. Johnson*, 940 F.Supp. 1046, 1051 (S.D. Tex. 1996), *aff'd*, 139 F.3d 191

(5th Cir. 1997), *cert. denied*, 525 U.S. 969 (1998).  Consequently, where facts have been

determined by the Texas state courts, this court is bound by those findings.

D.    Summary Judgment in This Case

Aguilar raises 25 claims for relief.  These are addressed in turn.

1.    Procedurally Defaulted Claims.

First, Aguilar claims his right to due process of law was violated because he appeared

before the jury in shackles.  The State habeas court rejected this claim on the grounds that Aguilar

should have raised it in his direct appeal, and on the grounds that he did not reference specific and

timely objections in the trial record.  Aguilar still does not reference any specific or timely

objection, instead citing only a statement in an affidavit by his trial counsel that he "requested"

that Aguilar not be shackled in the presence of the jury.  SHTr. at 51.  The Texas court also

rejected Aguilar's tenth claim for relief, arguing that the admission of evidence that Aguilar was a

member of a prison gang violated his First Amendment rights, for failure to lodge a timely

objection on the same grounds raised in his petition.

Aguilar raised his Twenty Second through Twenty Fifth Claims for Relief -- concerning a

police station lineup, the admission of allegedly false testimony, and alleged bias by the Texas

Court of Criminal Appeals – in his second State habeas corpus petition.  That petition was

dismissed by the Texas Court of Criminal Appeals as an abuse of the writ.

"When a state court declines to hear a prisoner's federal claims because the prisoner failed

to fulfill a state procedural requirement, federal habeas is generally barred if the state procedural

8

rule is independent and adequate to support the judgment." *Sayre v. Anderson*, 238 F.3d 631, 634

(5th Cir. 2001). The Supreme Court has noted that

> [i]n all cases in which a state prisoner had defaulted his federal claims
> in state court pursuant to an independent and adequate state procedural
> rule, federal habeas review of the claims is barred unless the prisoner
> can demonstrate cause for the default and actual prejudice as a result
> of the alleged violation of federal law, or demonstrate that failure to
> consider the claims will result in a fundamental miscarriage of justice.

*Coleman v. Thompson*, 501 U.S. 722, 750 (1991). "This doctrine ensures that federal courts give

proper respect to state procedural rules." *Glover v. Cain*, 128 F.3d 900, 902 (5th Cir. 1997) (citing

*Coleman*, 501 U.S. at 750-51), *cert. denied*, 523 U.S. 1125 (1998); *see also Edwards v. Carpenter*,

529 U.S. 446, 451 (2000) (finding the cause and prejudice standard to be "grounded in concerns of

comity and federalism").

Aguilar makes no attempt to show cause for his failure to make adequate objections at trial,

or for his failure to raise his First and Tenth claims in his direct appeal or on his first State application

for a writ of habeas corpus. Therefore, his First and Tenth Claims for Relief are procedurally

defaulted.

Aguilar claims that the abuse of the writ ruling was incorrect because he could not have raised

the Twenty Second through Twenty Fifth claims in his first petition. The Twenty Second and Twenty

Third claims complain about events that occurred before and during the trial. Obviously, the factual

basis for these claims existed at the time of his direct appeal and his first application for habeas

corpus. Aguilar argues that these claims were not included in his first habeas corpus application

because, despite his own diligence, he was unable to learn who his State writ attorney was until after

the writ was filed. At most, Aguilar's argument that he had trouble learning the identity of his habeas

9

corpus counsel raises a claim that his State habeas counsel was ineffective for failing to contact Aguilar and investigate the available claims for relief.

It is well-established that there is no constitutional right to counsel in a post-conviction proceeding. "States have no obligation to provide this avenue of relief, and when they do, the fundamental fairness mandated by the Due Process Clause does not require that the State supply a lawyer as well." *Finley v. Pennsylvania*, 481 U.S. 551, 557 (1987)(citation omitted). For this reason, Aguilar has no right to effective assistance of postconviction counsel, *id.* at 557-58, and ineffective assistance of postconviction counsel cannot constitute cause for a procedural default.

> There is no constitutional right to an attorney in state post-conviction proceedings. Consequently, a petitioner cannot claim constitutionally ineffective assistance of counsel in such proceedings . . . [Petitioner] must bear the risk of attorney error that results in a procedural default.

*Coleman v. Thompson*, 501 U.S. 722, 752-53 (1991) (citations and internal quotation marks omitted); *see also Martinez v. Johnson*, 255 F.3d 229, 241 (5th Cir. 2001) ("ineffective assistance of habeas counsel cannot provide cause for a procedural default"), *cert. denied sub nom. Martinez v. Cockrell*, 534 U.S. 1163 (2002).

Aguilar also claims that the factual basis for his Twenty Fourth and Twenty Fifth claims, which allege that the Texas Court of Criminal Appeals was a biased tribunal in ruling on his direct appeal, did not arise until after his first State habeas corpus petition was filed. Notably, he does not contend that the habeas petition was *denied* before the denial of his direct appeal, and he does not contend that he made any attempt to amend his State habeas corpus petition to add these claims. Accordingly, the Texas Court of Criminal Appeals' finding that Aguilar's second State habeas corpus petition was an abuse of the writ is consistent with the facts, and bars review of these claims by this

Court. Therefore, Aguilar's First, Tenth, and Twenty Second through Twenty Fifth claims for relief are procedurally defaulted.

2.    Sidebar Remarks Concerning Threats to Witnesses

Aguilar next contends (Claim for Relief 2) that the prosecutor made comments during sidebar discussions suggesting that Aguilar threatened certain witnesses. Aguilar points to nothing in the trial record containing such comments, instead relying solely on a bare assertion in his counsel's affidavit that such comments were made.

