IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

**APR 1 6** 2003

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| JESUS LEDESMA AGUILAR, | § | |
| Petitioner, | § | |
| | § | |
| v. | § | Civil Action No. B-01-195 |
| | § | **CAPITAL LITIGANT** |
| JANIE COCKRELL, Director, | § | |
| Texas Department of Criminal Justice, | § | |
| Institutional Division, | § | |
| Respondent | § | |

**RESPONDENT'S OBJECTIONS TO THE UNITED STATES
MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

Petitioner Jesus Ledesma Aguilar ("Aguilar")[1] was properly convicted and sentenced

to die for murdering Leonardo Chavez, III ("Leo, Sr.") during the same criminal transaction

in which he killed Leonardo's wife, Annette Esparza Chavez, in June 1995. Aguilar filed

a federal writ petition in this Court in May 1999, followed by an amended petition in June

1999. *Aguilar v. Johnson*, Civil Action No. B-99-044 (S.D. Tex.) at Computer Docket

Entries ("CDE") #11 & #9. In May 2000, the Court dismissed the case so that Aguilar could

return to state court to exhaust several claims. CDE #46. After his successive state habeas

application was dismissed as an abuse of the writ, *Ex parte Aguilar*, No. 36,142-02 (Tex.

Crim. App. 2001) (unpublished order of November 21, 2001), Aguilar returned to federal

court, filing an original writ of habeas corpus petition on November 26, 2001, and a

supplemental petition on March 4, 2002. *Aguilar v. Cockrell*, Civil Action No. B-01-195

---

[1]      Respondent Janie Cockrell will be referred to as "the Director."

(S.D. Tex.) at CDE #1 & #9. The Director answered and moved for summary judgment in August 2002, and Aguilar responded on January 21, 2003. CDE #13 & #26.[2] Thereafter, on March 3, 2003, United States Magistrate Judge Felix Recio issued a Report and Recommendation ("Recommendation"), CDE #33, in which he recommended that habeas relief be granted in part as to Aguilar's seventh claim for relief -- that the trial court erred by not providing a lesser included offense instruction for noncapital, or simple, murder. Recommendation at 17-19, 32. The magistrate also recommended that summary judgment be granted on all of Aguilar's remaining claims. *Id.* at 32. Pursuant to the Court's orders, both parties are allowed until April 16, 2003, in which to file their objections. CDE #35 & #37. The Director's objections are thus timely filed and follow below.

## STANDARDS OF REVIEW

In his seventh claim for habeas relief, Aguilar argued that "there is evidence that in this case that [*sic*] would have permitted a jury to rationally find [Aguilar] guilty of a lesser charge or murder, while acquitting him of capital murder." Original Writ Petition (CDE #11) at 11. According to Aguilar, nine-year-old surviving victim Leo Chavez, Jr. testified that he saw Aguilar shoot only one of the two victims, Leo's mother Annette Chavez. *Id.* (citing 18

---

[2]    This Court denied several of Aguilar's motions for additional time to file a reply because the motions failed to comply with various local rules. *See, e.g.,* CDE #15 & #17. Although Aguilar's third motion was in compliance, the Court denied the request in November 2002. *See* CDE #18 & #19. Despite the Court's order (CDE #19), Aguilar nevertheless filed a response to the Director's motion for summary judgement in January 2003. *See* CDE #26.

RR 155).[3]  In addition, he argued that there is a "complete absence from the record of any evidence that would indicate that [Aguilar] acted as a party to the shooting of the other victim...." *Id.*  Magistrate Judge Recio recommended granting habeas relief on this one claim. Recommendation at 17-19, 32. This Court should review -- and ultimately reject -- the magistrate's recommendation in light of the following standards.

## I.     Standard For Reviewing Aguilar's Claim Under The Anti-terrorism And Effective Death Penalty Act ("AEDPA")

Because Aguilar filed his federal writ petition in November 2001, review is governed by the AEDPA. *Lindh v. Murphy*, 521 U.S. 320, 326-27 (1997). Aguilar's claim that the trial court erred by refusing to give a lesser included offense instruction presents a mixed question of law and fact subject to the "unreasonable" standard of 28 U.S.C. § 2254(d). *Bowles v. Berge*, 999 F.Supp. 1247, 1255 (E.D. Wis. 1998); *see Drinkard v. Johnson*, 97 F.3d 751, 769 (5th Cir. 1996) (determining whether defendant was entitled to lesser included offense instruction requires "a showing that the facts of the case and the laws of the State warrant such an instruction.") (citing *Andrews v. Collins*, 21 F.3d 612, 629 (5th Cir. 1994)).

When confronting mixed questions of law and fact under § 2254(d)(1), a state court "unreasonably" applies clearly established federal law "if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle

---

[3]      "RR" refers to the reporter's record of transcribed trial proceedings from Aguilar's capital murder trial. "SHTr" will refer to the state habeas transcript -- the transcript of pleadings and documents filed during state writ proceedings. Each citation is preceded by volume and followed by page reference.

to the facts of the prisoner's case." *Penry v. Johnson*, 532 U.S. 782, 792 (2001) ("*Penry II*"); *Williams v. Taylor,* 529 U.S. 362, 407-09 (2000). A federal habeas court's inquiry into the reasonableness of a state court's decision should be objective rather than subjective and, most importantly, a court should not issue the writ simply because it concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. *Williams,* 529 U.S. at 409-11. As the *Williams* Court explained,

> Congress specifically used the word "unreasonable," and not a term like "erroneous" or "incorrect." Under § 2254(d)(1)'s "unreasonable application" clause, then, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.

*Williams*, 529 U.S. at 411; *Penry II,* 532 U.S. at 793 ("... even if the federal habeas court concludes that the state court decision applied clearly established federal law incorrectly, relief is appropriate only if that application is also objectively unreasonable."); *Martin v. Cain,* 246 F.3d 471, 476 (5th Cir.) (relief appropriate only where state court decision is both incorrect *and* objectively unreasonable) (citing *Williams*), *cert. denied*, 534 U.S. 885 (2001). In other words, habeas relief is *inappropriate* when a state court, at a minimum, reaches a "satisfactory conclusion." *Williams*, 529 U.S. at 411 (citing *Wright v. West,* 505 U.S. 277, 287 (1992)). Further, the Fifth Circuit has also held that it is the state court's "ultimate decision" that is to be tested for reasonableness, "not every jot of its reasoning." *Santellan v. Cockrell,* 271 F.3d 190, 193 (5th Cir. 2001), *cert. denied*, 535 U.S. 982 (2002); *DiLosa*

-4-

*v. Cain*, 279 F.3d 259, 262 (5th Cir. 2002) (citing *Santellan*); *see also Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002) (*en banc*) (holding that a federal court's "focus on the 'unreasonable application' test under § 2254(d) should be on the ultimate legal conclusion that the state court reached and not on whether the state court considered and discussed every angle of the evidence"), *cert. denied*, 123 S. Ct. 962 (2003).

As explained below, the Texas court's decision to deny relief on Aguilar's claim on direct appeal[4] was neither incorrect nor objectively unreasonable, much less both. *Aguilar v. State*, No. 72,470, slip op. at 11-13 (Tex. Crim. App. 1997) (*op. on reh'g*). Therefore, the Court should sustain the Director's objections and reject the magistrate's recommendation because Aguilar is not entitled to relief under § 2254(d)(1).

