IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
ENTERED
MAY 2 7 2004
Michael N. Milby, Clerk of Court
By Deputy Clerk

| | |
|---|---|
| JESUS LEDESMA AGUILAR. § | |
| § | |
| Petitioner, § | |
| § | |
| v. § | Civil Action B-01-195 |
| § | |
| § | |
| JANIE COCKRELL, DIRECTOR § | |
| TEXAS DEPARTMENT OF CRIMINAL § | |
| JUSTICE – INSTITUTIONAL DIVISION § | |
| § | |
| Respondent. § | |

**ORDER**

BE IT REMEMBERED that on May 27, 2004, the court **ADOPTED IN PART and REJECTED in part** the Magistrate Judge's Report and Recommendation. The court adopts the Report and Recommendation with the exception of section D.6. The court rejects that section and finds that the Petitioner is not entitled to relief on his claim that he was denied due process of law when the trial court failed to charge the jury on the lesser included offense of non-capital murder.

I.      **Background**

The court adopts the Background section for the Report and Recommendation. However, the Court reiterates relevant portions here. Petitioner Jesus Ledesma Aguilar ("Petitioner" or "Aguilar") and Rick Esparza ("Esparza") knew each other since they were teenagers. After losing touch, the two became reacquainted in the early 1990s, and Esparza helped Aguilar get a job in the Mississippi cotton gins between September and December of each year.

In November 1994, Aguilar approached Esparza with the idea of transporting marijuana from their homes in Texas to Mississippi. Having no car of his own, Aguilar needed Esparza's help to transport the marijuana. Shortly thereafter, another supplier

1

asked Esparza to transport marijuana to Mississippi. Esparza agreed and transported the marijuana without Aguilar. While Esparza and his wife were in Mississippi on this run, Aguilar appeared at their motel room and accused Esparza of using Aguilar's connections to sell drugs behind Aguilar's back. Esparza assured Aguilar that he had his own connections. The Esparzas and Aguila then returned to Texas together.

In January 1995, Esparza and Aguilar each took ten pounds of marijuana to Mississippi. It took some time for them to sell their inventories, and Esparza became nervous that his Texas license plates would make the Mississippi police suspicious. Therefore, Esparza took the remainder of his inventory to his connection and told him he would return later for the money. He also talked Aguilar into doing the same. Esparza later retrieved his money from his connection, but Aguilar's connection told him that his money was stolen. Aguilar blamed Esparza for this loss because it was Esparza who had convinced him to return the marijuana. After returning to Harlingen, Texas, Esparza decided he would not make any more trips to Mississippi with Aguilar. He did, however, continue to travel to Mississippi on his own.

Aguilar occasionally dropped by Esparza's trailer and accused him of running drugs without Aguilar. Aguilar told Esparza he owed Aguilar for getting him into the business. In March 1995, Aguilar brought twenty pounds of marijuana to Esparza's home looking for transportation to Mississippi. Esparza refused, but he agreed to set up a transaction with his connection. Aguilar then went to Mississippi with his cousin, Christopher Quiroz, sold the marijuana, and apparently bought a white Camero vehicle with the proceeds.

Aguilar visited Esparza's home driving the white Camero and told Esparza to come for a ride. While driving around, Aguilar again told Esparza that he "owed" Aguilar. Esparza testified that Aguilar also told him that "I can take you out of the picture." Aguilar apparently threatened Esparza's life on a number of other occasions. Esparza noted that he was afraid of Aguilar because he had seen "the way [Aguilar] hurts people."

In spite of Aguilar's threats, Esparza maintained his own drug courier operation. He often asked his sister, Annette Chavez, and her family to stay at his home during his

out-of-town trips. On June 8, 1995, Esparza and his wife took a load of drugs to Mississippi. Annette Chavez, her husband Leo Chavez, Sr. ("Leo Sr."), and their two children, Leo Chavez, Jr. ("Leo Jr.") and Lincoln, nine and two years old respectively, stayed at Esparza's home.

Aguilar spent much of the afternoon and evening of June 9, 1995, drinking with friends. At approximately 9:00 p.m., he was at a friend's house with, among others, David and Christopher Quiroz. Their host eventually went to bed. As David Quiroz was leaving, he saw Aguilar and Christopher Quiroz walk toward Christopher Quiroz's mother's red Buick. David Quiroz went home to bed but was awakened an hour or two before sunrise by Aguilar and Christopher Quiroz, who wanted more to drink. He took a bottle of liquor across the alley to Christopher Quiroz's house and eventually fell asleep there.

