United States District Court
Southern District of Texas
FILED

JUN 25 2004

Michael N. Milby
Clerk of Court

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE DIVISION

| | | |
|---|---|---|
| JESUS LEDESMA AGUILAR,<br>Petitioner | § § § | |
| V. | § § | CIVIL ACTION NO. B-01-195 |
| DOUGLAS DRETKE, DIRECTOR,<br>Texas Department of Criminal Justice-<br>Correctional Institutions Division,<br>Respondent. | § § § § | |

## REQUEST FOR A CERTIFICATE OF APPEALABILITY

COMES NOW, Jesus Ledesma Aguilar, who has petitioned this Court for a Writ of Habeas Corpus and hereby files this Request for a Certificate of Appealability.

### STANDARD OF REVIEW

This § 2254 habeas petition is subject to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *See Penry v. Johnson*, 532 U.S. 782, 792, 121 S. Ct. 1910, 1918 (2001). AEDPA requires that Aguilar obtain a Certificate of Appealability before he can appeal the district court's denial of habeas relief. 28 U.S.C. § 2253(c) (I) (2000). Hence, "until a COA has been issued federal courts of appeals lack jurisdiction to rule on the merits of appeals from habeas petitioners." *Miller-El v. Cockrell*, 537 U.S. 322, 336, 123 S. Ct. 1029, 1039 (2003).

A Certificate of Appealability will issue only if the petitioner makes substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c) (2) (2000); *Miller-El*, 537 U.S. at 336, 123 S. Ct. at 1039. More specifically, the petitioner must demonstrate that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484, 120 S. Ct. 1595, 1604 (2000). Likewise, when the district court has rejected a

claim on a procedural ground, "the petitioner must also demonstrate that 'jurists of reason would find it debatable whether the district court was correct in the procedural ruling.'" *Henry v. Cockrell*, 327 F.3d 429, 431 (5th Cir. 2003) (quoting *Slack*, 529 U.S. at 484, 120 S. Ct. at 1604). The Supreme Court counseled that "a COA ruling is not the occasion for a ruling on the merit of petitioner's claim[.]" *Id.* at 331. Instead, the court should engage in an "overview of the claims in the habeas petition and a general assessment of their merits." *Id.* at 336. "[A] claim can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail." *Id.* at 338.

In *Tennard v. Dretke*, 542 U.S. ___ (June 24, 2004), the United States Supreme Court clarified the standard for granting a Certificate of Appealability. The Court significantly lowered the burden on a petitioner to make showing that reasonable jurists disagree on a particular matter by merely requiring the petitioner to make a prima facie case.

Ultimately, "[t]o prevail on a petition for writ of habeas corpus, a petitioner must demonstrate that the state court proceeding 'resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.'" *Robertson v. Cockrell*, 325 F.3d 243, 247-48 (5th Cir. 2003) (en banc) (quoting 28 U.S.C. § 2254(d) (I) (2000)).[1] However, "[w]e have no authority to grant habeas corpus relief simply because we conclude, in our independent judgment, that a state supreme court's application of [federal law] is erroneous or incorrect." *Catalan v. Cockrell*, 315 F.3d 491, 493 (5th

---

[1] A state court's decision is "contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States . . if the state court arrives at a conclusion opposite to that reached by the Court on a question of law or if the state court decides a case differently than the Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13, 120 S.Ct. 1495, 1523 (2000).

Cir. 2002) (citation and quotation omitted). *Bagwell v. Dretke,* ___ F.3d ___ (5th Cir. 2004) No. 03-51060.

## INDIVIDUAL CLAIMS

### I.   *BECK V. ALABAMA* (Claim No. 7)

Mr. Aguilar respectfully asks this Court to issue a Certificate of Appealability regarding the issues raised in *Beck v. Alabama* in Claim No. 7. The Court has utilized the wrong standard of review in assessing whether the *Beck* claim should be upheld. Given that the Magistrate recommended relief on this claim, it is apparent that a Certificate of Appealability should be granted because the Magistrate is presumed to be a reasonable jurist and, thus, the Magistrate disagrees with the reasoning of the District Court. *Tennard v. Dretke, supra; Bagwell, supra.*

In addition, a Certificate of Appealability should be granted for the following reasons:

**A.   The Magistrate Correctly Concluded That the Texas Court of Criminal Appeals' Adjudication on Aguilar's Claims Was Unreasonable and Contrary to the United States Supreme Court's Holding in *Beck V. Alabama.***

Title 28 U.S.C. § 2254(d) allows federal courts to grant an application for a writ of habeas corpus on behalf of state prisoners with respect to any claim which adjudication on the merits in State court proceeding "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."

**B.   The Eighth and Fourteenth Amendment Compel Lesser Included Offense Instructions When Warranted by the Evidence**

In *Beck v. Alabama,* the United States Supreme Court established that death penalty may not be constitutionally imposed after a jury verdict of a capital offense, when the jury was not permitted

to consider a verdict of guilt of a lesser-included, non-capital offense, and when the evidence would have supported such a verdict. *Beck v. Alabama,* 447 U.S. 625, 627 (1980). In *Beck,* the Supreme Court struck down the Alabama death penalty statute which specifically prohibited the judge from giving the jury the option of convicting petitioner of a lesser included offense. *Id.* The Supreme Court reasoned that failure to give the jury a "third option" of convicting on a lesser included offense inevitably enhanced the constitutionally intolerable risk of an unwarranted death conviction. *Id.* at 637.