"To constitute a due process violation, the prosecutorial misconduct must be "'of sufficient significance to result in the denial of the defendant's right to a fair trial.'"" *Greer v. Miller*, 483 U.S. 756, 765 (1987) (quoting *United States v. Bagley*, 473 U.S. 667, 676 (1985) (quoting *United States v. Agurs*, 427 U.S. 97, 108 (1976)). "'A trial is fundamentally unfair if there is a reasonable probability that the verdict might have been different had the trial been properly conducted.'" *Barrientes v. Johnson*, 221 F.3d 741, 753 (5th Cir. 2000) (quoting *Foy v. Donnelly*, 959 F.2d 1307, 1317 (5th Cir. 1992)), *cert. dismissed*, 531 U.S. 1134 (2001).

This court must apply a two-step analysis in reviewing claims of prosecutorial misconduct. *See United States v. Wise*, 221 F.3d 140, 152 (5th Cir. 2000), *cert. denied*, 532 U.S. 959 (2001); *United States v. Lankford*, 196 F.3d 563, 574 (5th Cir. 1999), *cert. denied*, 529 U.S. 1119 (2000). First, the Court must determine whether the prosecutor made an improper remark. *Wise*, 221 F.3d at 152. "If an improper remark was made, the second step is to evaluate whether the remark affected the substantial rights of the defendant." *Id.*

A "prosecutor's improper [conduct] will, in itself, exceed constitutional limitations in only the most egregious cases." *Menzies v. Procunier*, 743 F.2d 281, 288-89 (5th Cir. 1984).

11

> [I]t is not enough that the prosecutor's remarks were undesirable or
> even universally condemned, rather "the relevant question is whether
> the prosecutor's comments 'so infected the trial with unfairness as to
> make the resulting conviction a denial of due process.'  In order to
> constitute a denial of due process "'the acts complained of must be of
> such quality as *necessarily prevent a fair trial.*'" Moreover, the burden
> is on the habeas petitioner to also show a reasonable probability "that
> but for these remarks 'the result would have been different.'"

*Nichols v. Scott*, 69 F.3d 1255, 1278 (5th Cir. 1995) (quoting *Darden v. Wainwright*, 477 U.S. 168,

181 (1986), *cert. denied*, 518 U.S. 1022 (1996); *Derden v. McNeel*, 978 F.2d 1453, 1457 (5th Cir.

1992), *cert. denied*, 508 U.S. 960 (1993); and *Felde v. Blackburn*, 795 F.2d 400, 403 (5th Cir. 1986)),

*cert. denied*, 484 U.S. 873 (1987)(emphasis in *Nichols*).

Aguilar does not point to anything in the trial record containing the alleged comments.

Aguilar does not even contend that the comments were made in the hearing of the jury, but rather

during a sidebar, when, presumably, only counsel and the trial judge would have heard such

comments.  Assuming that Aguilar is correct that such comments were made during sidebar

discussions, Aguilar fails to show any prejudice whatsoever, let alone that the comment "affected the

substantial rights of the defendant."  Accordingly, he is not entitled to relief on this claim.

### 3.  Failure to Appoint Experts

Aguilar next contends (Claim for Relief 3) that the trial court's failure to appoint an expert

pathologist and a ballistics expert to testify on his behalf violated his right to due process of law.[6]  The

State habeas court rejected this claim because of Aguilar's "failure to have attached an affidavit from

an expert or a portion of a learned treatise supporting the argument; his "failure to have attached an

---

[6]     Aguilar also makes reference to his request for an expert psychologist, but admits that
the trial court agreed to provide one if the State called an expert psychologist to testify against Aguilar.
The State did not do so, and Aguilar does not press this point.

12

affidavit from trial counsel explaining what expert witness, including blood spatter, he anticipated calling, and how his defense was actually prejudiced through his inability to present that expert"; and his "failure to have referenced what 'blood spatter' evidence there was that the State relied on to connect him to the crime."

In *Ake v. Oklahoma*, 470 U.S. 68 (1985), the Supreme Court held "that when a State brings its judicial power to bear on an indigent defendant, it must take steps to assure that the defendant has a fair opportunity to present his defense." *Id.* at 76. This requires that indigent defendants have "an adequate opportunity to present their claims fairly within the adversary system," by having access to "the basic tools of an adequate defense." *Id.* at 77 (internal quotation marks and citations omitted). In determining which expert witnesses constitute the "basic tools of an adequate defense," *Ake* identified three relevant factors: 1) the private interest that will be affected by the action of the State; 2) the governmental interest that will be affected if the safeguard is provided; and 3) the probable value of the additional or substitute procedural safeguard, and the risk of an erroneous deprivation of the affected interest if the safeguards are not provided. *Id.*

Aguilar's private interest is clear: His liberty and his life hung in the balance of the trial. There is no apparent State interest in denying access to these experts. The probable value of the experts is, however, not evident. Aguilar does not dispute the cause of the Chavez' deaths; they were shot to death at close range. He does not offer an affidavit or other evidence by any expert who purports to dispute that cause of death, nor was there any apparent attempt to call the testimony of the State's pathologist into question during trial. The probable value of a defense pathologist is, therefore, nil.

Due process is offended by denial of a ballistics expert "only if the state prevented inspection

13

by defense experts of tangible evidence that is both critical to the conviction and subject to varying expert opinion." *Scott v. Louisiana*, 934 F.2d 631, 633 (5th Cir. 1991) (internal quotation marks omitted). The ballistics evidence (that the bullets could have been, but were not necessarily, fired by the purported murder weapon) was inconclusive and did not provide a strong link between Aguilar and the murders. Rather, it was the eyewitness testimony of Leo Chavez, Jr. that firmly established Aguilar's participation in the murders. The testimony of other fact witnesses laid the context for Aguilar's participation, including his grudge against Rick Esparza, his presence in the vicinity, and his effort to dispose of the gun after the murders. The inconclusive ballistics evidence was not "critical to the conviction."