## II.    Standard For Reviewing Aguilar's Claim That He Was Entitled To A Lesser Included Offense Instruction

Although Magistrate Judge Recio correctly set out the general standards for reviewing Aguilar's instant claim, he did not mention any restriction which precludes trial courts from granting lesser included offense instructions. *See* Recommendation at 17-19. This Court should therefore review, and reject, the magistrate's recommendation based on controlling federal precedent set out below.

Aguilar's claim that he was entitled to an instruction on noncapital murder is based

---

[4]    Aguilar also raised the instant claim during state habeas proceedings where it was rejected because the theory had already been decided against Aguilar on direct appeal. *Ex parte Aguilar*, No. 36,142-01 (Tex. Crim. App. 1998) at SHTr 16-17; Supp. SHTr 2; *id.* at Court of Criminal Appeals' unpublished order of June 10, 1998 (adopting trial court's findings and conclusion, and denying relief).

on *Beck v. Alabama*, 447 U.S. 625 (1980). There, the Supreme Court held that in order to avoid the possibility of arbitrary and capricious sentencing decisions, a state could not impose a blanket ban on lesser included offense instructions in capital cases. *Beck*, 447 U.S. at 638. The Court's holding stemmed from its recognition that the all-or-nothing choice between death and total acquittal could lead juries to act unlawfully, either by convicting and sentencing to death because the defendant was guilty of a serious, violent crime, even though there was reasonable doubt as to his guilt of the capital offense, or by acquitting even though the defendant was plainly guilty due to a belief that he did not deserve to die. *Id.* at 642-43. As the Supreme Court has explained, *Beck* stands for the proposition that a sentence of death may not be imposed "when the jury was not permitted to consider a verdict of guilt of a lesser included noncapital offense, provided that the evidence would have supported such a verdict." *Hopper v. Evans*, 456 U.S. 605, 609 (1982). In a capital case, the jury must therefore be allowed to consider a lesser included noncapital instruction if, based on the evidence, "the jury could rationally acquit [the defendant] on the capital crime and convict [him] on the noncapital crime." *Cordova v. Lynaugh*, 838 F.2d 764, 767 (5th Cir. 1988).[5]

---

[5]    In Texas, there is a two-pronged test for determining whether a jury must be charged on a lesser included offense: (1) the lesser included offense must be included within the proof necessary to establish the offense charged; and (2) there must be some evidence in the record that if the defendant is guilty, he is guilty only of the lesser charge. *Royster v. State*, 622 S.W.2d 442, 446 (Tex. Crim. App. 1981). In *Rousseau v. State*, 855 S.W.2d 666 (Tex. Crim. App. 1993), the Texas court refined the second prong to read, "second, some evidence must exist in the record *that would permit a jury rationally to find* that if the defendant is guilty, he is guilty only of the lesser offense." *Rousseau*, 855 S.W.2d at 672-73 (emphasis in original). Although the state and federal standards are certainly similar, Texas courts have noted that, "[i]n adhering to the *Royster* test, the *Rousseau* Court rejected the federal standard [set forth in *Cordova*, 838 F.2d at 767], but borrowed

However, the Supreme Court has emphasized that even in capital cases, "due process requires that a lesser included offense instruction be given *only when the evidence warrants such an instruction.*" *Hopper*, 456 U.S. at 611 (emphasis added). "It is not enough that the jury may disbelieve crucial evidence pertaining to the greater offense. Rather, there must be some evidence directly germane to a lesser-included offense for the factfinder to consider before an instruction on a lesser-included offense is warranted." *Dowthitt v. Johnson*, 230 F.3d 733, 757 (5th Cir. 2000) (citing *Jones v. Johnson*, 171 F.3d 270, 274 (5th Cir. 1999)), *cert. denied*, 532 U.S. 915 (2001). This necessarily requires "a showing that the facts of the case and the laws of the State warrant such an instruction." *Drinkard*, 97 F.3d at 769 (citing *Andrews*, 21 F.3d at 629). The "merest scintilla of evidence" in a defendant's favor does not warrant a jury instruction; instead, there must be "evidence sufficient for a reasonable jury to find in [the defendant's] favor." *United States v. Branch*, 91 F.3d 699, 713 (5th Cir. 1996) (citing *United States v. Jackson*, 726 F.2d 1466, 1468 (9th Cir. 1984), and *Matthews v. United States*, 485 U.S. 53, 63 (1988)). As the Fifth Circuit insists, the evidence "must be ... sufficient to raise a factual question for a reasonable jury." *Branch*, 91 F.3d at 712 (citing *United States v. Lucien*, 61 F.3d 366, 374-77 (5th Cir. 1995), and *United States v. Jones*, 839 F.2d 1041, 1053 (5th Cir. 1988)).

Moreover, a defendant's evidence may not be considered in a vacuum because a lesser included offense instruction is required only if a "rational juror, *given all the facts*, could

---

from it." *Ybarra v. State*, 890 S.W.2d 98, 108 (Tex. App. -- San Antonio 1994).

have acquitted [a defendant] of capital murder and convicted him of a lesser included offense." *Cordova*, 838 F.2d at 767 (emphasis added); *Ransom v. Johnson*, 126 F.3d 716, 725 (5th Cir. 1997) (same). Therefore, even if evidence viewed in isolation warrants a lesser included offense instruction, the same does not necessarily hold true if the evidence is viewed in context of the entire trial record. *United States v. Harrison*, 55 F.3d 163, 168 (5th Cir. 1995). Indeed, "while a particular piece of evidence standing alone may support inferences that warrant an instruction, those inferences may evaporate after reviewing the entire record." *Branch*, 91 F.3d at 712; *see id.* at 713 ("In short, it is not enough that an item of evidence viewed alone and unweighed against all the evidence supports an inference ... The critical distinction is that a single item of evidence can be overwhelmed by other evidence in the record.") (citing *Harrison*, 55 F.3d at 167). Most importantly, although a trial court may not refuse to give an instruction where there is sufficient evidence in the record, a court is not required "to put the case to the jury on a basis that 'essentially indulges and even encourages speculations.'" *United States v. Collins*, 690 F.2d 431, 438 (5th Cir. 1982) (quoting *United States v. Sinclair*, 444 F.2d 888, 890 (D.C. Cir. 1971)).

Finally, the Supreme Court has noted that in a case in which the evidence does not warrant an instruction on a lesser offense, giving one would actually be impermissible:

> In *Roberts v. Louisiana* [428 U.S. 325 (1976)], the Court considered a Louisiana statute which was the obverse of the Alabama preclusion clause. In Louisiana, prior to *Roberts*, every jury in a capital murder case was permitted to return a verdict of guilty of the noncapital crimes of second-degree murder and manslaughter, "even if there [was] not a scintilla of evidence to support the lesser verdicts." *Id.,* 428 U.S. at 334 ... (plurality opinion). Such a practice

> was impermissible, a plurality of the Court concluded, because it invited the jurors to disregard their oaths and convict a defendant of a lesser offense when the evidence warranted a conviction of first-degree murder, inevitably leading to arbitrary results. *Id.,* at 335 ... The analysis in *Roberts* thus suggests that an instruction on a lesser offense in this case would have been impermissible absent evidence supporting a conviction of a lesser offense.

*Hopper,* 456 U.S. at 611; *see Spaziano v. Florida,* 468 U.S. 447, 455 (1984) ("Where no lesser included offense exists, a lesser included offense instruction detracts from, rather than enhances, the rationality of the process."). In keeping with such concerns, the Fifth Circuit has cautioned that, "[w]hile a defendant's request for a lesser-included offense charge should be freely granted, there must be a rational basis for the lesser charge and it cannot serve merely as a device for defendant to invoke the mercy-dispensing prerogative of the jury." *Collins,* 690 F.2d at 438.