At approximately 5:00 a.m., Leo Jr. was awakened from his bed in Esparza's trailer by the sound of a gunshot. He got out of bed and entered the kitchen. There were no walls between the rooms, and Leo Jr. could see into the living room which was illuminated by a small lamp. Leo Jr. saw his parents on the floor with two men standing over them. He testified that the "American" man told his father to "get your fat ass up," and then he saw the man shoot his father. The "Mexican" man then took the gun and shot his mother. After the men left the trailer, Leo Jr. went over to the window and saw the two men drive off in what he thought was a purple Camero.[1] Leo Jr. ran to the neighbor's home for help.

That afternoon, Daniel Pena was driving around with Aguilar and Christopher Quiroz when Aguilar asked him to go to Rafael Flores, Jr.'s residence. While there, Aguilar offered to sell a .22 caliber revolver. Rafael bought the revolver and gave it to his brother, who gave it to their father. Their father placed the gun in the trunk of a car on his property. The police later received a tip that they could recover the murder weapon from the Flores residence, which they did. After recovering the weapon, the

---

[1] The police established that Leo Jr. could not distinguish between a Camero and a Buick, and that a red car looked purple at night through the tinted glass of the trailer.

3

police lab compared bullets from the gun with the bullets recovered from the Chavez's bodies. An expert testified that the bullets that killed the Chavezes could have been fired from the gun but could not testify that the bullets were, in fact, fired from that gun.

Approximately two weeks after the murders, Leo Jr.'s grandmother was reading the newspaper when Leo Jr. saw a picture and told her that two of the men in the picture were the men who "hurt" his parents. His grandfather took him to the police station where Leo Jr. identified Christopher Quiroz as the "American" man who shot his father and Aguilar as the "Mexican" man who shot his mother.

Aguilar was convicted of capital murder for intentionally and knowingly causing the death of more than one person during the same criminal transaction. The Texas Court of Criminal Appeals originally affirmed Aguilar's conviction and sentence on June 18, 1997. The court subsequently withdrew its opinion and issued a new opinion affirming the conviction and sentence on October 29, 1997. On May 26, 1998, the United States Supreme Court denied certiorari. See Aguilar v. Texas, 523 U.S. 1139 (1998). Aguilar then filed a state application for post conviction relief which was denied by the Texas Court of Criminal Appeals on June 10, 1998. Aguilar filed his original federal habeas corpus petition on May 28, 1999, and amended it on Jun 9, 1999. At an evidentiary hearing on June 15, 2000, Aguilar asked the court to dismiss his petition without prejudice so that he could return to state court and raise unexhausted claims. The request was granted; Aguilar filed a state habeas petition; and the Texas Court of Criminal Appeals dismissed the petition as an abuse of the writ on November 21, 2001. Five days later, Aguilar again filed a federal habeas corpus petition which he later amended. The petition was referred to the magistrate judge who subsequently entered a Report and Recommendation recommending the court deny relief on all claims except Petitioner's Seventh Claim for Relief that he was denied due process of law when the trial court failed to give a lesser included offense instruction for non-capital murder.

**II. Standard**

Petitioner's habeas petition is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Title 28 U.S.C. § 2254(d) provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

This court's determination requires deference to the state habeas court's adjudication of Petitioner's claims unless the adjudication is flawed under at least one of these provisos. *See, e.g., Kutzner v. Johnson*, 242 F.3d 605, 608 (5th Cir. 2001).

"Under the 'contrary to' clause [of § 2254(d)(1)], a federal habeas court may grant [a writ of habeas corpus] if the state court arrives at a conclusion opposite to that reached by [the Supreme Court of the United States] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362 (2000). "A 'run-of-the-mill state-court decision applying the correct legal rule' would not fit within this exception as 'diametrically different' or 'opposite in character or nature' from Supreme Court precedent." *Beazley v. Johnson*, 242 F.3d 248, 256 (5th Cir.), *cert. denied*, 534 U.S. 945 (2001).

"Under the 'unreasonable application' clause [of § 2254(d)(1)], a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413. "[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id.* at 409. "A state court's decision will be based on an unreasonable application of clearly established federal law when it is objectively unreasonable." *Kutzner*, 242 F.3d at 608. "[A]n unreasonable application of federal law is different from an incorrect application of federal law." *Williams*, 529 U.S. at 410. "Under § 2254(d)(1)'s 'unreasonable

5

application' clause, then, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411.