Providing the jury with the third option of convicting on a lesser included offense also ensures that the jury will accord the defendant the full benefit of the reasonable doubt standard. *Keeble v. United States,* 412 U.S. 205, 208 (1973). A defendant is entitled to a lesser-offense instruction precisely because he should not be exposed to the substantial risk that the jury practice will diverge from theory. *Id.* Thus, where one of the elements of the offense charged remains in doubt, but the defendant is plainly guilty of *some* offense, the jury is likely to resolve its doubts in favor of the conviction. *Id.*

### C.    Lesser-Included Offense Instructions Are Warranted Where Conviction Is Likely Unreliable

In its express denial of the Petitioner's claims, this court cited to the Fifth Circuit precedent for the proposition that due process requires instruction on lesser included offense only where evidence warrants it and not in every capital case. (*slip. op., p.7, citing Reddix v. Thigpen,* F. 2d 506, 512 (5th Cir. 1986)). The court then decided, based on *Reddix,* that jury instructions were not warranted in the present case and denied the Petitioner's claim.

The Fifth Circuit held in *Reddix* that the lack of a lesser-included offense instruction can be constitutionally sound where no reasonable jury could have acquitted defendant of the lesser included offense given the undisputed evidence of his confession. *Reddix v. Thigpen*, 805 F. 2d at 512. The Fifth Circuit relied on the United States Supreme Court's decision in *Hopper v. Evans*, 456 U.S. 605 (1982), which found, inter alia, that jury instructions on the lesser-included offense of manslaughter can be unwarranted where the defendant's own testimony affirmatively negates any possibility that he did not have the requisite intent to kill. *Evans*, 456 U.S. at 612.

Both of these decisions correctly recognize that *Beck* instructions are not necessary where the defendant's conviction is reliable in light of the evidence presented. Thus, the *Evans* court reasoned that defendant's own admissions such as confessions, testimonies, or statements to the grand jury that the defendant intended to kill the victim adequately address *Beck*'s concerns with channeling the sentencing discretion so as to avoid arbitrary and capricious results. *Id.* at 611.

It is important to note that *Evans* did not overrule *Beck* and *Reddix* merely cited to *Evans* and neither case specified the quantum of proof necessary to warrant the lesser-included offense instructions. Both cases merely held that lesser included offense instructions do not have to be given when the facts of the case preclude any possibility that defendant may be guilty of the lesser included offense.

Furthermore, the extraordinary facts of both cases suggest that the Fifth Circuit and the Supreme Court would only deny the jury instructions when the strength of the State's case against the defendant leaves the Court with less than reasonable doubt in the reliability of the conviction. This interpretation is further supported by United States Supreme Court's later decision in *Spaziano v. Florida*, which explained that in *Beck*, the element found essential to a fair trial was not simply

a lesser-included offense in the abstract, but the enhanced rationality and reliability that the instruction introduces into the jury's deliberation. *Spaziano v. Florida*, 468 U.S. 447, 455 (1984).

In the present case, the denial of jury instructions on the lesser-included offense of non-capital murder failed to adequately address the *Beck* concern with irrational and unreliable verdicts. This is because Mr. Aguilar, unlike the defendants in *Reddix* and *Evans,* did not confess to committing the actual crime, nor was his jury presented with the evidence that would affirmatively negate any possibility of the conviction on the lesser-included offense of non-capital murder. In fact, even a Magistrate Judge, appointed by the federal court, recognized the likelihood that Mr. Aguilar's conviction was unwarranted and recommended a new trial.

Because a properly instructed jury could have convicted Mr. Aguilar of only a non-capital murder, this court should reconsider its denial of Mr. Aguilar's claim. The court should defer to the opinion of a Magistrate Judge, who is presumed to be a rational jurist, and recognize the constitutionally impermissible risk that Mr. Aguilar's conviction was unwarranted. The court should deny the Respondent's motion for summary judgment and grant Mr. Aguilar a writ of habeas corpus with respect to his Eighth and Fourteenth Amendment claims.

**D.      The Magistrate Correctly Concluded That, Given the All the Facts, a Rational Jury Could Have Voted to Acquit Mr. Aguilar of Capital Murder and to Convict Him of the Lesser-included Offense of Non-Capital Murder.**

The Fifth Circuit explained that *Beck* instructions are necessary if, in a capital case, a jury could rationally acquit the defendant of the capital offense and convict him of the noncapital offense. *Cordova v. Lynaugh*, 838 F. 2d 764, 767 (5th Cir. 1988). Furthermore, since due process is violated whenever the jury is not permitted to consider a lesser included offense that the evidence would have

supported, the Fifth Circuit concluded that the source of that refusal, whether by operation of state law or refusal by the trial court judge, is immaterial. *Id.* at 767 n.2.