Moreover, Aguilar makes no showing that the ballistics evidence is subject to varying expert opinion. At a minimum, Aguilar is required to make allegations supported by a factual showing that this point is in issue. *Yohey v. Collins*, 985 F.2d 222, 226 (5th Cir. 1993). In the absence of any evidence that Aguilar's desired expert could have excluded the gun as the murder weapon, the trial court's denial of Aguilar's request for a ballistics expert did not violate Aguilar's right to a fair trial.

### 4.   Publicity

For his Fourth Claim for Relief, Aguilar contends that he was prejudiced by two newspaper articles that appeared during jury selection. The articles gave an account of a fight between someone purportedly acting at Aguilar's behest, and a potential prosecution witness in this case. Pet. Exh. 19. Aguilar argues that the trial court should have inquired of the three individual jurors who had already been selected whether they saw the articles, and declared a mistrial.

In determining whether mid-trial publicity requires individual voir dire of jurors, this Court must consider: 1) whether the publicity is innately prejudicial; and, if so, 2) the probability that the

14

publicity reached the jury. *United States v. Aragon*, 962 F.2d 439, 443-44 (5th Cir. 1992). The Fifth Circuit has found publicity "[i]nnately prejudicial" where it included information about a defendant's prior criminal record, *id.* at 444, reports of death threats toward a witness on the same day the defendant testified, *United States v. Herring*, 568 F.2d 1099, 1100-02 (5th Cir. 1978), and reports that defendants charged with drug offenses were dealing drugs even during the trial, *United States v. Williams*, 809 F.2d 1072, 1091-92 (5th Cir. 1987), *cert. denied*, 484 U.S. 896 *and cert. denied*, 484 U.S. 913 (1987). The publicity at issue here, which, at a minimum, raises an inference that Aguilar attempted to silence or intimidate a prosecution witness, is similarly prejudicial.

The next inquiry focuses on the likelihood the publicity reached the jury, and steps taken by the trial court to minimize the probability of jury exposure. *United States v. Bermea*, 30 F.3d 1539, 1558 (5th Cir. 1994), *cert. denied sub nom. Rodriguez v. United States*, 513 U.S. 1156 (1995). While it is not clear from the record how likely jurors were to have seen the articles, Aguilar conceded in his argument for a mistrial that the court instructed the jurors not to read anything about the case. 13 Tr. at 707. This approach has been approved by the Fifth Circuit. *Bermea*, 30 F.3d at 1559. Moreover, the trial court offered Aguilar the opportunity to conduct individual voir dire on this subject. 13 Tr. at 709. Apparently, Aguilar never took advantage of this opportunity.

On State habeas review, this claim was rejected because Aguilar failed to substantiate a claim of prejudice. In light of the record, including the opportunity given to Aguilar to conduct individual voir dire, this conclusion was neither unreasonable nor contrary to clearly established law. Therefore, Aguilar is not entitled to relief on this claim.

      5.    <u>Sufficiency of the Evidence Supporting the Jury's Finding that Aguilar was a Party to the Second Murder</u>

15

The eyewitness testimony established that Aguilar shot Annette Chavez, but that his accomplice, Chris Quiroz, shot Leo Chavez, Sr.. For his Fifth and Sixth Claims, Aguilar contends that the evidence was insufficient to support the jury's finding that he was a party to the murder of Leo Chavez, Sr., and that the finding that he was responsible as a party violated his right to due process of law.

In addressing a sufficiency of the evidence claim, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). The sufficiency of evidence is a mixed question of law and fact. *See Gomez v. Acevedo*, 106 F.3d 192, 198 (7th Cir. 1997), *vacated on other grds.*, 522 U.S. 801 (1997). Therefore, as noted above, this Court may grant federal habeas relief under 28 U.S.C. § 2254(d)(1) only if the state court decision "was contrary to, or involved an unreasonable application of, clearly established [Supreme Court precedent]." *Martin v. Cain*, 246 F.3d 471, 475 (5th Cir. 2001), *cert. denied*, 534 U.S. 885 (2001).

Under Texas law, "[a] person is criminally responsible for an offense committed by the conduct of another if ... acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense." Tex. Penal Code § 7.02(a)(2). On Aguilar's direct appeal, the Texas Court of Criminal Appeals noted that Aguilar, not Quiroz, had a motive to kill the people in Rick Esparza's trailer, and that Aguilar later sold the .22 caliber revolver which was recovered by the police and offered by the State as the murder weapon. The Court of Criminal Appeals found that this evidence supported a jury finding that Aguilar decided to kill the Chavezes and enlisted Quiroz to help. Under Texas law, the Court of

16

Criminal Appeals concluded this was sufficient to satisfy the law of parties.

Viewing the evidence in the light most favorable to the prosecution, the evidence established that only Aguilar had a motive for the killings and therefore likely told or encouraged Quiroz to kill Leo, Sr. Under the very deferential *Jackson* standard, this was sufficient to support the jury's finding that Aguilar was a party to the second murder. Aguilar is, therefore, not entitled to relief on this claim.