Because, as the Texas appeals court held, no rational jury could have acquitted Aguilar on the capital murder charge and convicted him only on a noncapital murder charge, the trial court's failure to provide a lesser included offense instruction did not violate Aguilar's rights. *Aguilar v. State,* slip op. at 11-13. This Court should, therefore, sustain the Director's objections and reject the magistrate's recommendation to grant relief.

## OBJECTIONS

Magistrate Judge Recio recommended granting habeas relief on one claim -- that Aguilar's jury was entitled to a lesser included offense instruction on noncapital murder. *See* Recommendation at 17-19, 32. According to the magistrate, while evidence was sufficient, under the deferential standard of *Jackson v. Virginia,* 443 U.S. 307 (1979), to support

Aguilar's conviction under the law of parties, the evidence "was not ... so strong as to preclude a finding that [Aguilar's nephew, co-defendant Christopher] Quiroz killed Leo Chavez, Sr. on his own initiative." Recommendation at 18. As support, the magistrate reasoned that:

> There was no evidence demonstrating that Aguilar instructed or encouraged Quiroz to shoot Leo, Sr. While such encouragement or instruction could reasonably be inferred from the evidence, it was *equally reasonable* to find that Aguilar and Quiroz went to the trailer to shoot Rick Esparza, found the Chavezes there instead, and that Quiroz then, on his own initiative, shot Leo, Sr. before handing the gun to Aguilar. Under this scenario, which is also supported by the evidence, Aguilar would have been guilty only of simple murder, not capital murder.

*Id.* (emphasis added). Additionally, Magistrate Judge Recio found that Aguilar's case was similar to *Cordova v. Lynaugh, supra,* and, thus, Aguilar was similarly entitled to relief. *Id.* at 18-19. Finally, the magistrate determined that, in light of the above inference that Quiroz could have acted on his own initiative, the Court of Criminal Appeals' conclusion that "it would not be rational for a jury to find that [Aguilar] was not at least a party to the murder of Leo, Jr.'s father" is "unreasonable and contrary to the Supreme Court's holding in *Beck.*" *Id.* at 19.    The magistrate's recommendation is incorrect (1) because the Texas court's adjudication of Aguilar's claim was not incorrect and objectively unreasonable; (2) because overwhelming evidence supports Aguilar's conviction for capital murder such that no rational jury, given all the facts, could have acquitted him of the greater offense and instead convicted him only of noncapital murder; (3) because no rational jury would have found it "equally reasonable" that Christopher Quiroz shot Leo, Sr. on his own initiative; and (4)

-10-

because Aguilar's case is not comparable to *Cordova, supra.* Therefore, the Director's objections should be sustained and the magistrate's recommendation to grant relief should be rejected.

I.    **The Magistrate Erred In Concluding That The Texas Court's Adjudication Of Aguilar's Claim Was Unreasonable And Contrary To The Supreme Court's Opinion in *Beck v. Alabama.***

Magistrate Judge Recio criticized the Court of Criminal Appeals' direct appeal opinion, in particular, the statement that "it would not be rational for a jury to find that [Aguilar] was not at least a party to the murder of Leo, Jr.'s father," because he found it "unreasonable and contrary to the Supreme Court's holding in *Beck.*" Recommendation at 19. According to Recio, "if given an opportunity to convict Aguilar on a charge of non-capital murder, Aguilar's jury could have rationally rejected the inference that Aguilar told or encouraged Quiroz to shoot Leo, Sr." *Id.* In a separate instance, the magistrate criticized the Texas court's opinion because it rejected Aguilar's claim "for the reasons discussed in connection with Aguilar's sufficiency of the evidence claims: The evidence established that Aguilar, but not his accomplice, had the motive to commit the murders, was seen committing one of the murders, and was connected to the murder weapon." *Id.* at 18. Contrary to the magistrate's belief, the state court's adjudication of the instant claim is neither incorrect nor objectively unreasonable -- much less both -- and, accordingly, Aguilar is not entitled to habeas relief.

In deciding whether a jury could rationally acquit Aguilar on the capital crime and

convict for the noncapital crime, the Fifth Circuit instructs that "we must turn to Texas law." *East v. Scott*, 55 F.3d 996, 1006 (5th Cir. 1995). As explained in note 4, *supra*, Texas follows a two-prong test which requires defendants to prove (1) that the lesser included offense must be included within the proof necessary to establish the offense charged; and (2) that some evidence exists in the record that would permit a jury rationally to find that if the defendant is guilty, he is guilty only of the lesser offense. *Rousseau*, 855 S.W.2d at 672-73. In making this determination, Texas courts are instructed to review *all of the evidence presented at trial*. *Id.* at 673. Furthermore, "it is not enough that the jury may disbelieve crucial evidence pertaining to the greater offense; there must be some evidence directly germane to a lesser included offense for the factfinder to consider before an instruction on a lesser included offense is warranted." *Bignall v. State*, 887 S.W.2d 21, 24 (Tex. Crim. App. 1994). Where, as here, a claim turns on an application of state law rather than federal law, federal courts "must give deference to the articulation by the state's highest court of how the state law applies to the facts of the case." *Hill v. Black*, 932 F.2d 369, 374 (5th Cir. 1991). Thus, the issue for a federal reviewing court is whether, under the law as set out by the state court, "a rational juror, given all the facts[6], could have acquitted [Aguilar] of capital murder and

_____

[6]    Although the *Cordova* court conducted an independent review of the facts, *Cordova* was a pre-AEDPA case such that the district court's factual findings were reviewed for clear error, but issues of law were reviewed *de novo*. *Earhart v. Johnson*, 132 F.3d 1062, 1064 (5th Cir. 1998); *Clark v. Scott*, 70 F.3d 386, 388 (5th Cir. 1995). Under AEDPA standards which apply to Aguilar's case, this Court must instead presume the state court's factual finding are correct unless Aguilar "rebut[s] the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *Dowthitt*, 230 F.3d at 741.

convicted him of a lesser included offense." *Cordova*, 838 F.2d at 764.

In Aguilar's case, no dispute exists that he meets the first prong -- intentional murder is a lesser included offense of capital murder. *Bignall*, 887 S.W.2d at 23; *Ex parte McClelland*, 588 S.W.2d 957, 959 (Tex. Crim. App.1979). Regarding the second prong, the Court of Criminal Appeals held that Aguilar failed to meet *Rousseau's* test because, given the trial record, he failed to prove that if he was guilty of any offense, then he was guilty only of murder. *Aguilar*, slip op. at 11-13 (citing *Rousseau*). Indeed, the evidence established that Aguilar, not Quiroz, was the only one with any motive to kill either the owners of the trailer house, or their relatives, and that Aguilar disposed of a weapon the same day as the double homicide which tested as consistent with the murder weapon. *Id.* at 13. Although the magistrate contends that the Texas court's determination is "unreasonable and contrary to the Supreme Court's holding in *Beck*," this conclusion is erroneous.

On direct appeal, Aguilar argued his jury was entitled to a lesser included offense instruction for the same reasons the evidence was insufficient to support his conviction for capital murder under the law of parties. *See Brief of Appellant* filed Feb. 5, 1997 in *Aguilar v. State*, No. 72,470 at 17-21. He did not point to any direct, germane evidence in the record which would have entitled his jury to such an instruction, much less did he actually argue that evidence existed to raise a factual issue whether Quiroz could have killed Leo, Sr. on his own initiative. *See id.* Given Aguilar's specific argument, the Court of Criminal Appeals acted reasonably in holding that for a rational jury to find Aguilar was guilty only of murder, there

-13-

must be no evidence in the record proving that Aguilar acted as a party. *See Aguilar v. State*, slip op. at 12-13. Consequently, the Texas court rejected the instant claim by pointing to record evidence which proved Aguilar acted as a party -- that being that Aguilar was the only individual with a motive to kill Esparza or his family, and that Aguilar disposed of the alleged murder weapon the same day as the murders. *Id.* at 13.