"Factual findings of the state court are presumed to be correct . . .." *Gardner v. Johnson*, 247 F.3d 551, 557 (5th Cir. 2001). A federal habeas court "must defer to them unless they were based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." *Id.* (internal quotation marks and footnote omitted) (quoting *Chambers v. Johnson*, 218 F.3d 360, 363 (5th Cir.), *cert. denied*, 531 U.S. 1002 (2000)). "When challenging a state court's factual determinations, a petitioner must rebut this presumption of correctness by 'clear and convincing evidence.'" *Barnes v. Johnson*, 160 F.3d 218, 222 (5th Cir. 1998) (quoting 28 U.S.C. § 2254(e)(1)).

## III. Discussion

In his Seventh Claim for Relief, Petitioner contends that the trial court deprived him of due process of law by failing to charge the jury that it could convict him of the lesser included offense of non-capital murder.

In a capital case, the jury must be permitted to consider a verdict of guilt of a non-capital offense when the evidence presented would support such a verdict. *See Beck v. Alabama*, 447 U.S. 625, 634-38 (1980). Accordingly, a "defendant is entitled to an instruction on a lesser included offense if the evidence would permit a jury rationally to find him guilty of the lesser offense and acquit him of the greater." *Id.* at 635 (citations omitted); *see Cordova v. Lynaugh*, 838 F.2d 764, 767 (5th Cir. 1988). In *Beck*, the Supreme Court invalidated on due process grounds a provision of the Alabama death penalty statute the precluded the jury from being instructed on a lesser included non-capital offense. *Beck*, 447 U.S. at 637, 638 & 642-43. When warranted by the facts of the case, the mandatory instruction on a lesser included noncapital offense provides a third option as a safeguard against the risk of an "all or nothing" jury verdict on the capital offense. *Id.*; *see also Spaziano v. Florida*, 468 U.S. 447, 455 (1984). There is no Supreme Court precedent for the proposition that a lesser included

instruction must be given in every case. The Fifth Circuit has found no due process violation when a state court refused a lesser included instruction when the facts of the case did not support giving the lesser included offense instruction. *See, e.g., Reddix v. Thigpen*, 805 F.2d 506, 511 (5th Cir. 1986).

Furthermore, the Fifth Circuit has held that when a claim turns on application of state law rather than federal law, a jury instruction on lesser included offenses is mandated if, under state law as applied to the facts of the case, a rational juror could vote to convict the defendant of the lesser offense and to acquit on the greater. *See Hill v. Black*, 932 F.2d 369, 374 (5th Cir. 1991). In Texas, murder is a lesser included offense of capital murder. TEX. PENAL CODE ANN. § 19.03(c).

In this case Petitioner was charged with committing two murders during the same transaction which is a capital offense under Texas law. "A person commits an offense if the person commits murder as defined under Section 19.02(b)(1) and . . . the person murders more than one person: during the same criminal transaction . . . ." TEX. PEN CODE ANN. § 19.02(a)(7(A) (defining capital murder). Moreover, it is not required that the same person commit both murders. Under Texas law, "A person is criminally responsible for an offense committed by the conduct of another if: . . . acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense . . . ." TEX. PEN CODE ANN. § 7.02(a)(2). The trial court properly charged the jury on both capital murder and the law of parties.

The question remains, however, whether under Texas law as applied to the facts of this case, a rational juror could vote to convict the defendant of the lesser offense of non-capital murder and to acquit on the greater offense of capital murder. The answer hinges on the application of the law of parties.

> Evidence is sufficient to convict the defendant under the law of parties where he is physically present at the commission of the offense, and encourages the commission of the offense either by words or other agreement. *Tarpley v. State*, 565 S.W.2d 525 (Tex.Cr.App.1978). The agreement, if any, must be before or contemporaneous with the criminal event. *Urtado v. State*, 605 S.W.2d 907 (Tex.Cr.App. 1980). To convict someone as a party to an offense, the evidence must show that at the

> time of the offense the parties were acting together, each doing some part
> of the execution of the common purpose. *Brooks v. State*, 580 S.W.2d
> 825 (Tex.Cr.App. 1979). In determining whether the accused participated
> as a party, the court may look to events occurring before, during and after
> the commission of the offense, and may rely on actions of the defendant
> which show an understanding and common design to do the prohibited
> act. *Medellin v. State*, 617 S.W.2d 229 (Tex.Cr.App. 1981); *Ex parte
> Prior*, 540 S.W.2d 723 (Tex.Cr.App.1976). Circumstantial evidence may
> be used to prove one is a party to an offense.

*Cordova v. Texas*, 698 S.W.2d 107, 111 (Tex.Cr.App. 1985); *see also Cordova v. Lynaugh*, 838 F.2d at 769.[2] In this case, the evidence leaves no doubt that Petitioner was a party to the murder of Leo Sr.