Yet, where a claim turns on application of state law rather than federal law, a federal appellate court must give deference to the articulation by the state's highest court of how the state law applies to the facts of the case. *Hill v. Black*, 932 F. 2d 369, 374 (5th Cir. 1991). Still, this does not mean that a federal court must accept the state's characterization of the facts without inquiry. *Id.* Rather, the federal court must determine whether, under the law as set out by the state court, a rational juror, given all the facts, could have reached a position consistent with the claimant's position. *Id.*

**E.      The Magistrate Correctly Recognized That the Present Case Squarely Falls Under *Cordova v. Lynaugh*.**

The Magistrate Judge, appointed by the federal court, correctly recognized that Mr. Aguilar was entitled to jury instructions on the lesser included offense. RR, p. 19. The Magistrate relied on Fifth Circuit decision in *Cordova v. Lynaugh* where, under very similar facts, the court overturned a capital conviction. *Cordova*, 838 F. 2d 764 (5th Cir. 1988). In *Cordova*, the evidence adduced at trial left no doubt that defendant committed a murder, but there was only circumstantial evidence from which a jury could infer that Cordova was indeed a party to the robbery. *Cordova*, 838 F.2d at 769. The court reasoned that this inference could have been rejected by a rational jury; therefore, the failure to instruct on the lesser-included offense left the jury with no option but acquittal of capital murder, thus violating the Eighth Amendment and due process. *Id.* at 770.

In the present case, the evidence linking Mr. Aguilar to the murder of Leo Chavez was purely circumstantial. The prosecution did not present any direct evidence that would unequivocally support

Mr. Aguilar's capital conviction. Rather, the evidence could lead a rational juror to consider three options: either completely acquit defendant of all charges, or convict him of the murder of Annette but not Leo Chavez or, find him guilty of both murders.

Since the prosecution relied on mere inference to convict Mr. Aguilar as a party to the murder of Leo Chavez, jury instructions on the lesser included offense were necessary to guard against the risk of unwarranted conviction. Because the jury could have rejected the inference that Mr. Aguilar was a party to the murder of Leo Chavez, the failure to instruct the jury on the lesser included offense of non-capital murder left the jury with no option but to convict Mr. Aguilar of the capital murder. Therefore, the Magistrate Judge correctly recognized that the trial court's failure to properly instruct the jury violated Mr. Aguilar's Eighth and Fourteenth amendment rights.

**F.      Under the Texas Law of Parties as Applied to the Present Case, a Rational Jury Could Have Concluded That Mr. Aguilar Was Not a Party to the Murder of Leo Chavez, Sr.**

In its denial of Mr. Aguilar's Eighth and Fourteenth Amendment claims, this court correctly stated that this case "turns" on application of the Texas law of parties to the facts of the present case. (Slip. Op. p.7.) Yet, the court also determined that, under the Texas law of parties as applied to this case, no rational jury could vote to convict Mr. Aguilar of the lesser offense of non-capital murder and to acquit him of the capital murder. (Slip. Op. pp.9-10.)

Mr. Aguilar now moves this Court to reconsider its denial of his claims because the evidence adduced at trial does not support this court's harsh conclusion. On the contrary, the evidence adduced at trial presented the jury with so many different theories of the crime that only a properly instructed jury could have avoided an arbitrary and capricious result.

Tex. Penal Code Section 7.02 (a)(2) provides that a person is criminally responsible for an offense committed by the conduct of another only if "acting with an intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense." In *Cordova v. State*, 698 S.W. 2d 107, 111 (Tex. Crim. App.), the Court of Criminal Appeals succinctly explained the Texas law of parties:

> An agreement, if any, must be before or contemporaneous with the criminal event. To convict someone as a party to an offense, the evidence must show that at the time of the offense the parties were acting together, each doing some part of the execution of the common purpose. The agreement, if any, must be before or contemporaneous with the criminal event. In determining whether the accused participated as a party, the court may look to the events occurring before, during, and after the commission of the offense.

1.  **Given all the facts, a rational jury could have found that Mr. Aguilar had no motive to commit the alleged offenses.**

In its denial of Mr. Aguilar's Eighth and Fourteenth Amendment claims, this Court found that a rational juror could infer motive to kill the Chavezes based on the inference that Mr. Aguilar and not Quiroz had a connection to the Esparzas, the trailer, and the Chavezes. (Slip. Op. p. 9). While such outcome could be possible, the court failed to consider the possibility that the jury could have found that Mr. Aguilar did not have the motive to kill the Chavezes.

a.  *The Jury Could Have Doubted That Aguilar Would Kill Chavezes*

The jury could have doubted whether the feelings of animosity, if any, that Mr. Aguilar had towards Rick Esparza were so strong that Aguilar would brutally execute Esparza's relatives. The jury could have believed that Aguilar was unhappy with Esparza, but not so unhappy that he would wish him or his family dead. After all, the jurors knew that Esparza and Aguilar were childhood friends, business partners, and otherwise very close.