6.    <u>Failure to Charge the Jury on Lesser Included Offense</u>

For his Seventh Claim for Relief, Aguilar contends that the trial court deprived him of due process of law by failing to charge the jury that it could convict Aguilar of the lesser included offense of non-capital murder. Due process requires a jury charge "on a lesser included offense if the evidence would permit a jury rationally to find [the defendant] guilty of the lesser offense and acquit him of the greater," *i.e.*, "when the evidence unquestionably establishes that the defendant is guilty of a serious, violent offense -- but leaves some doubt with respect to an element that would justify conviction of a capital offense . . . ." *Beck v. Alabama*, 447 U.S. 625, 635, 637 (1980) (citing *Keeble v. United States*, 412 U.S. 205, 208 (1973)). Under these circumstances, "the failure to give the jury the . . . option of convicting on a lesser included offense would seem inevitably to enhance the risk of an unwarranted conviction. Such a risk cannot be tolerated in a case in which the defendant's life is at stake." *Beck*, 447 U.S. at 637. A lesser included offense charge is required under these circumstances to avoid presenting the jury with a false dichotomy: Either convict a defendant who is guilty of a serious non-capital crime (but not a capital crime) on the capital charge, or acquit him so as to avoid convicting him of the more serious offense. *See, e.g., Hopper v. Evans*, 456 U.S. 605, 611 (1982). "[I]f the unavailability of a lesser included offense instruction enhances the risk of an unwarranted conviction, [Texas] is constitutionally prohibited from withdrawing that option from the

17

jury in a capital case." *Beck*, 447 U.S. at 638.

The Texas Court of Criminal Appeals rejected this claim for the reasons discussed in connection with Aguilar's sufficiency of the evidence claims: The evidence established that Aguilar, but not his accomplice, had the motive to commit the murders, was seen committing one of the murders, and was connected to the murder weapon. The key to the Court of Criminal Appeals' conclusion appears to be that, of the two murderers, only Aguilar had the motive to initiate the crime.

While the evidence did not reveal any connection between Quiroz and the Chavezes, it also did not establish a very strong connection between Aguilar and the Chavezes. As discussed above, the evidence was sufficient, under the deferential standard of *Jackson v. Virginia*, 443 U.S. 307 (1979), to support a conviction under the law of parties. The evidence of party liability was not, however, so strong as to preclude a finding that Quiroz killed Leo Chavez, Sr. on his own initiative. There was no evidence demonstrating that Aguilar instructed or encouraged Quiroz to shoot Leo, Sr. While such encouragement or instruction could reasonably be inferred from the evidence, it was equally reasonable to find that Aguilar and Quiroz went to the trailer to shoot Rick Esparza, found the Chavezes there instead, and that Quiroz then, on his own initiative, shot Leo, Sr. before handing the gun to Aguilar. Under this scenario, which is also supported by the evidence, Aguilar would have been guilty only of simple murder, not capital murder.

This case is similar in this regard to *Cordova v. Lynaugh*, 838 F.2d 764 (5th Cir. 1988), *cert. denied*, 486 U.S. 1061 (1988). In *Cordova*, the defendant was convicted of intentionally killing a person during the course of a robbery. The evidence left no doubt that he committed the murder, but there was only circumstantial evidence that Cordova participated in the robbery. The State argued that Cordova was liable for the robbery as a party and the court agreed that the evidence supported

18

an inference of party liability. *Id.* at 768-69. The court also noted, however, "that the jury could reject that inference." *Id.* at 769. The court concluded that, because the evidence would have supported a finding that Cordova was not a party to the robbery, the trial court's refusal to give a lesser included offense instruction denied Cordova due process. *Id.* at 770.

If given the opportunity to convict Aguilar on a charge of non-capital murder, Aguilar's jury could have rationally rejected the inference that Aguilar told or encouraged Quiroz to shoot Leo, Sr. In light of this, the Court of Criminal Appeals' conclusion that "it would not be rational for a jury to find that [Aguilar] was not at least a party to the murder of Leo Jr.'s father" is unreasonable and contrary to the Supreme Court's holding in *Beck.* Therefore, Aguilar is entitled to relief on this claim.

### 7.    Jury Tampering

For his Eighth Claim for Relief, Aguilar contends that the trial court erred in denying his motion for a mistrial after a spectator spoke to one of the jurors. During a recess in Aguilar's trial, a spectator approached one of the jurors. The trial court conducted a hearing during which the judge questioned the spectator and the juror. The spectator insisted that she was not talking to the juror about Aguilar's case, but about a trial in another courtroom. The juror testified that the spectator asked whether the juror thought "he" was guilty or not. It was not clear whether "he" referred to Aguilar or the defendant in the other trial. The juror also specifically testified that she did not answer the spectator, and that the contact did not influence her on Aguilar's guilt or innocence. The court denied Aguilar's motion for a mistrial. 18 Tr. at 241-52.

"[T]he remedy for allegations of juror partiality is a hearing in which the defendant has an opportunity to prove actual bias." *Smith v. Phillips*, 455 U.S. 209, 215 (1982). This does not necessarily mean a full blown evidentiary hearing. Rather, the trial court "must balance the probable

19

harm resulting from the emphasis [a hearing] would place upon the misconduct and the disruption involved in conducting a hearing against the likely extent and gravity of the prejudice generated by the misconduct." *United States v. Chiantese*, 582 F.2d 974, 980 (5th Cir. 1978), *cert. denied*, 441 U.S. 922 (1979). Such a hearing was held in this case: The trial court questioned both the juror and the spectator concerning the contact. The juror specifically stated that she was not influenced by the contact. 18 Tr. at 251-52.

The ultimate question is whether the defendant was prejudiced by the contact, not merely whether the contact occurred. *United States v. Olano*, 507 U.S. 725, 739 (1993). Aguilar did not make any specific showing of juror bias at trial, nor has he done so since his conviction. The State habeas court rejected this claim on the grounds that Aguilar failed to show that this contact influenced deliberations, or was perceived by the juror as an attempt to do so. This conclusion was neither unreasonable, nor contrary to established law. Aguilar is not entitled to relief on this claim.