The magistrate contends that the Texas court rejected the claim "for the reasons discussed in connection with Aguilar's sufficiency of the evidence claim." Recommendation at 18. However, even if the Texas court referred to the sufficiency of the evidence, that adjudication is reasonable because Texas courts are required to review the entire record in determining whether a rational jury could have found that if Aguilar was guilty, then he was guilty only of noncapital murder. *See Rousseau*, 855 S.W.2d at 673. This requirement is in accordance with federal precedent which also instructs reviewing courts to consider all of the facts in making its determination. *Cordova*, 838 F.2d at 767; *Ransom*, 126 F.3d at 725.[7]

Finally, in *Beck*, the Supreme Court was concerned that the unavailability of a lesser included offense instruction might increase the risk of unwarranted convictions. *Beck*, 447 U.S. at 637. In Aguilar's case, there is no chance his jury reached an arbitrary or capricious verdict because, as detailed in part II., *infra.*, overwhelming evidence supports his conviction

---

[7]     Even if it could be said that the Texas court incorrectly analyzed the claim -- which it did not -- the "incorrectness" of a state court decision, standing alone, is insufficient to merit relief. *See Penry II*, 532 U.S. at 793; *Williams*, 529 U.S. at 411; *Martin v. Cain*, 246 F.3d at 476 (relief appropriate only where state court decision is both incorrect *and* objectively unreasonable) (citing *Williams*).

-14-

for capital murder. The same cannot be said in regards to evidence that Aguilar only committed noncapital murder because, in order for the jury to believe that scenario, the jury would have to suspend all rational belief, as set out in part III., *infra.* In denying relief on Aguilar's claim, the Texas court's ultimate legal conclusion was in accordance with *Beck's* concerns. *See Aguilar v. State,* slip op. at 11-13. Yet even if this Court believes the Texas court should have provided a more detailed or elaborate explanation, a federal court's "focus on the 'unreasonable application' test under § 2254(d) should be on the ultimate legal conclusion that the state court reached and not on whether the state court considered and discussed every angle of the evidence." *Neal v. Puckett,* 286 F.3d at 246.

Because the Texas court's adjudication is not both incorrect *and* objectively unreasonable, the Director's objections should be sustained and the magistrate's recommendation to grant relief should be rejected.

## II. The Magistrate's Recommendation Failed To Consider Overwhelming Evidence Supporting Aguilar's Conviction Of Capital Murder -- Evidence Which Precludes A Rational Jury From Acquitting Aguilar Of The Greater Offense And Convicting Him Only Of Noncapital Murder.

Magsitrate Judge Recio's conclusion that Aguilar's jury should have received an instruction on noncapital murder failed to take into account all of the facts which were before the jury. The Fifth Circuit has explained the issue is whether a "rational juror, *given all the facts,* could have acquitted [the defendant] of capital murder and convicted him of a lesser included offense." *Cordova,* 838 F.2d at 767; *Ransom,* 126 F.3d at 725 (citing *Cordova*). As shown below, Aguilar's jury was presented overwhelming evidence of his guilt of capital

murder. Given the record evidence in Aguilar's case, there is no chance a rational jury could have acquitted him of capital murder.

### A. The jury heard substantial evidence of Aguilar's connection to Ricardo ("Rick") Esparza, and of Aguilar's motives for wanting to harm Esparza or his relatives.

The magistrate wrote that "[w]hile the evidence did not reveal any connection between Quiroz and the Chavezes, it also did not establish a very strong connection between Aguilar and the Chavezes." Recommendation at 18. However, the jury heard substantial evidence linking Aguilar to Rick Esparza which, in turn, provides the link to the Chavezes.

After all, Aguilar, *not Quiroz*, was the one involved in drug dealing with Rick Esparza, the owner of the trailer where the double murder of Leo, Sr. and Annette Chavez occurred. *See, e.g.*, 19 RR 560 (Esparza testifies that he and Aguilar began transporting marijuana to Mississippi in November or December 1994; that Aguilar did not have a car and needed Esparza to help), 561-63 (Esparza describes first trip to Mississippi with Aguilar to sell marijuana), 568 (Esparza testifies to helping Aguilar sell three pounds of marijuana and three ounces of cocaine), 569-75 (Esparza describes second trip to sell marijuana with Aguilar); 20 RR 616 (Esparza explains that Aguilar recruited him to sell marijuana), 820 (Juanita "Janie" Esparza, Rick's wife, testifies that Rick and Aguilar made trips to Mississippi to sell marijuana).

Aguilar, *not Quiroz*, visited Esparza's trailer on numerous occasions. *See, e.g.*, 19 RR 584 (Esparza testifies Aguilar came to trailer only one time with Quiroz), 588 (Esparza

-16-

testifies Aguilar had been to trailer "probably more than ten times"), 634 (Aguilar at trailer "around seven to ten times"); 20 RR 674-75 (Esparza testifies that Aguilar had been to trailer ten times, was familiar with the trailer and had been inside), 802-03 (Janie Esparza testifies that Aguilar frequently come to her home, the trailer).

Aguilar, *not Quiroz*, had on previous occasions visited the trailer when Esparza was not home and had questioned Esparza's sister Annette Chavez about Esparza's whereabouts. 19 RR 589-90 (Esparza testifies that Aguilar told him he had been by the trailer when his sister Annette was there and had questioned her about where Esparza was and when he was coming back); 20 RR 675 (Esparza testifies that Aguilar had met Annette and Leo, Sr., and knew they were Esparza's sister and brother-in-law), 715 (Aguilar met Annette and Leo, Sr. at the trailer).

Aguilar, *not Quiroz*, appeared unannounced at Esparza's hotel room in Mississippi suspicious over whether Esparza was selling marijuana to Aguilar's connection. 19 RR 565-67 (Esparza testifies that he had not told Aguilar he was going to Mississippi, but Aguilar showed up unexpectedly at hotel room, asking why Esparza was there and whether he was selling drugs without him); 20 RR 820-22 (Janie Esparza testifies that Aguilar showed up unexpectedly at hotel in Mississippi)

Aguilar, *not Quiroz*, was furious at Rick Esparza, whom he believed was cheating him in their drug business or was responsible when Aguilar's connection lost Aguilar's marijuana. *See, e.g.*, 19 RR 567 (Aguilar upset and angry when connection did not pay him),

-17-

577 (Aguilar got upset and had anger in him), 579 (Aguilar blaming Esparza and connection for loss of drugs), 589 (Aguilar informs Esparza that he knows what Esparza has been up to); 20 RR 669-70 (Aguilar upset, angry, and mad at losing marijuana in Mississippi).

Aguilar, *not Quiroz*, kept asking Esparza whether he had been making trips to Mississippi to deal marijuana without him. 19 RR 579 (Esparza testifies that Aguilar would say, "I know you've been to Mississippi. I know you already took some weed. How much did you take? How much money did you make? When did you get back? When did you leave?"); 20 RR 603-04 (Esparza testifies Aguilar "always wanted to know if I had been gone -- if I had been going to Mississippi, how much money have I made.")