The evidence connected Petitioner to Esparza personally and his trailer home. Petitioner and Esparza had been friends, traveled to and worked together in Mississippi, and had a drug smuggling operation. Petitioner had been to Esparza's trailer on numerous occasions. Petitioner and Esparza had argued over money derived from the sale of marijuana. Petitioner had threatened Esparza on several occasions for cheating Petitioner out of drug proceeds. Petitioner had even met Annette Chavez at Esparza's trailer and questioned her about Esparza's whereabouts. No evidence suggested Christopher Quiroz had any ties to Esparza, the trailer home, or the Chavezes.

The evidence in this case also showed that the murders of the Chavezes were protracted, cruel and intentional. Both the Chavezes were beaten significantly before

---

[2] The *Cordova* case explicated both the law of parties under Texas law and Supreme Court precedent regarding the due process requirements for the use of a lesser included offense. *Cordova*, however, does not mandate a lesser included instruction or the granting of relief in this case. First, *Cordova* is a pre-AEDPA case and thus was decided under a different standard. Second, *Cordova* is factually distinguishable from this case. Cordova was charged with the capital offense of murder during the commission of a robbery. The Fifth Circuit concluded a lesser included instruction was warranted because Cordova did not personally participate in the robbery, no stolen property was traced to Cordova, and the facts suggested Cordova intended only to commit a rape, not robbery. *See Cordova v. Lynaugh*, 838 F.2d at 769-770.

they were murdered. The assistant pathologist testified that Leo Sr. had been "severely beaten." Leo Sr. had been beaten on the head and face. Leo Jr. testified that he witnessed Petitioner kick his mother, Annette Chavez, in the ribs shortly before shooting her. The pathologist testified that the injuries were inflicted within one to two hours before the victims were shot and that the shootings were done "execution style."

Furthermore, as summarized *supra*, the evidence connected Petitioner to the .22 caliber pistol allegedly used to commit the murders. On June 10, 1995, Daniel Pena was driving around with Petitioner and Chris Quiroz when Petitioner asked him to go to Rafael Flores, Jr.'s residence. While there, Aguilar and Quiroz offered to sell a .22 caliber revolver. Rafael Flores, Jr. bought the revolver and gave it to his brother, who gave it to their father. Their father placed the gun in the trunk of a car on his property. The police later received a tip that they could recover the murder weapon from the Flores residence, which they did. After recovering the weapon, the police lab compared bullets from the gun with the bullets recovered from the Chavez's bodies. An expert testified that the bullets that killed the Chavezes could have been fired from the gun but could not testify that the bullets were, in fact, fired from that gun. The evidence connected Petitioner to the use and the disposal of the alleged murder weapon.

Based on this evidence, a rational juror could conclude that Petitioner and not Quiroz had a connection to the Esparzas, the trailer and the Chavezes; that both Petitioner and Quiroz participated in the beatings of the Chavezes; that Petitioner was present during the murder of Leo Sr.; that Petitioner shot Annette Chavez; and that Petitioner disposed of the murder weapon. From these conclusions, a rational juror could further conclude that Petitioner and Quiroz had formed an agreement to shoot the Chavezes. Particularly, the nature of the beatings, the time elapsed during the beatings, the time elapsed between the beatings and the shootings of the Chavezes, and the execution style shooting could lead a rational juror to conclude that Petitioner and Quiroz formed an agreement to commit these acts either before shooting or contemporaneously with shooting the Chavezes. Finally, a rational juror could conclude that Petitioner did shoot Annette Chavez and was a party to the shooting of Leo Sr. Thus, the evidence would not permit a jury rationally to find Petitioner guilty of the

lesser offense of non-capital murder and acquit him of the greater offense of capital murder.

Thus, Petitioner has not demonstrated that the trial court's decision to refrain from instructing on the lesser included offense of non-capital murder was either "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States . . .." Nor has Petitioner demonstrated that the trial court's decision "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

### IV. Conclusion

For the foregoing reasons, the court **ADOPTS IN PART and REJECTS in part** the Magistrate Judge's Report and Recommendation. The court adopts the Report and Recommendation with the exception of section D.6. The court rejects section D.6 and finds that the Petitioner is not entitled to relief on his claim that he was denied due process of law when the trial court failed to charge the jury on the lesser included offense of non-capital murder. Defendant Cockrell's motion for summary judgment [Dkt. no. 13] is **GRANTED**.

DONE at Brownsville, Texas, this 27th day of May 2004.

Hilda G. Tagle
United States District Judge