**b.    The Jury Could Have Disbelieved The Testimony Of Rick Esparza**

The jury could have disbelieved the testimony of Rick Esparza, who testified that Mr. Aguilar

was the first person to come to his mind as the murderer of both victims "because of all the threats

he had been giving me." 20 RR 603. The jurors knew of Mr. Esparza's past criminal record and

affiliation with Mr. Aguilar, his role in the Mississippi drug trafficking business, and his rather shaky

reputation even among the drug dealers. Also, the jury was aware that Esparza was on parole and

testified against Mr. Aguilar as part of a plea bargain with the prosecution, and likely considered him

not credible. Thus, the jury could have seen Esparza not as a grief-stricken relative of the victims,

but yet another drug dealer, whose testimony the jury could have determined to be not credible.

**c.    The Jury Could Have Determined That Aguilar Had No Motive To
Hurt Either Rick Esparza or the Chavezes**

The jury could have found that Mr. Aguilar's connection to Esparza did not extent to the

Chavez family. Specifically, the jury could have believed that Aguilar did not know the Chavezes,

and therefore could not have had a motive to hurt them. Alternatively, the jurors could have found

that Mr. Aguilar knew the Chavezes but did not know that they would be in Esparza's trailer.

**2.    Given conflicting testimonies of the State's witnesses, the jury could have
doubted whether Aguilar in fact tried to dispose of the murder weapon.**

In its denial of Mr. Aguilar's claims, this court found that a rational juror could conclude that

Mr. Aguilar formed an agreement to shoot the Chavezes based on the evidence that Mr. Aguilar tried

to dispose of the murder weapon. (Slip. Op. p.9). However, the court failed to consider the possi-

bility that a rational jury could have doubted whether Mr. Aguilar in fact tried to dispose of the mur-

der weapon, or whether the weapon introduced at trial as the murder weapon was the actual murder

weapon. Due to these inherent contradictions, a rational jury could have determined that Mr. Aguilar

did not try to dispose of the murder weapon and therefore doubt whether Mr. Aguilar had the requisite mental state to be a party to the murder of Leo Chavez.

a.    *The Jury Was Likely Confused As To The Caliber Of The Alleged Murder Weapon*

In light of the conflicting testimonies of the single eyewitness and the single ballistics expert, the jury was likely confused as to the caliber of the alleged murder weapon. Thus, the jury heard the testimony of the State's ballistics expert, who testified that the murder weapon could have been a .22 *or* a .25 caliber, but could not conclusively identify or exclude Mr. Aguilar's gun as the actual weapon that fired the bullets because "the surface patterns of the projectiles were damaged or obliterated." 20 RR 688, 709. On the other hand, the jury heard Leo Chavez Jr testify that the firearm used in homicide was a small, silver revolver. 18 RR 160.

First, the evidence gathered from the crime scene suggested that a .22 caliber and not a .25 caliber ammunition was used. For example, it is a common knowledge among gun owners that .25 caliber ammo is jacketed, which makes it sturdier and less likely to be "damaged or obliterated." In contrast, .22 caliber revolvers usually fire lead, a softer and more brittle ammunition, which would be more likely to be damaged or obliterated. Since the discovered projectiles were damaged, the jury could have concluded that the ammo was fired from a .22 caliber handgun.

Second, the testimony of the eyewitness suggested that the gun used in the homicide was a small silver revolver and not a six-shooter pistol, like that found on Mr. Aguilar. This inference is supported by the fact that .25 caliber handguns, like that found on Mr. Aguilar, generally are not manufactured "revolver style", but are produced "pistol-style". In contrast, major American gunsmiths, such as Smith & Wesson, have produced hundreds of thousands of small, stainless steel

or chrome plated flat-nosed .22 caliber revolvers, like the one that the child saw the night of the murder.

This Court should note that Mr. Aguilar's trial counsel requested the trial judge to allocate funds so that the defense could hire its own ballistics experts, but the trial judge denied the motion. 3 RR 16. Had this motion been granted, the jury confusion as to the caliber of the murder weapon could have been cleared. Yet, the trial judge decided that since the testifying expert was an independent contractor, and not biased towards the State, there was no need to expand the State funds to hire a second ballistics expert.

           b.     *The Jury Could Have Disbelieved The Testimony Of Mr. Florez, Because He Was Drunk, Almost Blind, And His Testimony Was Hearsay In Violation Of* Crawford.

In its denial of Mr. Aguilar's claims, this court assumed that "Rafael Florez, Jr. bought the revolver and gave it to his brother, who gave it to their father." (Slip. Op. p. 9). However, the actual testimony of Mr. Florez was inconclusive, and the jury that heard the testimony could have found that Mr. Florez never got the alleged murder weapon from Mr. Aguilar.

First, Mr. Florez's own testimony established that he was not sure if it was Aguilar who ultimately sold him the weapon, because he "did not get the gun from Aguilar personally." 13 RR 970. Rather, Mr. Flores said that he got the gun from Rick Mendoza, who in turn got it from Mr. Aguilar. However, Mr. Mendoza never testified at trial. This testimony not only established lack of personal knowledge that Mr. Aguilar was part of the alleged firearm transaction, but it also violated Mr. Aguilar's Sixth Amendment right to confront and cross-examine the witness. *See Crawford v. Washington,* ____ US ____ (2004), holding that the State cannot introduce testimonial hearsay unless

the witness is unavailable to testify in person and the defendant had the opportunity to cross-examine him.)