> [D]ue process does not require a new trial every time a juror has been placed in a potentially compromising situation . . . Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen.

*Smith*, 455 U.S. at 217.

8.      Failure to Require Expert to Reveal Source of Information

During the punishment phase of Aguilar's trial, R.C. Garcia, a Sergeant with the Houston Police Department, testified that Aguilar was a high-ranking member of the Texas Syndicate, a prison gang. For his Ninth Claim for Relief, Aguilar complains that the trial judge denied a defense request for the names of informants who told this witness that Aguilar was a member of the Texas Syndicate.

20

Aguilar does not identify which federal constitutional right he claims was violated, but presumably refers to his Sixth Amendment right to confront witnesses against him.

"[T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on. . . cross-examination based on concerns about, among other things . . . the witness' safety . . . ." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986). Here, there was extensive testimony concerning the extremely violent nature of the Texas Syndicate, and the State's expert testified that revealing the names of the confidential informants would put their lives in jeopardy. 25 Tr. at 291. The trial judge's refusal to order the witness to reveal the names was within the scope of his discretion to protect the informants' safety.

In any event, withholding the identities of the confidential informants, and thus the opportunity to cross-examine these informants, "violates the Confrontation Clause only when the evidence was a crucial, critical or highly significant factor in the framework of the whole trial." *Gochicoa v. Johnson*, 118 F.3d 440, 446 (5th Cir. 1997) (internal quotation marks and citation omitted). Here, the evidence was not crucial.

Other witnesses also testified to Aguilar's membership in the Texas Syndicate. *See, e.g.*, 25 Tr. at 230-34. Witnesses identified photographic evidence of tattoos on Aguilar's body indicating his membership in the Texas Syndicate. 25 Tr. at 250-51. Finally, Aguilar admitted that he was a member of the Texas Syndicate. *Id.* at 235. In light of this evidence, the substance of the informants' statements that Aguilar was a member of the Texas Syndicate was merely cumulative, and was not crucial to the State's punishment phase case. There was, accordingly, no violation of his rights under the Confrontation Clause.

9.    <u>State Constitutional Issues</u>

21

In his Eleventh and Twelfth Claims for Relief, Aguilar alleges violations of the Texas State constitution. These claims are not cognizable in a federal petition for a writ of habeas corpus.

A federal court reviewing a petition for a writ of habeas corpus may grant relief only if the petitioner demonstrates that his conviction or sentence was obtained in violation of "the Constitution, laws, or treaties of the United States." 28 U.S.C. § 2254(a). "[F]ederal habeas corpus relief does not lie for errors of state law." *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990). Accordingly, these claims provide no grounds for relief.

        10.    Due Process

For his Thirteenth Claim for Relief, Aguilar alleges that it was a due process violation for Texas not to enforce its own Constitution. He does not specify how Texas did not enforce its own Constitution, but presumably refers to the alleged State constitutional violations of his Eleventh and Twelfth claims for relief. The Eleventh Claim alleges that evidence of his gang membership violated his rights under article 1, section 8 of the Texas Constitution. The Twelfth Claim alleges that his State constitutional right against compelled self-incrimination was violated, but he does not allege any facts in support of this claim.

Bald assertions of constitutional violations, unsupported by any specific allegations of fact, are insufficient to support a claim for habeas corpus relief. *Blackledge v. Allison*, 431 U.S. 63, 74 (1977); *Theriot v. Whitley*, 18 F.3d 311, 315 (5th Cir. 1994); *Ross v. Estelle*, 694 F.2d 1008, 1011 (5th Cir. 1983). For this reason, Aguilar's self-incrimination claim cannot, directly or as the basis of this derivative due process claim, support federal habeas corpus relief.

Aguilar's claim that evidence of gang membership violates his State constitutional rights is also unavailing. The Supreme Court of the United States has made clear that such evidence does not

22

violate the First Amendment to the United States Constitution if it is relevant. *Delaware v. Dawson*, 503 U.S. 159, 166-68 (1992). The evidence here was admitted at the punishment phase, and was not limited to Aguilar's membership, but also to the violent nature of the gang. It was thus clearly relevant to the issue of Aguilar's future dangerousness. Aguilar cites no Texas case addressing the admissibility of such evidence under the Texas Constitution, and it does not appear that there is any such case. Texas courts have, however, held that "Texas constitutional provisions guaranteeing freedom of expression are coextensive with the federal guarantees . . . ." *Reed v. State*, 762 S.W.2d 640, 644 (Tex.App.-- Texarkana 1988), *cert. denied sub nom. Harris v. Texas*, 493 U.S. 822 (1989). Texas courts have also affirmed death sentences based in part on evidence of gang membership, without addressing any state constitutional objections. *See, e.g., Anderson v. State*, 901 S.W.2d 946, 954 (Tex.Crim.App. 1995). Thus, Texas courts have held that evidence of gang membership, where relevant, is admissible under the Texas Code of Criminal Procedure and the Texas Rules of Evidence. Along with case law holding that the freedom of expression protections of the Texas Constitution are coextensive with those of the First Amendment, it follows that the Texas constitution allows admission of gang evidence under the same conditions set forth in *Dawson*. Accordingly, Aguilar's underlying State constitutional claim is meritless, and provides no basis for his due process claim.

### 11.    Constitutionality of the Texas Death Penalty Statute

Aguilar next contends, in his Fourteenth and Fifteenth Claims for Relief, that the Texas death penalty statute is unconstitutionally vague because the special issues the jury must answer in assessing a defendant's penalty do not define the terms "reasonable expectation," and "probability." This argument has long been rejected by both the Supreme Court and the Fifth Circuit.