Aguilar, *not Quiroz*, noticed and commented about things in Esparza's trailer which were bought with drug money. 20 RR 605 (Esparza testifies that Aguilar would say, "What a nice dresser you have. Where did you buy it? How much did you pay for it? I know you've been making money and you're not reporting to me."), 821 (Janie Esparza testifies that Aguilar kept inquiring about belongings in the trailer).

Aguilar, *not Quiroz*, made threats against Esparza. *See, e.g.,* 19 RR 466-68 (Ramiro Serrato testifies that Aguilar told him he and Esparza were "moving drugs to Mississippi and that [Aguilar] was going to drop him"; Serrato reports Aguilar's comment to Esparza and warns him to be careful), 584 (Esparza testifies that Aguilar threatened him not to deal in Mississippi and that Aguilar would be the only one using Esparza's connection), 585-86 (Aguilar furious, and tells Esparza "I'm going to take you out of the picture" which Esparza

-18-

took to mean Aguilar would kill him); 20 RR 604 (Aguilar threatens "I found out now that you've been going to Mississippi without telling me"), 604-05 (Aguilar threatens "I've noticed that you've been going to Mississippi without my permission, and I want to know how much money you've made, how many pounds you took because you're not going to get me. You're not going to fool me. You're not going to get me because I'm going to get you."), 638 (Aguilar threatens Esparza on numerous occasions), 664-65 (Esparza testifies that Aguilar threatened to take over Esparza's drug connections and run the business himself), 719 (Aguilar tells Esparza that he is entitled to Esparza's money because Aguilar set him up in the drug business).

Most damning, it was Aguilar, *not Quiroz*, who was the first and only individual to come to mind to Rick Esparza as the murderer of both victims because of all the threats Aguilar had been making against Esparza. *See, e.g.*, 20 RR 603 (Esparza tells authorities Aguilar responsible "[b]ecause of all the threats he had been giving me"). The record evidence thus fully supports that Aguilar, *not Quiroz*, was the only individual with a motive to hurt the owner of the trailer, Rick Esparza, or if not Rick, then to hurt Esparza's relatives -- in this case, Rick's sister Annette and brother-in-law Leo, Sr.

Importantly, the jury heard no evidence whatsoever to establish that Christopher Quiroz had any connection to either the Esparzas or the Chavezes, much less that Quiroz had any motive to kill Leo Chavez, Sr. Indeed, Magistrate Judge Recio concedes "the evidence did not reveal any connection between Quiroz and the Chavezes...." Recommendation at 18.

Although the magistrate contends that it is "equally reasonable" to find that Quiroz shot Leo, Sr. "on his own initiative," given the fact that no credible evidence supports any reason why Quiroz would have done so or shows that Quiroz had committed other similar violent acts on the spur of the moment in the past -- as compared to the overwhelming reasons for Aguilar's conduct -- a reasonable jury would not have wildly speculated and given credence to the magistrate's hypothesis that perhaps Quiroz acted on his own.

**B.    The jury heard substantial evidence that the Chavezes were beaten prior to being killed -- evidence which further substantiates that the killings were done by someone with a motive to hurt Esparza or his relatives.**

Magistrate Judge Recio erred in concluding that "it was *equally reasonable* to find that Aguilar and Quiroz went to the trailer to shoot Rick Esparza, found the Chavezes there instead, and that Quiroz then, on his own initiative, shot Leo, Sr. before handing the gun to Aguilar." Recommendation at 18 (emphasis added). This description of events fails to consider that Aguilar's jury heard compelling evidence that both Annette and Leo, Sr. were beaten prior to being killed. Such evidence proves the attacker did not simply find the Chavezes by accident and kill them in order to eliminate any witnesses. Instead, the evidence indicates that the attacker specifically intended to hurt these victims prior to shooting and killing them. Most importantly, such violent action is consistent with the theory that the attacker -- in this case Aguilar -- had a motive to hurt Esparza, or his relatives.

For example, nine-year-old Leo, Jr. testified that he saw Aguilar ("the Mexican man") kick his mother Annette Chavez in the ribs shortly before he shot her. 18 RR 153-55, 181.

Assistant pathologist Arnold Argullin testified that Leo, Sr. had been "severely beaten" as evidenced by the "markings he had on his face." 19 RR 434. He also identified State's Exhibit ("SX") 11 as a photograph of Leo, Sr. showing that he had a "beating around the face," his "lips were busted," and that he had "blue and black eyes" and "swelling in both eyes." 19 RR 434-35; 23 RR 989 (SX 11). According to Argullin, these injuries were separate from the injuries caused when Leo, Sr. was shot in the back and the bullet was lodged in the sinus area. *Id.* Argullin also testified that Leo, Sr. had considerable bruising and injuries, and loss of blood. 19 RR 437. Cameron County Sheriff's investigator Jimmy Vasquez testified to viewing the bodies at the scene of the crime, and that the beating of Leo, Sr. "around the face" was immediately obvious. 19 RR 259. He also identified SX 11 and SX 14 as photos of the male victim, one showing "the face beaten up on the male subject" and the other showing the victim holding a white rag to his face. 19 RR 257-58; 23 RR 989 (SX 11), 992 (SX 14). Maricruz Ramos, a neighbor to the Esparzas, testified that after being awoken by Leo, Jr., she went to check on his parents and saw Leo, Sr. lying on the floor, bleeding from the nose, with a white t-shirt in his mouth covered in blood. 19 RR 223, 225-27. Finally, pathologist Lawrence Dahm testified that the shootings of both victims were done "execution style." 20 RR 738, 745. He described injuries inflicted on Leo, Sr. -- a cut on his lower lip, scraping injuries, bruising on his chin and left cheek, and bruising of his scalp which was indicative of blows to the head. 20 RR 740, 741, 751-54. Importantly, Dr. Dahm testified that the injuries had been inflicted within one to two hours prior to death, thus

-21-

supporting the State's theory that Aguilar and Quiroz had beaten the victims prior to shooting them. 20 RR 751.

In considering whether Aguilar's jury was entitled to a lesser included offense instruction, the magistrate makes no reference whatsoever to the fact that the victims were beaten prior to being shot -- evidence which further substantiates that Quiroz did not act on his own initiative. *See* Recommendation at 17-19. In light of the beating suffered by the Chavezes, no rational juror, *given all the facts*, could have acquitted Aguilar of capital murder and convicted him of noncapital murder instead. *Cordova*, 838 F.2d at 767; *Ransom*, 126 F.3d at 725.

**C.    The jury heard substantial evidence connecting Aguilar to the alleged murder weapon.**

In addition to evidence establishing Aguilar's motives for harming Esparza and, in turn, the Chavezes, the jury considered substantial evidence connecting Aguilar to the alleged murder weapon -- evidence which proved Aguilar tried to get rid of the weapon soon after the double murder. For example, Daniel Menchaca Pena testified that in the early evening hours of June 10, 1995 (the same day as the murders), he was driving around with Aguilar and Quiroz; that Aguilar told him to stop at a home (the Flores home) in Harlingen; and that Aguilar and Quiroz went inside for maybe fifteen to thirty minutes. 19 RR 515, 519, 520-522. Ralph Flores, Jr. testified that on June 10, 1995, he bought a six-shooter or revolver gun for $18 from an individual who looked like Aguilar; that the individual wanted $40 but agreed to accept $18 instead; and that Flores, in turn, sold the gun to his brother Domingo.