Second, Mr. Florez's testimony established that on the day of the alleged firearm transaction he was severely intoxicated. Thus, Mr. Florez admitted that on the day of the alleged transaction he was "drinking all day and all night", that it was customary for him to drink "for two or three days", and that he does not remember seeing Aguilar at all. 13 RR 972. On cross-examination, Mr. Florez admitted that he told the police that he could not remember seeing Mr. Aguilar because he was drunk, but that the police officer told him that even if he was not sure to just "go ahead and write it down." 13 RR 970.

Finally, when the prosecution asked Mr. Flores to read a part of his testimony, Mr. Florez stated that he could not do so, because he "forgot to bring his glasses". Apparently, Mr. Florez had very poor vision, "needed glasses", and "could not see well the things that were far". 13 RR 973.

In light of the evidence produced at trial, the jury could have doubted that Mr. Aguilar tried to dispose of the murder weapon, or, alternatively, whether the weapon linked to Mr. Aguilar was the actual murder weapon. Thus, the jury could have concluded that the gun used in the homicide was a .22 caliber revolver, and not the longer, heavier, .25 caliber pistol linked to Mr. Aguilar. Also, the jury could have disbelieved Mr. Florez's testimony and found that Mr. Aguilar was not involved in the alleged firearm transaction at all. Finally, the jury could have decided that based on everything they knew about Mr. Aguilar and his enterprise, it was highly unlikely that he would not just dispose of the "hot" weapon rather than trying to sell it for a meager $18.00.

    *c.*    ***The Evidence of Severe Beatings Does Not Make Mr. Aguilar a
Party To the Murder of Leo Chavez.***

In its denial of Mr. Aguilar's claims, this court also stated that the nature of the beatings, the

time elapsed between the beatings and the shooting of the Chavezes, and the execution style shooting

could lead a rational juror to conclude that Mr. Aguilar agreed with Quiroz to shoot Leo Chavez.

(Slip. Op. p. 9). Yet, this evidence, when viewed together with all other facts, could not have aided

the jury in finding that Aguilar had the requisite specific intent to aid Quiroz.

First, the eyewitness testimony established that Mr. Aguilar kicked Annette Chavez in the

rib shortly before shooting her. 18 RR 153-155. The child testified that he was awoken up by a

gunshot, that he walked into the kitchen area of the trailer, and that shortly thereafter he observed

Quiroz shoot his father, then Aguilar shoot his mother. 18 RR 86, 147-48, 153-55, 179-81. As the

Respondent concedes, the child was asleep and thus unable to testify as to whether it was Aguilar

or Quiroz or both men who beat his parents, nor could he describe to the jury which of the two men

could have directed the other to act. Respondent's Objections to RR, p.27.

Second, the pathologist testified to the beatings of Chavezes prior to being shot. Specifically,

he testified that *Leo Chavez* had been "severally beaten" as evinced by the fact that "his lips were

busted", that he had "blue and black eyes" and "swelling in both eyes", as well as considerable

bruising, swelling, and loss of blood. Strangely, the record was devoid of similar finding of "severe

beatings" with respect to Annette Chavez.

Third, the jury could have doubted whether the shooting really was done "execution style".

Since the child testified that he was awoken by a gun shot, and then observed the two murders, the

jury would likely conclude that at least three shots were fired. Such a conclusion would contradict

a common-sense definition of an "execution style" murder. See, e.g. THE GODFATHER (execution

of the Turk and Cpt. McCluskey); *Sopranos*,(execution of Adrianna La Cerva)).

Based on the testimony of the two witnesses, the jury could have found that Mr. Aguilar did

not have the specific intent to aid Quiroz. Without knowing of the precise nature of the beatings, or

the manner of the shootings, the jury could not have inferred Mr. Aguilar's participation from either

fact. The jury could only infer that Leo Chavez was beaten, possibly by Quiroz alone; that the child

observed Quiroz, *not Aguilar*, shoot Leo Chavez; and that Mr. Aguilar shot Annette Chavez only

*after* Quiroz shot Leo.

Thus, the jury was not precluded from finding that Quiroz was acting independently of Mr.

Aguilar. Similarly, the jury could have found that Mr. Aguilar decided to shot Annette only *after*

Quiroz shot Leo, so as to "eliminate" the witness to the crime. Also, the jury could have found that

Mr. Aguilar was not even in room prior to the first shot being fired, could have been elsewhere. In

the absence of the jury instructions on the lesser included offense of non-capital murder, there is

simply no way of knowing what the jury actually decided.

### 3.    The Lack Of Meaningful Choice Adversely Affected Jury's Decision

When this Court denied Mr. Aguilar's Eighth and Fourteenth Amendment claims, it stated

that, under the Texas law of parties as applied to the present case, "the evidence leaves no doubt that

Petitioner was a party to the murder of Leo Sr." (slip.op. p.8). Yet, as shown above there were

multiple theories advanced by both the prosecution and the defense, all of which could have led a

properly-instructed jury to conclude that Mr. Aguilar was guilty only of non-capital murder, and not

of capital murder. Moreover, even Magistrate Judge Raccio understood the inherent contradictions

in the present case and recommended a new trial. Accordingly, the evidence could not have been so abundantly clear as to "leave no doubt that Petitioner was a party to the murder of Leo Sr."