In *Jurek v. Texas*, 428 U.S. 262 (1976), the Supreme Court addressed a challenge to the Texas

death penalty statute. That statute, which was substantially similar in this regard to the current statute, required the jury to determine whether the defendant acted "deliberately and with the reasonable expectation that the death of the deceased or another would result," and whether "there was a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." *Compare id.* at 267-68 and Tex. Crim. Pro. art. 37.071(2)(b). The Supreme Court held that the Texas capital-sentencing procedure adequately guides the jury's decision-making process, and therefore passes constitutional muster. *Jurek*, 428 U.S. at 273-74. The Fifth Circuit has likewise "frequently rejected challenges to the lack of definition of diverse terms in the first two punishment special issues." *Woods v. Johnson*, 75 F.3d 1017, 1034 (5th Cir. 1996); *see also Milton v. Procunier*, 744 F.2d 1091, 1095-96 (5th Cir. 1984) ("deliberately" and "probability" "have a plain meaning of sufficient content that the discretion left to the jury" is "no more than that inherent in the jury system itself"), *cert. denied*, 471 U.S. 1030 (1985); *Thompson v. Lynaugh*, 821 F.2d 1054, 1060 (5th Cir. 1987), *cert. denied*, 483 U.S. 1035 (1987). Accordingly, Aguilar's claim that the undefined terms in the punishment special issues render the statute unconstitutionally vague is without merit.

### 12.    Ineffective Assistance of Counsel

For his Sixteenth, Seventeenth and Nineteenth Claims for Relief, Aguilar contends that his trial counsel rendered ineffective assistance. The Sixteenth and Seventeenth claims allege ineffective assistance because counsel failed to object to, and request a limiting instruction on, the evidence of Aguilar's gang membership and activity. The Nineteenth claim alleges ineffective assistance because counsel failed to request an "independent impulse" instruction.

To prevail on a claim for ineffective assistance of counsel, Petitioner

> must show that . . . counsel made errors so serious that counsel was not
> functioning as the "counsel" guaranteed by the Sixth Amendment.
> Second, the [petitioner] must show that the deficient performance
> prejudiced the defense. This requires showing that counsel's errors
> were so serious as to deprive the defendant of a fair trial, a trial whose
> result is reliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984). In order to prevail on the first prong of the

*Strickland* test, Petitioner must demonstrate that counsel's representation fell below an objective

standard of reasonableness. *Id.* at 687-88. Reasonableness is measured against prevailing

professional norms, and must be viewed under the totality of the circumstances. *Id.* at 688. Review

of counsel's performance is deferential. *Id.* at 689.

At the sentencing phase, "the question is whether there is a reasonable probability that, absent

the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating

circumstances did not warrant death." *Strickland*, 465 U.S. at 695. "A reasonable probability is a

probability sufficient to undermine confidence in the outcome." *Id.* at 694.

a. Gang Evidence

As discussed above, the evidence of Aguilar's gang membership and activity was properly

admitted as clearly relevant to the issue of Aguilar's future dangerousness. Because the evidence was

properly admitted, counsel did not render deficient performance by failing to lodge meritless

objections, and Aguilar suffered no prejudice caused by counsel's performance.

b. "Independent Impulse" Instruction

At the time of Aguilar's trial, Texas case law supported the defense of "independent impulse."

This defense was applicable when the defendant was charged with conspiracy liability for an offense

25

under Texas Penal Code § 7.02(b).[7]  A defendant may be criminally liable under § 7.02(b) when, "in

an attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the

conspirators . . ." Aguilar was not charged with a conspiracy offense, SHTr. at 196, and there is no

evidence supporting a conspiracy to commit any crime other than the murders of Leo and Annette

Chavez.  Because Aguilar was not charged with participating in a conspiracy to commit another

felony and there is no evidence supporting any theory of such conspiracy, there was no basis for

requesting an independent impulse instruction, and counsel was not deficient for failing to make a

frivolous request.  *See, e.g., Sones v. Hargett*, 61 F.3d 410, 415 n.5 (5th Cir. 1995) ("Counsel cannot

be deficient for failing to press a frivolous point"); *Koch v. Puckett*, 907 F.2d 524, 527 (5th Cir. 1990)

("This Court has made clear that counsel is not required to make futile motions or objections.").

13.    Ineffective Assistance of Appellate Counsel

For his Eighteenth Claim for relief, Aguilar contends that he received ineffective assistance

of appellate counsel.  Aguilar's petition is unclear on this point, but he appears to raise two separate

claims: 1) that counsel was ineffective for failing to argue on appeal that the Texas "questioning

scheme" (by which Aguilar presumably means the capital sentencing scheme) violates the Sixth,

Eighth and Fourteenth Amendments; and 2) that counsel was ineffective for combining arguments

concerning the legal and factual sufficiency of the evidence rather than briefing them separately.

A defendant is constitutionally entitled to effective assistance of appellate counsel when he

has a right to appeal under State law. *Evitts v. Lucy*, 469 U.S. 387, 395 (1985).  Appellate counsel,

however, is not required to raise every possible non-frivolous claim on appeal.  "Experienced

---

[7]       This defense has since been rejected by the Texas Court of Criminal Appeals. Solomon
v. State, 49 S.W.2d 356, 367-68 (Tex.Crim.App. 2001).

26

advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues." *Jones v. Barnes*, 463 U.S. 745, 751-52 (1983).

Aguilar does not state what he thinks is unconstitutional about the Texas capital sentencing scheme, but he cites to the dissent in *Johnson v. Texas*, 509 U.S. 350 (1993). Obviously, a dissenting opinion is not controlling authority. Moreover, the issue in *Johnson* was whether the Texas capital sentencing scheme allowed the jury to give adequate mitigating effect to evidence of a defendant's youth.[8] That was not an issue in this case. Accordingly, Aguilar fails to identify a valid claim counsel could have raised on appeal.