-22-

19 RR 524, 525, 528, 529, 532-33. Domingo Flores testified that his brother Ralph sold him a gun which he identified as SX 20; that his father Ralph, Sr. liked the gun so he gave it to his father; that the gun was placed inside a car; and that the Sheriff's Department came and took the gun on June 20th. 19 RR 538, 539, 541, 543, 545, 546.

Further, Cameron County Sheriff's investigator Jimmy Vasquez testified that officers received information that they could locate the murder weapon at a home in Harlingen and that, after receiving the tip, they were able to retrieve the weapon from one of the vehicles located on the property. 18 RR 286-87. Cameron County Sheriff's Department supervisor Abel Perez, Jr. testified that the weapon he retrieved from the car in Harlingen was a revolver handgun consistent with the type of weapon used in the double homicide. 19 RR 378-80. Finally, the jury heard testimony from Department of Public Safety firearms examiner Ronald Richardson that the projectiles submitted by the State for testing (SX 16 and SX 17) were probably fired from the .22 revolver admitted as SX 20. 20 RR 686. The officer was unable to identify or exclude SX 20 as the actual weapon that fired the bullets because the surface patterns of the projectiles were damaged or obliterated, a problem common to .22 revolvers. 20 RR 688, 709.

Based on the above evidence, a jury would reasonably have believed that Aguilar attempted to dispose of a weapon consistent with the murder weapon later the same day of the double murder, thus acting to ensure that he and Quiroz would not be caught. On the other hand, the jury heard no evidence to establish that it was Quiroz who actually possessed

the weapon or tried to sell the weapon. Because overwhelming evidence establishes
Aguilar's conviction for capital murder such that no rational jury, *given all the facts*, could
have acquitted him of the greater offense and instead convicted him only of noncapital
murder; the magistrate's conclusion that Aguilar's jury was entitled to a noncapital murder
instruction is incorrect. The Director's objections should therefore be sustained, and the
magistrate's recommendation to grant relief should be rejected.

III.    **The Magistrate's Recommendation To Grant Relief Was Based On The
        Incorrect Assumption That A Rational Jury Would Have Found It "Equally
        Reasonable" To Infer That Quiroz Actually Shot Leo, Sr. On His Own Initiative.**

        Magistrate Judge Recio erroneously concluded that Aguilar's jury was entitled to a
lesser included offense instruction because evidence establishing Aguilar's guilt as a party
"was not ... so strong as to preclude a finding that Quiroz killed Leo Chavez, Sr. on his own
initiative." Recommendation at 18. The magistrate also erred in determining that a rational
jury would have found it "equally reasonable" to infer that Quiroz shot Leo, Sr. on his own
accord because there was no evidence demonstrating that Aguilar instructed or encouraged
Quiroz to act. *Id.* Although the magistrate believes a lesser charge was required based on
this inference, the kind of reconstruction of events needed to support such a charge was not
pointed out by defense counsel during Aguilar's trial and such an inference is not fairly
inferable from the trial testimony. Furthermore, instead of considering what a rational jury
would do when faced with all the facts, the magistrate plucked certain evidence, or lack
thereof, from the record and examined it in a vacuum. The recommendation to grant relief

is incorrect and, therefore, should be rejected.

It was never once argued at trial that Christopher Quiroz decided to kill Leo, Sr. on his own initiative. Neither was it argued that Quiroz was the actual murderer of both Leo, Sr. and Annette Chavez. Instead, the defense argued that Aguilar was innocent and was never at the trailer at the time of the crime (18 RR 37; 21 RR 923-24); that Leo, Jr. did not even see the murder of his parents and that he incorrectly identified Aguilar and Quiroz as the killers (18 RR 34; 21 RR 899-903, 911-14); and that the police had failed to follow leads to other unnamed suspects who actually committed the murders, such as the driver of a purple Camaro (18 RR 40; 21 RR 911-12, 921, 928), or the possibility that one of Esparza's drug deals in Mississippi went bad (18 RR 39-40; 21 RR 919-20). The defense also argued that Rick Esparza had no credible testimony or documentation regarding his alleged drug transactions with Aguilar (18 RR 34; 21 RR 907-08, 915); and that Esparza's testimony (especially regarding Aguilar's threats) should not be believed because Esparza was on parole and had a deal with the State for his testimony (18 RR 38, 39; 21 RR 908-11, 928). A jury might have inferred that Quiroz acted on his own to kill Leo, Sr. and that Aguilar did not encourage Quiroz if Aguilar had at least admitted the two men were at the scene, either through a confession or statement to authorities or through trial testimony.[8] Yet here, the only argument from the defense was that Aguilar was never even involved.

---

[8]     Of course, the Director is not arguing that Aguilar should have been compelled to testify at trial. However, the consequence of Aguilar not testifying means the jury never heard any evidence at trial that Quiroz did the shooting on his own initiative.

Additionally, the jury heard no evidence whatsoever to establish that Christopher Quiroz had any connection to either the Esparzas or to the Chavezes -- a fact which the magistrate concedes. *See* Recommendation at 18 ("the evidence did not reveal any connection between Quiroz and the Chavezes...."). Most damning, there was certainly no evidence establishing that Quiroz had any motive to kill Leo, Sr. The magistrate contends that it is "equally reasonable" to find that Quiroz shot Leo, Sr. "on his own initiative," but a reasonable jury would not have wildly speculated and given credence to the magistrate's hypothesis, especially given the fact that no credible evidence supports any reason why Quiroz would have done so -- as compared to the overwhelming reasons for Aguilar's conduct set out in part II.A., *supra*. As in the instant case, courts are not required to provide instructions on a basis that "'essentially indulges and even encourages speculations.'" *Collins*, 690 F.2d at 438 (quoting *Sinclair*, 444 F.2d at 890).

As "proof" that Quiroz acted on his own initiative, the magistrate comments that there was "no evidence demonstrating that Aguilar instructed or encouraged Quiroz to shoot Leo, Sr." Recommendation at 18; *see id.* at 19 ("... Aguilar's jury could have rationally rejected the inference that Aguilar told or encouraged Quirez to shoot Leo, Sr."). However, this *lack of direct evidence* does not prove that no agreement existed nor would it cause a rational jury to infer that Quiroz decided to kill Leo, Sr. on his own initiative.

It is true that there is no direct evidence of Aguilar having encouraged his nephew

Christopher Quiroz to act -- for example, no confession from either Aguilar or Quiroz,[9] and no notarized document or videotaped conversation evidencing any agreement between Aguilar and Quiroz. It is also true that the only eyewitness to the killings -- nine-year-old Leo Chavez, Jr. -- did not testify that he saw or heard Aguilar encourage Quiroz to act. Instead, Leo, Jr. testified that he was awoken by a loud noise which he believed to be a gunshot, that he went into the kitchen area of the trailer only after both his parents were already lying on the floor, and that very shortly thereafter, both men shot his parents. 18 RR 86, 147-48, 153-55, 179-81. He was, therefore, unable to testify as to whether it was Aguilar or Quiroz or both men who beat his parents, nor could he describe which of the two men may have directed the other to act. Although testimony that Aguilar directly instructed or encouraged Quiroz to act would have certainly strengthened the State's case, mercifully Leo, Jr. was spared from having to watch any more of the horrific attack on his parents.[10]

---

[9]    Cameron County Sheriff's Department Supervisor Abel Perez, Jr. testified that Quiroz gave a statement to authorities after which he was placed under arrest for capital murder. 19 RR 393-94. However, Quiroz's statement was excluded from Aguilar's trial.