While it is impossible to determine the exact nature of the jury's deliberation, it is clear that without a confession, testimony, or any direct evidence implicating Mr. Aguilar in the murder of Leo Chavez, the jury was not precluded from finding that the two murders were independent of each other. Thus, even if the jury believed Mr. Aguilar to have shot Annette Chavez, it could still have convicted him of only the non-capital murder.

In *Beck*, the United States Supreme Court warned us that "the failure to give the jury the 'third option' of convicting on a lesser included offense would inevitably enhance the risk of an unwarranted conviction." *Beck*, 447 U.S. at 637. Because death penalty is unlike any other punishment, "such a risk cannot be tolerated in a case in which the defendant's life is at stake." *Id.* Accordingly, Mr. Aguilar prays that this court reconsider its previous denial of his claims and order the Respondent State of Texas to conduct a new trial.

In conclusion, the Fifth Circuit has held that failure to issue lesser-included offense instruction in accordance with Beck is a type of constitutional error that can never be harmless. *Cordova v. Lyndough*, 838 F.2d at 764 n. 8. Therefore, the failure to properly instruct the jury in Mr. Aguilar's case cannot be considered harmless error. Accordingly, Mr. Aguilar prays that this Court reconsider its previous denial of his Eighth and Fourteenth Amendment claims.

**G.   Under *Hicks v. Oklahoma*, the Texas Court of Criminal Appeals Violated Mr. Aguilar's Due Process Rights When It Did Not Follow Its Own State Law On Lesser-Included Offense Instructions.**

The United States Supreme Court has long held that it is violation of the federal due process law for the state not to follow its own law on jury instructions. *Hicks v. Oklahoma*, 447 U.S. 343,

16

347 (1980). In *Hicks*, the Oklahoma Court of Criminal Appeals affirmed the conviction of a recidivist felon who was sentenced to 40 years under a statute that the same court declared unconstitutional in another case. The Oklahoma Court of Criminal Appeals reasoned that Hicks was not prejudiced by the impact of the invalid statute because his sentence was within the range of punishment that could have been imposed by the Court.

The Supreme Court reversed, holding that Hick's federal due process rights were violated. The Court reasoned that a criminal defendant has a substantial and legitimate expectation that he will be deprived of his liberty only to the extent determined by the jury in the exercise of its statutory discretion, and that his liberty interest is protected by the Fourteenth Amendment against arbitrary deprivation by the States. In other words, the State must follow its own law.

In this case, Mr. Aguilar was entitled to have his jury instructed on the lesser-included offense of non-capital murder under Texas law. Yet, the Texas Court of Criminal Appeals affirmed the lower court's denial of jury instructions, despite its previous rulings to the contrary in similar cases. Since the Fourteenth Amendment protects criminal defendants from arbitrary deprivation of liberty by the States under *Hicks*, this Court should recognize that the State of Texas violated Mr. Aguilar's federal due process rights and grant Mr. Aguilar relief on his due process claim.

In determining whether a defendant is entitled to a charge on a lesser-included offense, the Texas courts must consider all evidence presented at trial in a two-prong test. *Lugo v. State*, 667 S.W. 2d 144 (Tex. Crim. App. 1984), *Royster v. State*, 622 S.W. 2d 442 (Tex. Crim. App. 1981), *Aguilar v. State*, 682 S.W. 2d 556 (Tex. Crim. App. 1985). The first prong requires that the lesser-included offense must be included within the proof necessary to establish the offense charged.

Secondly, there must be *some* evidence in the record that if the defendant is guilty, he is guilty of

lesser offense only. *Aguilar, 682 S.W. 2d 556 at 558.*

### 1.    Under Texas Law, Non-Capital Murder Is A Lesser Included Offense Of Capital Murder.

Under Texas law, commission of two murders during the same transaction is a capital

offense. Tex. Penal Code Sec. 19.03 (a) (7) (A). But, an offense of non-capital murder is statutorily

defined as lesser-included offense of capital murder. *Cordova v. Lyndough,* 838 F. 2d at 769. Thus,

Tex. Penal Code Ann.§19.03(c) specifically provides that if the jury does not find the defendant

guilty of capital murder, it may convict him "of murder or any other lesser included offense."*Id.*

Because a non-capital murder is a lesser-included offense of capital murder under both

statutory and case law, Mr. Aguilar easily satisfies the first prong of the*Aguilar-Royster* test.

### 2.    The Record Contained Sufficient Evidence That Mr. Aguilar Was Guilty Of Only A Non-Capital Murder.

Under *Aguilar-Royster* test, lesser-included offense instructions must be given so long as

there is *some* evidence in the record that would justify a conviction of *only* the lesser-included

offense. *Cordova v. State,* 698 S.W. 2d 107, 113 (Tex. Crim. App. 1985).

As illustrated above, a rational jury could have doubted whether Mr. Aguilar had the requisite

intent to aid Quiroz in shooting Leo Chaves. Specifically, the evidence pointing to the motive,

disposal of the gun, and the nature and manner of the shootings was plainly inconclusive and subject

to dispute. Even if Mr. Aguilar did not have sufficient evidence to persuade a jury beyond doubt that

he was not a party to the murder of Leo Chaves, he had sufficient evidence to satisfy the *Aguilar-*

*Royster* test. Even a Federal Magistrate, who is presumed to be a rational jurist, had serious

reservations about Mr. Aguilar's participation in the commission of the first murder and recommended retrial. Report and Recommendation, p.19.