Aguilar's argument concerning counsel's failure to separately brief the legal and factual sufficiency arguments was never presented to the Texas State courts. It is therefore unexhausted.[9]

AEDPA requires that a prisoner exhaust his available State remedies before raising a claim in a federal habeas petition.

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall not be granted unless it appears that (A) the applicant has exhausted the remedies available in the courts of the State; or (B)(i) there is an absence of available State corrective process; or (ii) circumstances exist that render such process ineffective to protect the rights of the applicant.

28 U.S.C. § 2254(b)(1). As the Fifth Circuit explained in a pre -AEDPA case, "federal courts must respect the autonomy of state courts by requiring that petitioners advance in state court all grounds

---

[8]       The defendant in *Johnson* was 19 years old when he committed the crime that sent him to death row. 509 U.S. at 353.

[9]       Aguilar's State habeas corpus petition listed numerous claims of ineffective assistance of counsel. The failure to separately brief the legal and factual sufficiency claims was not among them. *See* SHTr. at 39-40.

for relief, as well as factual allegations supporting those grounds. This rule extends to the evidence establishing the factual allegations themselves. *Knox v. Butler*, 884 F.2d 849, 852 n.7 (5th Cir. 1989) (citing 28 U.S.C. § 2254(b)); *see also Jones v. Jones*, 163 F.3d 285, 298 (5th Cir. 1998) (noting that "[s]ubsection (b)(1) [of AEDPA] is substantially identical to pre-AEDPA § 2254(b)"), *cert. denied*, 528 U.S. 895 (1999). Because Petitioner did not present this claim to the Texas state courts, he has failed to properly exhaust the claim, and this Court may not consider it. *Knox*, 884 F.2d at 852 n.7.

Ordinarily, a federal habeas petition that contains unexhausted claims is dismissed without prejudice, allowing the petitioner to return to the state forum to present his unexhausted claims. *Rose v. Lundy*, 455 U.S. 509 (1982). Such a result in this case, however, would be futile because Petitioner's unexhausted claims would be procedurally barred as an abuse of the writ under Texas law. On habeas review, a federal court may not consider a state inmate's claim if the state court based its rejection of that claim on an independent and adequate state ground. *Martin v. Maxey*, 98 F.3d 844, 847 (5th Cir. 1996). A procedural bar for federal habeas review also occurs if the court to which a petitioner must present his claims to satisfy the exhaustion requirement would now find the unexhausted claims procedurally barred. *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991).

Texas prohibits successive writs challenging the same conviction except in narrow circumstances. Tex. Code Crim. Proc. Ann. art. 11.071 § 5(a) (Vernon Supp. 2002). The Texas Court of Criminal Appeals will not consider the merits or grant relief on a subsequent habeas application unless the application contains sufficient specific facts establishing the following:

> (1) the current claims have not been and could not have been presented previously in an original application or in a previously considered application because the factual or legal basis for the claim was unavailable on the date the applicant filed the previous application; or

28

>(2) by a preponderance of the evidence, but for a violation of the United States Constitution no rational juror could have found the applicant guilty beyond a reasonable doubt.

*Id.* The Texas Court of Criminal Appeals applies its abuse of the writ doctrine regularly and strictly. *Fearance v. Scott*, 56 F.3d 633, 642 (5th Cir. 1995) (per curiam), *cert. denied*, 515 U.S. 1153 (1995).

Petitioner does not claim that he could not have presented the claim in his direct appeal or his state habeas petition because the factual basis for the claim did not exist, or that he is actually innocent. Therefore, Petitioner's unexhausted claim does not fit within the exceptions to the successive writ statute and would be procedurally defaulted in the Texas courts. *Coleman*, 501 U.S. at 735 n.1. That bar precludes this Court from reviewing Petitioner's claim absent a showing of cause for the default and actual prejudice attributable to the default, or that this Court's refusal to review the claim will result in a fundamental miscarriage of justice. *Id.* at 750.

Aguilar offers no cause for his default. A "miscarriage of justice" means actual innocence, either of the crime for which he was convicted, *id.*, or of the death penalty. *Whitley v. Sawyer*, 505 U.S. 333, 335 (1992). "Actual innocence of the death penalty" means that, but for a constitutional error, he would not have been legally eligible for a sentence of death. *Id.*

To show actual innocence,

>[T]he prisoner must 'show a fair probability that, in light of all the evidence, including that alleged to have been illegally admitted (but with due regard to any unreliability of it) and evidence tenably claimed to have been wrongly excluded or to have become available only after trial, the trier of the facts would have entertained a reasonable doubt of his guilt.

*Kuhlmann v. Wilson*, 477 U.S. 436, 455 n.17 (1986). Aguilar has not established that he is actually innocent of either capital murder or the death penalty. Accordingly, this claim is procedurally defaulted.

29

14.   Use of Allegedly False Testimony

For his Twentieth Claim for Relief, Aguilar contends that he was denied due process of law by the admission of allegedly false testimony.   Aguilar does not identify any specific testimony that he claims was false but, in his State writ application, he offered this argument with regard to punishment phase testimony by Officer Abel Perez, Jr. containing out of court statements by Aguilar's accomplice, Chris Quiroz. The statement in question was that Quiroz drove to the murder scene and waited in the car while others entered the trailer.  Quiroz claimed he remained in the car until the others exited the trailer, and then drove them away from the crime scene.  25 Tr. at 223-27. Aguilar contended in his State petition that the prosecution knew Quiroz' statement that he waited outside was false because Quiroz had already been convicted of capital murder.