[10]    Yet the absence of Leo, Jr's testimony in this regard does not prove that Aguilar did not, in fact, instruct or encourage Quiroz to act. Instead, jurors are able to infer that such actions occurred. *See, e.g., United States v. Gonzales*, 121 F.3d 928, 935 (5th Cir. 1997) (jury may infer existence of conspiracy or agreement to act from presence, association, and concerted action of defendant with others, and proof thereof may be established by circumstantial evidence); *United States v. Davis*, 19 F.3d 166, 170 (5th Cir. 1994) (agreement to act may be silent or tacit). Furthermore, under Texas law, in determining whether the accused participated as a party, the court may look to events occurring before, during, and after the commission of the offense, and may rely on actions of the defendant which show an understanding and common design to do the prohibited act. *Beier v. State*, 687 S.W.2d 2, 4 (Tex. Crim. App.1985); *Medellin v. State*, 617 S.W.2d 229, 231 (Tex. Crim. App.1981) (*panel op.*); *Ex parte Prior*, 540 S.W.2d 723, 727 (Tex. Crim. App.1976). Circumstantial evidence may be used to prove one is a party to an offense. *Wygal v. State*, 555 S.W.2d 465, 469 (Tex. Crim. App.1977). Here, Aguilar personally participated in the killing of

While there may not be direct evidence of Aguilar's encouragement, there is testimony from Leo, Jr. which establishes that Aguilar was not surprised or startled when Quiroz shot Leo, Sr. -- evidence which the jury certainly considered and which further supports the State's theory that both men knew beforehand that the murders would occur. During trial, Leo, Jr. testified that he saw Quiroz ('the American man") yell at Leo, Sr. to "get his fat ass up," that he saw Aguilar ("the Mexican") kick his mother Annette in the ribs, and that he then saw both men shoot his parents. 18 RR 147-48, 152-55, 179-80. When asked on several occasions if he heard anyone else (Quiroz or Aguilar) say anything, Leo, Jr. testified only that Quiroz said, "Get your fat ass up" to his father, Leo, Sr., and then shot him. 19 RR 152-53, 154-55, 179-80. At no time did Leo, Jr. ever testify that Aguilar said anything to Quiroz after Quiroz shot Leo, Sr. -- let alone anything which would have indicated that Aguilar was surprised, startled, alarmed, or angered by Quiroz's actions. If, as the magistrate hypothesized, Quiroz did the shooting "on his own initiative," then it would be reasonable to presume that Aguilar would have somehow responded to Quiroz's dramatic escalation of violence. Instead, Aguilar simply took the gun and shot Annette Chavez -- actions which clearly show Aguilar was in agreement with Quiroz's action and, most likely, that both men knew ahead of time the murders would occur. Therefore, the magistrate erred in focusing

_____

Annette Chavez, and then afterwards, took actions to dispose of the alleged murder weapon. It was, therefore, entirely reasonable for Aguilar's jury to have inferred that he encouraged or instructed his nephew Quiroz to shoot Leo, Sr. Indeed, even Magistrate Judge Recio correctly admits that "such encouragement or instruction could reasonably be inferred from the evidence...." Recommendation at 18.

solely on the lack of evidence to prove Aguilar directly encouraged Quiroz to act beforehand. Instead, the focus should have been on whether a rational jury, *given all the facts* -- which included evidence establishing Aguilar's complete lack of reaction to Quiroz shooting Leo, Sr. -- could have acquitted Aguilar of capital murder and convicted on noncapital murder instead. *Cordova*, 838 F.2d at 767; *Ransom*, 126 F.3d at 725. Given such evidence, no rational jury would have reached the inference posited by the magistrate.

Finally, even if evidence does not prove that Aguilar encouraged or instructed Quiroz *before* he shot Leo, Sr., there is no question that Aguilar assisted in concealing the crime *after* it occurred. The evidence of Aguilar's disposal of a weapon similar to the murder weapon, set out in part II.C., *supra*, helps establish that Aguilar assisted Quiroz in committing murder -- assistance which was sufficient to convict Aguilar as a party. TEX. PENAL CODE 7.02(a)(2) (criminally responsible for conduct of another if act "with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense."). As previously explained, in determining whether the accused participated as a party, Texas courts may look to events occurring before, during, and after the commission of the offense, and may rely on actions of the defendant which show an understanding and common design to do the prohibited act. *Beier*, 687 S.W.2d at 4; *Medellin*, 617 S.W.2d at 231; *Ex parte Prior*, 540 S.W.2d at 727. Here, Aguilar's jury considered evidence of his conduct before, during, and after the crime -- evidence establishing his motives for harming Esparza or his family, evidence of his personal

participation in the killing of Annette Chavez, evidence proving the victims were beaten prior to being shot, evidence proving Aguilar was not surprised or alarmed by Quiroz killing Leo, Sr., and evidence proving Aguilar tried to dispose of the alleged murder weapon on the same day as the double murders. In light of such evidence, no rational jury would have inferred, even in the absence of direct evidence of Aguilar's encouragement, that Quiroz simply acted on his own initiative and killed Leo, Sr. The magistrate's recommendation in this regard is incorrect and, therefore, the Director's objections should be sustained.

## IV.    The Magistrate Erred In Concluding That Aguilar Is Entitled To Relief Because He Is Similarly Situated To The Petitioner in *Cordova v. Lynaugh*.

Magistrate Judge Recio found that Aguilar's case was similar to *Cordova v. Lynaugh, supra,* and reasoned that Aguilar was similarly entitled to relief. Recommendation at 18-19. Contrary to the magistrate's belief, Aguilar's case differs vastly from Cordova's.

Cordova was indicted for, and convicted of, capital murder for his role in murdering victim Hernandez during the course of committing or attempting to commit the robbery of Hernandez. *Cordova,* 838 F.2d at 769. In determining whether Cordova's jury was entitled to a lesser included offense instruction for noncapital murder, the court focused on whether a rational jury, given all the facts, could have found that Cordova murdered Hernandez, but that it was not during the course of a robbery. *Id.* at 767. The Fifth Circuit briefly described the evidence as follows:

> Jose (Joey) Hernandez and Cynthia West in the early morning hours of August 4, 1979 "parked" in a small parking lot in Espada Park in San Antonio, Texas. As Hernandez and West talked in the car, George Cordova approached

and asked for oil. Hernandez replied that he did not have any and Cordova left. At around 2 a.m., Cordova returned with Manuel Villanueva and two other men.

When Hernandez reached to start the car, he was struck in the face by one of the men. The car door was opened and Cordova and Villanueva started beating Hernandez. West saw Cordova strike Hernandez with a tire iron and Villanueva attack him with a knife. Cordova took West's wrist and forced her to run into a wooded area of the park. Along the way, Cordova threatened to do to her what he did to Hernandez. West was then forced to the ground face down and Cordova stuck the tire iron next to her face and again threatened her. Cordova made West stand up and run further into the woods, where he undressed her, taking her watch and a necklace. She was raped by Cordova, Villanueva, and a third man. After the attackers departed, West dressed and ran back to the parking lot. There, she discovered that the car was gone and Hernandez was lying dead in a pool of blood.

When Villanueva was arrested shortly after the crime, he had a bloodied knife in his possession. Leon Springs testified that Villanueva returned home on August 4 with a bloody shirt. Springs turned over to police some 8-track tapes which belonged to Hernandez, together with Hernandez's watch and empty wallet. Springs testified that Villanueva had given him the property. Two cassette boxes, identified as belonging to Hernandez, were recovered from Villanueva's sister who had received them from Villanueva. West's watch was also recovered from Villanueva's house. Hernandez's car was discovered on a street about 2 1/2 blocks from Villanueva's house, and approximately the same distance from the house where Cordova lived.