Since Mr. Aguilar satisfied the *Aguilar-Royster* test, the Texas Court of Criminal Appeals should have instructed the jury on a lesser-included offense of non-capital murder. Instead, the Texas Court of Criminal Appeals affirmed the lower court's denial of the instructions. Therefore, Mr. Aguilar was denied federal due process of law under *Hicks*.

## II.   SHACKLING

Aguilar argued that his rights to due process of law was violated because he appeared before the jury in shackles. The State Habeas Court rejected this claim on the grounds that Aguilar should have raised it in his direct appeal.

A review of the record does not reveal that the shackling issue was properly raised so that it could be briefed to the Texas Court of Criminal Appeals. As a result, this is the unique ground of habeas. As Miller Farmer has stated, " the appeal is a book, the habeas is the rest of the story." In this case, the issue of shackling was a habeas issue rather than a direct appeal. Thus, the Magistrate's ruling disregards the distinction between habeas and direct appeal. Given the state of the record, Aguilar would respectfully object to the Magistrate's conclusion that he had to raise this issue on direct appeal, thus the point was procedurally defaulted.

"We begin with the threshold premise than an accused is presumed innocent and, as such, is entitled to all of the trappings of innocence during trial." *United States v. Nicholson*, 846 F.2d 277, 279 (5th Cir. 1988) (citations omitted). Thus, the shackling of a defendant during trial, a practice that potentially threatens the defendant's presumption of innocence, bears close scrutiny. *Holbrook v. Flynn*, 475 U.S. 560, 106 S. Ct. 1340, 1345 (1986) (citing *Estelle v. Williams*, 425 U.S. 501, 503-04,

96 S. Ct. 1691, 1692-93 (1976)); *Marquez v. Collins*, 11 F.3d 1241, 1244 (5th Cir. 1994) ("Restraint at trial may carry a message that a defendant continues to be dangerous.").

These important due process concerns "must be balanced against the court's obligation to protect the court and its processes, and to attend to the safety and security of those in the courtroom." *Nicholson*, 846 F.2d at 279 (citations omitted); *Marquez*, 11 F.3d at 1244. "While a defendant is entitled to the physical indicia of innocence, a court is justified in ordering him handcuffed and shackled during trial [when] there is a danger of escape or injury to the jury, counsel, or other trial participants." *Wilkerson v. Whitley*, 16 F.3d 64, 67 (5th Cir. 1994). Most importantly, this inquiry "does not trigger a type of 'least means' analysis. That in retrospect some lesser restraint might have sufficed is not determinative." *Marquez*, 11 F.3d at 1244.

In *Bagwell, supra*, shackling was approved of only as a last resort, after the defendant made realistic threats of violence and disrespectful behavior.

Here there were no threats nor evidence of other reasons that Aguilar needed to be shackled. Thus, a Certificate of Appealability should issue. *Bagwell, supra.*

## III.  **CLAIMS FOR RELIEF TWENTY TWO THROUGH TWENTY FIVE**

Aguilar respectfully asks for a Certificate of Appealability regarding Aguilar's claim numbers twenty-two through twenty-five relating to the police station lineup, the admission of allegedly false testimony, and alleged bias by the Texas Court of Criminal Appeals. The opinion by the Texas Court of Criminal Appeals gives this court no guidance as to why the issues were procedurally defaulted, why the court felt that this was an abusive of the writ process. It appears that the Texas Court of Criminal Appeals merely issued a rubber stamp opinion which contained no actual legal knowledge, analysis or evidence of significant legal training. Thus, the court's benchmark ruling

in *Coleman* simply does not apply where the Texas Court of Criminal Appeals fails in its duties to present appropriate argument and analysis to justify its conclusion. Thus, this court should at the very least conduct a de novo review.

## IV.   OBJECTION TO CLAIMS TWENTY FOUR AND TWENTY FIVE

In claims Twenty Four and Twenty Five, Aguilar contends that the Texas Court of Criminal Appeals is biased as an institution when it ruled on the direct appeal. It is interesting to note that the Texas Court of Criminal Appeals did not explain why a quotation that did not appear in the actual trial but appears in the State's record does not amount to institutional bias. However, the Magistrate's opinion fails to recognize the fact that the Texas Court of Criminal Appeals did not permit neutral third party judges to evaluate their credibility, but rather that the court ruled and judged itself.

Recently, in the case of *Wiggins v. Smith*, 539 U.S. ___ (2003), this very issue came before the United States Supreme Court. In *Wiggins*, the Court below based its conclusion that the trial counsel had done a job worthy of the standard in *Strickland v. Washington* and based it on that decision on a "clear factual basis." (Slip op, at 15). The Supreme Court held "[a]s the State and the United States now concede, the records contain no mention of sexual abuse, much less the repeated molestations and rapes of petitioner detailed in the Selvog report. Brief for Respondents 22; Brief for United States as *Amicus Curiae* 26; App. to Pet. for Cert. 175a–179a, 190a. The state court's assumption that the records documented instances of this abuse has been shown to be incorrect by "clear and convincing evidence," 28 U.S.C. §2254(e)(1), and reflects "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," §2254(d)(2). This partial

reliance on an erroneous factual finding further highlights the unreasonableness of the state court's decision.