The knowing use of perjured testimony by the State violates a defendant's right to due process of law.  *See Giglio v. United States*, 405 U.S. 150, 153-54 (1972); *Knox v. Johnson*, 224 F.3d 470, 477 (5th Cir. 2000), *cert. denied*, 532 U.S. 975 (2001).  The Fifth Circuit has explained, however, that

> [t]o establish a due process violation based on the State's knowing use of false or misleading evidence, [a habeas petitioner] must show (1) the evidence was false, (2) the evidence was material, and (3) the prosecution knew that the evidence was false.  Evidence is false if, *inter alia,* it is specific misleading evidence important to the prosecution's case in chief.  False evidence is material only if there is any reasonable likelihood that [it] could have affected the jury's verdict.

*Nobles v. Johnson*, 127 F.3d 409, 415 (5th Cir. 1997) (internal citations and quotation marks omitted, third alteration in original), *cert. denied*, 523 U.S. 1139 (1998).

The statements by Quiroz did not mention Aguilar or directly implicate him; they merely

30

gave Quiroz' self-serving account of his role in the murders. Moreover, by the time this evidence was admitted – during the punishment phase of Aguilar's trial – the jury already decided that Aguilar was guilty of capital murder. That verdict necessarily entails a finding that Aguilar shot at least one of the victims and either shot, or was liable as a party for the shooting of, the other victim. Quiroz' self-serving statement, which did not directly implicate Aguilar and came after the jury found Aguilar guilty of capital murder, was simply not material, *i.e.*, there is no reasonable likelihood it could have affected the jury's decision to sentence Aguilar to death. Therefore, the admission of this testimony did not violate Aguilar's right to due process of law.

### 15.    Aguilar's Presence at Hearing on Motion for New Trial

For his Twenty First Claim for Relief, Aguilar alleges that he was denied due process of law because he wanted to be present at the hearing on his motion for a new trial, and was not present. The only evidence he offers in support of this claim is a reference to an Exhibit 18 to his application. The packet of exhibits does not contain an Exhibit 18. In the absence of any evidence that he requested to be present, or that he was not present, there is no basis for relief on this claim.

### Evidentiary Hearing

An evidentiary hearing is not required if there are "no relevant factual disputes that would require development in order to assess the claims." *Michael Williams v. Taylor*, 529 U.S. 420, 436 (2000) (it was "Congress' intent to avoid unneeded hearings in federal habeas corpus"). "If it appears that an evidentiary hearing is not required, the judge shall make such disposition of the petition as justice shall require." Rules Governing Section 2254 Cases R. 8. Each of Aguilar's claims can be resolved by reference to the state court record, the submissions of the parties, and relevant legal authority. There is no basis on which to hold an evidentiary hearing.

31

## RECOMMENDATION

For the foregoing reasons, it is recommended that:

1.      Cockrell's Motion for Summary Judgment (Docket Entry 13) should be **GRANTED IN PART,** and that Aguilar's First through Sixth and Eighth through Twenty Fifth Claims for Relief be dismissed;

2.      Cockrell's Motion for Summary Judgment should be **DENIED** as to Aguilar's Seventh Claim for Relief;

3.      Aguilar's Petition for a Writ of Habeas Corpus (Docket Entry 1) should be **GRANTED IN PART** as to his Seventh Claim for Relief; and

4.      A writ of habeas corpus should issue directing Respondent to release Aguilar from custody unless, within 60 days of the entry of final judgment in this case, the State of Texas either: a) grants Aguilar a new trial; or b) vacates Aguilar's capital murder conviction, enters a conviction for the crime of murder under Tex. Penal Code § 19.02, and grants Aguilar a new sentencing hearing consistent with applicable Texas law.

## <u>NOTICE TO PARTIES</u>

A party's failure to file written objections to the proposed findings, conclusion, and recommendation in a magistrate judge's report and recommendation within ten (10) days after being served with a copy shall bar that party, except upon the grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusion accepted by the district court, provided that the party has been served with notice that such consequences will result from

a failure to object. *See Douglass v. United States Automobile Association*, 79 F.3d 1415 (5th Cir. 1996).

DONE in Brownsville, Texas on this 3rd day of March, 2003.

Felix Recio
United States Magistrate Judge

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| JESUS LEDESMA AGUILAR, | § | |
| Petitioner | § | |
| | § | |
| v. | § | CIVIL ACTION NO. B-01-195 |
| | § | |
| JANIE COCKRELL, DIRECTOR, | § | |
| TEXAS DEPARTMENT OF CRIMINAL | § | |
| JUSTICE - INSTITUTIONAL DIVISION, | § | |
| Respondent. | § | |

## ORDER ADOPTING MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Before the Court is the Magistrate Judge's Report and Recommendation in the above-referenced cause of action.  After a de novo review of the file, the Magistrate Judge's Report and Recommendation is hereby ADOPTED.  Furthermore,

1)   Cockrell's Motion for Summary Judgment (Docket Entry 13) is hereby **GRANTED IN PART,** and Aguilar's First through Sixth and Eighth through Twenty Fifth Claims for Relief are hereby dismissed;

2)   Cockrell's Motion for Summary Judgment is hereby **DENIED** as to Aguilar's Seventh Claim for Relief;

3)   Aguilar's Petition for a Writ of Habeas Corpus (Docket Entry 1) is hereby **GRANTED IN PART** as to his Seventh Claim for Relief; and

4)   A writ of habeas corpus shall hereby issue, and Respondent must release Aguilar from custody unless, within 60 days of the entry of this judgment, the State of Texas either: a) grants Aguilar a new trial; or b) vacates Aguilar's capital murder conviction, enters a conviction for the crime of murder under Tex. Penal Code § 19.02, and grants Aguilar a new sentencing hearing consistent with applicable

Texas law.

DONE at Brownsville, Texas this _____ day of _____, 2003.


_____
Hilda Tagle
United States District Judge