*Cordova*, 838 F.2d at 765-66. Here, the State argued that Cordova was guilty as a party to

the robbery of Hernandez based on the fact that he was the leader of the gang, since he did

all the talking, and the fact that Cordova robbed Hernandez's girlfriend West. *Id*. at 769.

However, the Fifth Circuit rejected this argument, holding that while a jury could have

inferred that Cordova had a prior agreement with two co-defendants to rob Hernandez, the

jury could also have rejected the inference given the lack of evidence of Cordova's personal

participation in the robbery, as well as the fact that none of the stolen items were traced to Cordova. *Id.* According to the court, "[t]he proof of Cordova's agreement to rob Hernandez, unlike the proof of his intent to kill Hernandez, was circumstantial and ambiguous." *Id.* at 770. Consequently, since a rational jury could have concluded that Cordova had no "prior agreement or common purpose" to rob Hernandez, then it could have acquitted Cordova of capital murder and found him guilty of murder instead such that failure to provide a lesser included offense instruction was error. *Id.*

Aguilar's case is not even remotely comparable to Cordova's. As an initial matter, *Cordova* was a pre-AEDPA case, which meant courts would review the district court's factual findings for clear error; however, Aguilar's case is governed by AEDPA standards which requires this Court to presume correct the state court's factual finding unless Aguilar rebuts the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Dowthitt*, 230 F.3d at 741. As explained in part I., *supra*, this Court is bound by the state court's reasonable adjudication of the issue.

Moreover, unlike *Cordova*, eyewitness testimony from Leo Chavez, Jr. firmly establishes Aguilar's personal participation in the double murder. Leo, Jr. testified that he saw two men in the living room with his parents, that his parents were "on the floor," and that he thought his parents "were playing" (19 RR 148); that Quiroz ("the American man") was standing next to his father, Leo, Sr. (19 RR 153); that Quiroz said "get your fat ass up" to Leo, Sr. (19 RR 153, 154, 179); that Aguilar ("the Mexican") was standing next to his

mother, Annette, and kicked her in the ribs (19 RR 154, 181); and that Quiroz then shot Leo, Sr. and gave the gun to Aguilar who shot Leo, Jr.'s mother Annette (19 RR 155-56, 179-80). Most importantly, as explained in part III., *supra*, Aguilar did not register any surprise or anger when Quiroz shot Leo, Sr., thus establishing that both men knew beforehand the double murder would occur.

Furthermore, unlike *Cordova* where the State argued that intent to rob Hernandez could simply be inferred because Cordova had robbed West, in Aguilar's case the jury was faced with overwhelming evidence, set out in part II.A., *supra*, establishing Aguilar's threats against Rick Esparza and his motives for harming Esparza or his relatives. *See, e.g.*, 19 RR 466-68, 565-67, 579, 584, 585-86, 589-90; 20 RR 603-05. In addition, the jury heard significant evidence set out in part II.B., *supra.*, detailing the beating suffered by both victims prior to their being shot -- evidence which fully supports the State's theory that the killings were done by someone with a motive against Esparza or his relatives. On the other hand, the jury heard no evidence that Quiroz even knew the Esparzas or the Chavezes, much less that he had any reason to want any of these individuals dead.

Finally, unlike *Cordova* where none of the stolen items were traced to his possession following the crime, Aguilar was clearly connected to a .22 revolver matching the weapon used during the murders, and evidence showed that Aguilar tried to dispose of it after the crime occurred. As detailed in part II.C., *supra*, several witnesses in Aguilar's case testified that on June 10, 1995, later the same day as the murders, Aguilar sold a .22 revolver for $18,

and this weapon was recovered and proved to be consistent with the murder weapon. *See,
e.g.,* 19 RR 515,519, 520-522 (Daniel Pena);  19 RR 524, 525, 528, 529, 532-33 (Ralph
Flores, Jr.);  19 RR 538, 539, 541, 543, 545, 546 (Domingo Flores); 18 RR 286-87 (Jimmy
Vasquez);  19 RR 378-80 (Abel Perez, Jr.).

Whereas it would have been reasonable for Cordova's jury to reject the inference that
Cordova had a prior plan to rob Hernandez because the evidence was "circumstantial and
ambiguous," it was not reasonable for Aguilar's jury to have spontaneously theorized that --
despite overwhelming evidence to the contrary -- perhaps Quiroz simply decided to shoot
Leo, Sr. on his own initiative.  The magistrate's conclusion that relief is warranted because
Aguilar's case is similar to Cordova's is incorrect.  Therefore, the Director's objections
should be sustained and the magistrate's recommendation to grant relief should be rejected.

## CONCLUSION

For all the reasons explained herein, Aguilar failed to demonstrate that the evidence
would permit a jury rationally to find him guilty of the lesser offense of murder, and acquit
him of capital murder, and, consequently, his rights were not violated when the trial court
refused to instruct the jury on the lesser included offense.  Therefore, the Director asks that
her objections be sustained,  that United States Magistrate Judge Recio's recommendation
to grant habeas relief on Aguilar's seventh claim be rejected, and that the Director's motion
for summary judgment be granted on all claims instead.

-34-

Respectfully submitted,

GREG ABBOTT
Attorney General of Texas

BARRY R. McBEE
First Assistant Attorney General

JAY KIMBROUGH
Deputy Attorney General for Criminal Justice

GENA BUNN
Assistant Attorney General
Chief, Postconviction Litigation Division


KATHERINE D. HAYES
Assistant Attorney General
*Attorney-in-Charge
State Bar No. 00796729
Southern District Admission No. 22698

Office of the Attorney General
Postconviction Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas  78711-2548
Telephone:  (512) 936-1600
Telecopier:  (512) 320-8132
Katherine.Hayes@oag.state.tx.us

ATTORNEYS FOR RESPONDENT

-35-

## CERTIFICATE OF SERVICE

I, Katherine D. Hayes, Assistant Attorney General for the State of Texas, do hereby certify that a true and correct copy of the above and foregoing Respondent's Objections to the United States Magistrate Judge's Report and Recommendation has been served by placing same in overnight delivery, postage prepaid, on this the 15th day of April, 2003, addressed to:

Mr. Larry Warner
LAW OFFICE OF LARRY WARNER
777 East Harrison, Suite 2
Brownsville, Texas 78520
contact # (956) 542-4784

and

Mr. David K. Sergi
SERGI & ASSOCIATES, P.L.L.C.
109 East Hopkins, Suite 200
San Marcos, Texas 78666
contact # (512) 392-5010

KATHERINE D. HAYES
Assistant Attorney General

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| JESUS LEDESMA AGUILAR, | § | |
|     Petitioner, | § | |
| | § | |
| v. | § | Civil Action No.  B-01-195 |
| | § | **CAPITAL LITIGANT** |
| JANIE COCKRELL, Director, | § | |
| Texas Department of Criminal Justice, | § | |
| Institutional Division, | § | |
|     Respondent | § | |

## ORDER

IT IS HEREBY ORDERED THAT Respondent's objections to the magistrate's recommendation are sustained (CDE #____); that the magistrate judge's recommendation to grant habeas relief in part on Petitioner's seventh claim is rejected (CDE #33 at 17-19, 32); that Respondent's motion for summary judgment (CDE #13) is granted in full; and that Petitioner's writ of habeas corpus (CDE #1 & #9) is denied.

It is so ORDERED.

SIGNED on this the _____ day of _____, 2003.


_____
HILDA G. TAGLE
UNITED STATES DISTRICT JUDGE PRESIDING