Thus, *Wiggins* holds that a state court acts unreasonably when it relies on facts that are not contained in the record. In this case, as detailed in both the original writ of habeas corpus as well as the objections and is conceded by the Texas Court of Criminal Appeals, the testimony of Mr. Albino Garcia simply did not exist in the record. Thus, we believe that *Wiggins* now supports the proposition that the Court of Criminal Appeals should have been recused and this matter decided by a different body.

As a result, the Twenty Fourth and Twenty Fifth Claims are ripe for a Certificate of Appealability because the court did not provide sufficient analysis to justify its reasoning and it was raised as early as possible moment after it was discovered.

## V.    **FAILURE TO APPOINT EXPERTS**

In Claim Three, Aguilar contends that the trial court felt to appoint a ballistics expert to testify on behalf on this violated due process of law. The Magistrate and the Court faults Aguilar for failing to attach an affidavit from an expert or a portion of a learned treatise supporting the argument that a ballistics expert could have made a difference. In this case, a review of the transcript reveals that it is undisputed that the state's ballistics expert could not say that the gun, which was introduced at trial, in fact fired the fatal bullets. Given the fact that Aguilar's defense was that he did not do it, it is clear that a defense expert who could have analyzed the gun and come to perhaps a different conclusion would have been seminal to the case. This is not the type of information readily ascertainable in books or treatises and without funds no expert would issue such an affidavit. As a result, Aguilar respectfully asks for a Certificate of Appealability.

## VI.   PUBLICITY

In Aguilar's Fourth Claim for Relief, he contends he is prejudiced by two news paper articles that appeared during jury selection.  The Magistrate and the Court goes through the analysis found in *United States v. Aragon*, 962 F.2d 439, 433-44 (5th Cir. 1992) and finds the fact that the first prong that the publicity as prejudicial was met.  As the Magistrate himself recognizes, ". . . while it is not clear from the record how likely jurors were to have seen the articles, Aguilar conceded in his argument for a mistrial that the court instructed the jurors not to read anything about the case."  However, while the trial court offered Aguilar the opportunity to conduct individual voir dire on the subject, and Aguilar did not take advantage of the opportunity, this at the very least raises spectrum in effect of this instance and a Certificate of Appealability should be granted.

## VII.   SUFFICIENCY OF THE EVIDENCE SUPPORTING THE JURY'S FINDING THAT AGUILAR WAS A PARTY TO THE SECOND MURDER

In Claims Five and Six, Aguilar contends that the evidence was insufficient to support the jury's finding that he was a party to the murder of Leo Chavez, Sr., and the finding that he was responsible as a party violated his rights to due process.  As the court points out, the sufficiency of evidence is a mixed question of law and fact.  While the magistrate judge applied the correct standard under *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), the U.S. Court held that, "the relevant question is whether after reviewing the evidence in the light most favorable to the prosecution, any rational trial fact could have found the essential elements of the crime beyond a reasonable doubt."  While Aguilar concedes that he may have had a motive to kill the people in Rick Esparza's trailer, it is interesting to note that this theory is literally turned on its head because Quiroz was the first person to actually shoot and then throw the gun to Aguilar.  The eye witness does not indicate nor

does the record reflect that there was any action taken by Aguilar, which could lead any reasonable person to the conclusion that he in fact intended for both people to die. Rather, it would appear that once Quiroz fired the fatal bullet, at the very best Aguilar decided to follow suite. However, as the state will not doubt argue, Aguilar maintains he is completely innocent of either crime. Thus taking with what one is left with it would appear that there is no evidence, circumstantial or otherwise, which would indicate that it was Aguilar's desire to see the murders accomplished. The question of delving into Mr. Aguilar's motives is simply fruitless because there are numerous motives which would indicate that Aguilar did not wish to see the people in Rick Esparza's trailer killed.

## VIII.  CONSTITUTIONALITY OF THE TEXAS DEATH PENALTY STATUTE

In Claims Fourteen and Fifteen, Aguilar claimed that the Texas death penalty statute is unconstitutionally vague because the special issues the jury must answer in assessing a defendant's penalty do not define the terms "reasonable expectation," and "probablility." Given the status of the case law, Aguilar believes that a Certificate of Appealability is ripe.

In regards to the remaining Claims for Relief, Aguilar incorporates by reference his prior briefing and objects for the reasons given therein.

Respectfully submitted,

SERGI & ASSOCIATES, P.L.L.C.
109 East Hopkins, Suite 200
San Marcos, Texas 78666
Telephone: (512) 392-5010/Fax: (512) 392-5042

BY:

David K. Sergi
Attorney for Jesus Ledesma Aguilar
State Bar No. 18036000

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing was mailed on June 25, 2004 via

first-class mail to:

Ms. Katherine Hayes
Assistant Attorney General
Texas Attorney General's Office
P.O. Box 12548
Austin TX 78711

DAVID K. SERGI